**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
David J. Sheehan
Timothy S. Pfeifer
Keith R. Murphy
Denise D. Vasel
Marco Molina
George Klidonas

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL)<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor, | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>v.<br><br>SONJA KOHN a/k/a SONJA BLAU KÔHN a/k/a SONJA BLAU a/k/a SINJA KÔHN a/k/a SINJA BLAU a/k/a SINJA TÜRK, ERWIN KOHN, NETTY BLAU, ROBERT ALAN KOHN, RINA HARTSTEIN (NÉE KOHN), MOISHE HARTSTEIN, | Adv. Pro. No. [_____] (BRL)<br><br><br><br>**COMPLAINT** |

MORDECHAI LANDAU, ERKO, INC.,
EUROVALEUR, INC., INFOVALEUR, INC.,
TECNO DEVELOPMENT & RESEARCH S.R.L.,
TECNO DEVELOPMENT & RESEARCH LTD.,
SHLOMO (MOMY) AMSELEM, HASSANS
INTERNATIONAL LAW FIRM, HERALD ASSET
MANAGEMENT LTD., 20:20 MEDICI AG f/k/a
BANK MEDICI AG, PETER SCHEITHAUER,
ROBERT REUSS, UNICREDIT BANK AUSTRIA
AG, GERHARD RANDA, STEFAN ZAPOTOCKY,
BANK AUSTRIA WORLDWIDE FUND
MANAGEMENT LTD., URSULA RADEL-
LESZCZYNSKI, UNICREDIT S.P.A.,
ALESSANDRO PROFUMO, PIONEER GLOBAL
ASSET MANAGEMENT, S.P.A., et al.,

Defendants.

# TABLE OF CONTENTS

DEFENDANT MEMBERS OF THE MEDICI ENTERPRISE ................................... 1

THE ILLEGAL SCHEME AND THE MEDICI ENTERPRISE ................................ 5

The Illegal Scheme ................................ 5

The Medici Enterprise ................................ 6

The RICO Violations ................................ 7
    Madoff's Secret Kickbacks to Kohn ................................ 7
    Kohn and Her Family Also Drew Stolen Money Directly from
    BLMIS ................................ 8
    The Medici Enterprise Profits from Feeding Investors' Money Into
    the Ponzi Scheme ................................ 9
    Bank Medici Is Kohn ................................ 10
    Herald Asset Management Is Kohn ................................ 11
    Kohn Anticipates the Collapse of BLMIS ................................ 13

THE TRUSTEE'S POWER AND RICO STANDING ................................ 15

THE SIPA LIQUIDATION ................................ 16

THE PONZI SCHEME THAT THE ILLEGAL SCHEME FED ................................ 18

PARTIES ................................ 21
    The Trustee ................................ 21

Defendants: The Medici Enterprise ................................ 23
    Kohn Family Defendants ................................ 23

Kohn's Sham Entity Defendants ................................ 27
    Kohn's New York Sham Entity Defendants ................................ 27
    Kohn's Cayman Sham Entity Defendants ................................ 29
    Kohn's Italian Sham Entity Defendants ................................ 31
    Kohn's Gibraltar Sham Entity Defendants ................................ 32
    Kohn's Austrian Sham Entity Defendants ................................ 34

Bank Medici Defendants ................................ 35
    Bank Medici Corporate Defendants ................................ 35
    Bank Medici Individual Defendants ................................ 40

Financial Institution Defendants ................................ 45
    Bank Austria Corporate Defendants ................................ 45
    Bank Austria Individual Defendants ................................ 47
    UniCredit Corporate Defendants ................................ 52
    UniCredit Individual Defendants ................................ 54

**Kohn's Holding Company Defendants** .......................................................................... 55

**John and Jane Does 1-100** ........................................................................................ 57

**Non-Defendant Bad Actors** ...................................................................................... 58

**Bernard L. Madoff Investment Securities** .................................................................. 58

**Cohmad Securities Corporation** ............................................................................... 58

**Madoff Securities International Ltd.** ......................................................................... 58

**Medici Enterprise Feeder Funds** ............................................................................... 59

**Pioneer Global Asset Management S.p.A. Agents** ..................................................... 60

**Kohn Slush Fund Recipient** ..................................................................................... 60

**Bank Medici Agents** ................................................................................................ 60

**Eurovaleur Agents** .................................................................................................. 60

**Kohn's Other New York Agents** ................................................................................ 60

**KOHN, MADOFF, AND THE ILLEGAL SCHEME** ................................................. 61
    Sonja Kohn in Europe ........................................................................................ 61
    The Kohn Family Moves to New York and Meets Madoff ................................. 62
    Kohn and Madoff's Special Relationship ........................................................... 63
    Madoff Pays Kohn for Bringing Accounts into BLMIS ..................................... 63
    Kohn and Madoff's Secret Payment Structure ................................................... 64
    Kohn and the Medici Enterprise Sustained the Ponzi Scheme ........................... 65

**KOHN, HER FAMILY, AND THE MEDICI ENTERPRISE** ..................................... 66
    Kohn's Husband Erwin ...................................................................................... 67
    Kohn's Mother Netty Blau .................................................................................. 69
    Kohn's Son-in-Law Moishe Hartstein .................................................................. 69
    Kohn's Daughter Rina Hartstein ......................................................................... 70
    Kohn's Son-in-Law Mordechai Landau ............................................................... 71
    Kohn's Son Robert Alan Kohn ........................................................................... 71

**KOHN INITIATES THE ILLEGAL SCHEME IN NEW YORK** ................................ 72
    Kohn's Sham Entities and Her Secret Kickbacks from Madoff ........................... 72
    Infovaleur ........................................................................................................... 73
    Erko .................................................................................................................... 74
    Tecno Italy .......................................................................................................... 75
    Tecno Gibraltar ................................................................................................... 76

**THE NEW YORK GENESIS OF THE MEDICI ENTERPRISE** ............................ 77
    Kohn Solicits Her First Account for Madoff Through Windsor........................ 78
    Kohn Launches Eurovaleur in New York to Help BLMIS Reach
    into Europe ................................................................................................... 79
    Kohn Solicits Foreign Investors in New York Through Eurovaleur ................. 81
    Kohn, Eurovaleur, and Bank Austria ............................................................. 83
    Primeo Fund: The First of the Medici Enterprise Feeder Funds ...................... 84
    Primeo Fund ................................................................................................. 84

**SONJA KOHN RETURNS TO EUROPE TO CREATE BANK
MEDICI** ........................................................................................................... 86
    Kohn, BA Worldwide, and Primeo Fund......................................................... 86
    Kohn Facilitates Bank Austria's BLMIS Account ........................................... 87
    Bank Austria's BLMIS Account Received Fictitious Profits ............................. 88
    Kohn Announces the Expansion of Primeo Fund ............................................. 88

**BANK MEDICI**................................................................................................... 88
    Bank Austria and Kohn Create a Special Purpose Vehicle to Sell
    Access to BLMIS ........................................................................................... 88
    Bank Austria Willingly Participates in the Illegal Scheme ................................ 90
    Bank Medici's Banking License Furthers the Illegal Scheme........................... 91
    Bank Medici Creates Its Own Investment Vehicles ........................................... 91
    Herald Asset Management ............................................................................... 93
    The Expansion of Herald Fund ....................................................................... 94
    Bank Medici Distributes Herald Fund Through Its Branches and
    Affiliates ....................................................................................................... 94
    Medici S.r.l..................................................................................................... 95
    Medici Cayman .............................................................................................. 95
    Bank Medici Gibraltar .................................................................................... 95
    MediciFinanz and APM Cayman...................................................................... 95
    Sofipo ............................................................................................................ 97

**OTHER MEDICI ENTERPRISE FEEDER FUNDS**..................................... 98
    Alpha Prime Fund .......................................................................................... 98
    Senator Fund ................................................................................................. 98

**COUNSEL TO THE MEDICI ENTERPRISE** ....................................... 100
    Kohn Conceals Her Ownership of HAM ........................................................ 100
    Tecno Gibraltar and Hassans ......................................................................... 101
    Hassans Creates and Hosts Bank Medici Gibraltar .......................................... 101
    Kohn Receives Kickbacks from Madoff Care of Hassans................................. 101

**UNICREDIT FORMALIZES ITS ROLE IN THE MEDICI ENTERPRISE** ........................................................................... **102**
    Kohn Facilitates UniCredit's Acquisition of Bank Austria ................................ 102
    UniCredit Participates in the Illegal Scheme Despite Its Concerns About BLMIS ....................................................................................... 102
    UniCredit Conspires with Kohn to Conceal Its Madoff Investment .................. 103
    UniCredit and Kohn Use Eurovaleur, Sofipo, and HAM to Effect This Deception ...................................................................................... 103
    UniCredit Becomes a Full Member of the Medici Enterprise ........................... 105

**KOHN ANTICIPATES THE COLLAPSE OF BLMIS** ............................................ **106**
    Herald (Lux): The Last Medici Enterprise Feeder Fund ................................. 106
    Kohn Attempts to "Diversify" Bank Medici ..................................................... 107
    The Impending Collapse of BLMIS .................................................................. 108
    Kohn Conceals the Proceeds of the Illegal Scheme .......................................... 108
    Kohn Conspires to Conceal Bank Medici's Involvement with Madoff ........................................................................................................ 109

**KOHN CONTINUES TO DIRECT THE MEDICI ENTERPRISE** ........................ **111**

**THE ILLEGAL SCHEME TRANSFERS** .................................................................... **111**
    The Fraudulent Sham Entity Transfers ............................................................. 112
    The Preference Period Sham Entity Transfers ................................................... 114
    The Fraudulent Bank Austria Transfers ............................................................ 115
    The Herald Fund Subsequent Transfers ............................................................ 115

**CAUSES OF ACTION** ............................................................................................... **117**

**COUNT ONE: CIVIL RACKETEERING – 18 U.S.C. § 1962(c)** ........................... **117**
    Against All Defendants ...................................................................................... 117

**COUNT TWO: CIVIL RACKETEERING – 18 U.S.C. § 1962(d)** .......................... **120**
    Against All Defendants ...................................................................................... 120

**COUNT THREE: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a), AND 551** ......................... **122**
    Against Infovaleur and Tecno Gibraltar .......................................................... 122

**COUNT FOUR: PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) 11 U.S.C. §§ 547(b), 550(a), AND 551** ......................... **124**
    Against Kohn, Eurovaleur, E. Kohn, R. Kohn, M. Hartstein, R. Hartstein, Scheithauer, M-Tech, APM Cayman, Palladium, Amselem, and Reuss ............................................................................................ 124

**COUNT FIVE:  PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) 11 U.S.C. §§ 547(b), 550(a), AND 551** ............................................ 125

    Against Bank Medici, HAM, Kohn, Medici Cayman, APM Cayman, Pioneer, Hassans, Sofipo, de Sury, and Mugnai ................................. 125

**COUNT SIX:  FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551** ............................................................. 127

    Against Infovaleur, Tecno Gibraltar, and Tecno Italy ...................................... 127

**COUNT SEVEN:  FRAUDULENT TRANSFER – 11 U.S.C.  §§ 548(a)(1)(B), 550(a), AND 551** ............................................................. 128

    Against Infovaleur, Tecno Gibraltar, and Tecno Italy ...................................... 128

**COUNT EIGHT:  FRAUDULENT TRANSFER – N.Y. DCL §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551** .......................... 129

    Against Infovaleur, Tecno Gibraltar, and Tecno Italy ...................................... 129

**COUNT NINE:  FRAUDULENT TRANSFER – N.Y. DCL §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551** ........................... 130

    Against Infovaleur, Tecno Gibraltar, and Tecno Italy ...................................... 130

**COUNT TEN:  FRAUDULENT TRANSFER – N.Y. DCL §§274, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551** ............................................... 131

    Against Infovaleur, Tecno Gibraltar, and Tecno Italy ...................................... 131

**COUNT ELEVEN:  FRAUDULENT TRANSFER – N.Y. DCL §§ 275, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551** ...................................... 132

    Against Infovaleur, Tecno Gibraltar, and Tecno Italy ...................................... 132

**COUNT TWELVE:  RECOVERY OF ALL FRAUDULENT TRANSFERS – N.Y.  CPLR 203(g), 213(8), N.Y. DCL §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551** ..................................... 133

    Against Bank Austria and the Sham Entity Transferee Defendants ................... 133

**COUNT THIRTEEN:  RECOVERY OF SUBSEQUENT TRANSFERS –N.Y.  DCL §§ 273-279 AND 276-a AND 11 S.C. § 544, 548, 550(a), AND 551** .................................................................................. 134

    Against Sham Entity Subsequent Transferee Defendants .................................. 134

**COUNT FOURTEEN: RECOVERY OF FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551** ............................................................. 135

    Against Herald Fund Subsequent Transferee Defendants ................................. 135

**COUNT FIFTEEN: RECOVERY OF FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551** ............................................................................................... **137**

    Against Herald Fund Subsequent Transferee Defendants ................................. 137

**COUNT SIXTEEN: RECOVERY OF FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - N.Y. DCL §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551** ........................................... **139**

    Against Herald Fund Subsequent Transferee Defendants ................................. 139

**COUNT SEVENTEEN: FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) N.Y. DCL §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551** ............................... **140**

    Against Herald Fund Subsequent Transferee Defendants ................................. 140

**COUNT EIGHTEEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) N.Y. DCL §§ 274, 278, AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551** ............................................... **142**

    Against Herald Fund Subsequent Transferee Defendants ................................. 142

**COUNT NINETEEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) N.Y. DCL §§ 275, 278, AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551** ............................................... **143**

    Against Herald Fund Subsequent Transferee Defendants ................................. 143

**COUNT TWENTY:  UNJUST ENRICHMENT** ......................................................... **145**

    Against All Defendants .................................................................................... 145

**COUNT TWENTY-ONE:  CONVERSION** ............................................................. **146**

    Against All Defendants .................................................................................... 146

**COUNT TWENTY-TWO:  MONEY HAD AND RECEIVED** ................................ **146**

    Against All Defendants .................................................................................... 146

**DEMAND FOR RELIEF** .......................................................................................... **147**

# DEFENDANT MEMBERS OF THE MEDICI ENTERPRISE

All "Defendants" in this action, as set forth below, are members of the "Medici Enterprise" as defined herein.  Defendants are grouped according to their main affiliation in the Medici Enterprise, and are depicted graphically in <u>Exhibit A</u>, attached hereto:

A.    Kohn Family Defendants

      1.    Sonja Kohn ("Kohn")
      2.    Erwin Kohn ("E. Kohn")
      3.    Netty Blau ("Blau")
      4.    Moishe Hartstein ("M. Hartstein")
      5.    Rina Hartstein ("R. Hartstein")
      6.    Mordechai Landau ("Landau")
      7.    Robert Alan Kohn ("R. Kohn")

B.    Kohn Sham Entity Defendants

      1.    Kohn's New York Sham Entity Defendants

            a.    Erko, Inc. ("Erko")
            b.    Eurovaleur, Inc. ("Eurovaleur")
            c.    Infovaleur, Inc. ("Infovaleur")
            d.    Robert Reuss ("Reuss")
            e.    Palladium Capital Advisors LLC ("Palladium")
            f.    Windsor IBC, Inc. ("Windsor")

      2.    Kohn's Cayman Sham Entity Defendants

            a.    Herald Asset Management Ltd. ("HAM")
            b.    Franco Mugnai ("Mugnai")
            c.    Paul de Sury ("de Sury")
            d.    Daniele Cosulich ("Cosulich")

      3.    Kohn's Italian Sham Entity Defendants

            a.    Tecno Development & Research S.r.l. ("Tecno Italy")
            b.    Mariadelmar Raule ("Raule")

      4.    Kohn's Gibraltar Sham Entity Defendants

            a.    Tecno Development & Research Ltd. ("Tecno Gibraltar")
            b.    Shlomo (Momy) Amselem ("Amselem")

      5.    Kohn's Austrian Sham Entity Defendants

            a.    Sofipo Austria GmbH ("Sofipo")
            b.    M-Tech Services GmbH ("M-Tech")

C. Bank Medici Defendants

    1. Bank Medici Corporate Defendants

        a. Bank Medici AG ("Bank Medici")
        b. Absolute Portfolio Management Ltd. ("APM Cayman")
        c. MediciFinanz Consulting GmbH ("MediciFinanz")
        d. Medici S.r.l. ("Medici S.r.l.")
        e. Medici Cayman Islands Ltd. ("Medici Cayman")
        f. Bank Medici AG (Gibraltar) ("Bank Medici Gibraltar")
        g. Hassans International Law Firm ("Hassans")
        h. ReviTrust Services Est. ("Revi")

    2. Bank Medici Individual Defendants

        a. Peter Scheithauer ("Scheithauer")
        b. Helmuth Frey ("Frey")
        c. Manfred Kastner ("Kastner")
        d. Josef Duregger ("Duregger")
        e. Andreas Pirkner ("Pirkner")
        f. Werner Tripolt ("Tripolt")
        g. Andreas Schindler ("Schindler")

D. Financial Institution Defendants

    1. Bank Austria Corporate Defendants

        a. UniCredit Bank Austria AG ("Bank Austria")
        b. Bank Austria Worldwide Fund Management Ltd. ("BA Worldwide")
        c. Bank Austria Cayman Islands Ltd. ("Bank Austria Cayman")

    2. Bank Austria Individual Defendants

        a. Gerhard Randa ("Randa")
        b. Friedrich Kadrnoska ("Kadrnoska")
        c. Stefan Zapotocky ("Zapotocky")
        d. Ursula Radel-Leszczynski ("Radel-Leszczynski")
        e. Werner Kretschmer ("Kretschmer")
        f. Wilhelm Hemetsberger ("Hemetsberger")
        g. Harald Nograsek ("Nograsek")

    3. UniCredit Corporate Defendants

        a. UniCredit S.p.A. ("UniCredit")
        b. Pioneer Global Asset Management S.p.A. ("Pioneer")

4. UniCredit Individual Defendants

        a. Alessandro Profumo ("Profumo")
        b. Gianfranco Gutty ("Gutty")

E. Kohn's Holding Company Defendants

    1. Brera Servizi Aziendiale S.r.l. ("Brera")
    2. Redcrest Investments, Inc. ("Redcrest")
    3. Line Group Ltd. ("Line Group")
    4. Line Management Services Ltd. ("Line Management")
    5. Line Holdings Ltd. ("Line Holdings")
    6. Herald Consult Ltd. ("Herald Consult")

F. John and Jane Doe Defendants 1-100

**The relevant Non-Defendant Bad Actors are grouped according to their main affiliation:**

G. Bernard L. Madoff Investment Securities LLC

    1. Bernard L. Madoff Investment Securities LLC ("BLMIS")

        a. Bernard L. Madoff ("Madoff")
        b. Frank DiPascali ("DiPascali")

    2. Cohmad Securities Corporation ("Cohmad")

        a. Cohmad Securities Corporation
        b. Maurice (Sonny) Cohn ("Cohn")

    3. Madoff Securities International Ltd. ("MSIL")

        a. Leon Flax ("Flax")
        b. Steven Raven ("Raven")

H. Medici Enterprise Feeder Funds

    1. Primeo Fund ("Primeo Fund")
    2. Thema International Fund plc ("Thema International")
    3. Alpha Prime Fund Ltd. ("Alpha Prime Fund")
    4. Herald Fund SPC ("Herald Fund")
    5. Senator Fund SPC ("Senator Fund")
    6. Herald (Lux) SICAV ("Herald (Lux)")

I. Pioneer Agents

    1. Alberto La Rocca ("La Rocca")
    2. Paul Tiranno ("Tiranno")

J.      Kohn's Slush Fund Recipient

      1.      Gerila Beteiligungsverwaltungs GmbH ("Gerila")

K.      Bank Medici Agents

      1.      Alexandra Lavi ("Lavi")
      2.      Susanne Giefing ("Giefing")
      3.      Medici Realty Ltd. ("Medici Realty")
      4.      FundsWorld Financial Services Ltd. ("FundsWorld")

L.      Eurovaleur Agents

      1.      Anne Kritzer ("Kritzer")
      2.      Thomas Grasso ("Grasso")

M.      Kohn's Other New York Agents

      1.      Medici Fund Management Company, Inc. ("Medici Fund Management")
      2.      Medici Finance Services, Inc. ("Medici Finance Services")

Plaintiff Irving H. Picard (the "Trustee"), as Trustee for the liquidation of the business of BLMIS and the substantively consolidated estate of Madoff under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa et seq. ("SIPA"), by his undersigned counsel, submits this Complaint and accompanying RICO Case Statement (which this Complaint incorporates by reference) based on the information currently available to the Trustee. Given the scope of Madoff's Ponzi scheme (the "Ponzi scheme"), the deceptive nature of Defendants,[1] and the deliberately Byzantine structure of the Medici Enterprise (as defined below), certain information about the Illegal Scheme (as defined below) has been purposefully concealed from the Trustee (and the United States and certain U.S. and foreign law enforcement and regulatory agencies) and will only become available through discovery. The Trustee reserves his right to amend this Complaint and accompanying RICO Case Statement as information is learned and discovery is obtained.

## THE ILLEGAL SCHEME AND THE MEDICI ENTERPRISE

### The Illegal Scheme

1.     For more than twenty years, Kohn masterminded a vast illegal scheme (the "Illegal Scheme") to exploit her privileged relationship with Madoff to feed over $9.1 billion of other people's money into his Ponzi scheme. The Illegal Scheme enriched Kohn, her family, and scores of other individuals and entities, including the largest banks in Austria and Italy, at the expense of the BLMIS estate and on the backs of Madoff's victims.

---

[1] The Trustee asserts against Hassans only U.S. and New York State bankruptcy claims in relation to its receipt of transfers from Kohn, via HAM. All references herein to "Defendants" or "All Defendants" in relation to all non-bankruptcy claims does not include Hassans.

2.      The Illegal Scheme began when Kohn met Madoff in New York in or around 1985, continued through Madoff's confession on December 11, 2008, and, on information and belief, is still ongoing.  Although the Illegal Scheme is distinct from Madoff's Ponzi scheme, they are symbiotic, and have thrived off of each other.

3.      To potential BLMIS investors, Kohn held herself out as extremely close to Madoff and suggested that their special relationship yielded special returns on investments through BLMIS.  In fact, Madoff secretly paid Kohn in exchange for feeding money into the Ponzi scheme.  This agreement between Kohn and Madoff was kept secret, and was unknown even to many within BLMIS.  All the while, Kohn operated as a BLMIS insider and knew that Madoff was a fraud.

4.      The Illegal Scheme fed, perpetuated, and profited from the Ponzi scheme and grew alongside it as the Ponzi scheme grew.  Like the Ponzi scheme, the Illegal Scheme metastasized beyond its core in New York.  As it reached out to draw money to New York, the Illegal Scheme enriched the Defendants in New York, Austria, Italy, Gibraltar, and elsewhere.

### The Medici Enterprise

5.      The Medici Enterprise is a deliberately complex association-in-fact that Kohn conceived in, and largely directed from, New York (the "Medici Enterprise").  All Defendants are members of the Medici Enterprise.  To date, the Trustee has identified fifty-six other individual and corporate members of the Medici Enterprise that acted in concert with Kohn to perpetrate the Illegal Scheme.  These include Kohn, at least six members of her family, her Sham Entities in New York and elsewhere, Bank Medici, Bank Austria, UniCredit, and dozens of trusts and nominee companies established under the laws of many different countries to further and conceal the Illegal Scheme.

### The RICO Violations

6.      In furtherance of the Illegal Scheme, Kohn and her co-conspirators engaged in a pattern of predicate acts in furtherance of the Illegal Scheme of which the Trustee pleads over 8,000. These predicate acts constitute violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq., ("RICO"), specifically RICO §§ 1962(c) and (d).

7.      Defendants' twenty-year pattern of racketeering activity is comprised of repeated and related predicate acts of: (i) money laundering in violation of 18 U.S.C. § 1956; (ii) engaging in monetary transactions in property derived from specific unlawful activity in violation of 18 U.S.C. § 1957; (iii) wire fraud in violation of 18 U.S.C. § 1343; (iv) financial institution fraud in violation of 18 U.S.C. § 1344; (v) mail fraud in violation of 18 U.S.C. § 1341; and/or (vi) interstate and international travel in violation of the Travel Act, 18 U.S.C. § 1952.

8.      No Ponzi scheme can survive without a constant influx of fresh capital, and the Illegal Scheme provided a flood of cash for Madoff. The total lost in the Ponzi scheme is approximately $19.6 billion in net investor deposits, and without Kohn's Illegal Scheme, the Ponzi scheme could not have continued for as long as it did. The Trustee seeks to recover the $19.6 billion in damages to the business and property of the BLMIS estate caused by the Illegal Scheme, to be trebled under RICO.

### Madoff's Secret Kickbacks to Kohn

9.      Kohn contrived to profit from the Ponzi scheme without exposure to its inevitable collapse. Kohn's theft of Customer Property[2] from the BLMIS estate began as

---

[2] SIPA § 78 *lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds

early as 1987 and continued at least quarterly until Madoff confessed that he was running a Ponzi scheme.

10.     As Kohn built the Medici Enterprise into a wholesale operation, Madoff secretly paid Kohn at least $62 million in secret kickbacks for bringing investors into BLMIS.  On information and belief, Madoff paid Kohn far more.  Madoff kept internal records that noted which accounts were attributable to Kohn.  Madoff appears to have destroyed these records of his agreement with Kohn before he confessed on December 11, 2008.  Certain former employees, however, kept copies of such records.

**Kohn and Her Family Also Drew Stolen Money Directly from BLMIS**

11.     Kohn arranged to receive money that Madoff stole by setting up an elaborate network of companies in New York and elsewhere that existed solely to receive kickbacks from Madoff.

12.     At the same time, Kohn took calculated measures to distance herself and her family from the Ponzi scheme.  Although Kohn and her co-conspirators fed billions of dollars of other people's money into the Ponzi scheme, neither Kohn nor any member of her family ever established a direct account with BLMIS.

13.     To disguise her receipt of payments from Madoff, Kohn devised a sham invoicing system that had no connection to Kohn's actual activities -- soliciting investors for Madoff, and feeding their money into BLMIS.  Kohn invoiced Madoff for fabricated "market research" that was summarily ignored and destroyed by Madoff's employees. Madoff did not pay Kohn for her sham invoices in the manner that BLMIS paid its actual vendors.  Rather, Madoff indicated that Kohn's sham invoices were paid as "BLM Special."

of any such property transferred by the debtor, including property of unlawfully converted."

14.     Madoff's "BLM Special" designation was for payments that had nothing to do with the purported business of BLMIS.  It was used for gifts to family members, forgiven loans to friends, payment of personal expenses, and charitable contributions.  Madoff's payments to Kohn were not for services rendered.  Rather, they were kickbacks for Kohn's solicitation of investors' money to fuel and sustain the Ponzi scheme.

15.     This was the "Money-Out" component of the Illegal Scheme, depicted graphically in <u>Exhibit</u> <u>B</u>.

### The Medici Enterprise Profits from Feeding Investors' Money Into the Ponzi Scheme

16.     The Illegal Scheme fed at least $9.1 billion of other people's money into the Ponzi scheme.  Kohn and the Medici Enterprise fed almost $4 billion of this total through the following so-called feeder funds into BLMIS, including Primeo Fund, Thema International, Herald Fund, Alpha Prime Fund, Senator Fund, and Herald (Lux) (together, the "Medici Enterprise Feeder Funds").  Although each of the Medici Enterprise Feeder Funds had nominally different operating structures or regulatory regimes, they were functionally identical, as each was invested exclusively through BLMIS.

17.     Primeo Fund fed at least $371 million, Thema International fed over $1 billion, Herald Fund fed at least $1.5 billion, Alpha Prime Fund fed almost $400 million, Senator Fund fed at least $247 million, and Herald (Lux) fed at least $255 million into the Ponzi scheme.

18.     Members of the Medici Enterprise conspired to conceal the fact that each Medici Enterprise Feeder Fund was 100% invested with BLMIS.  To bolster this deception, certain of the Medici Enterprise Feeder Funds invested in each other.  This allowed Kohn and her co-conspirators to avoid regulatory and investor scrutiny, fostered

the illusion of diversification, and disguised the fact that UniCredit, Bank Austria, Bank Medici, HAM, and other members of the Medici Enterprise did nothing but feed money into BLMIS through the nominally different Medici Enterprise Feeder Funds.

19.     Kohn, Eurovaleur, Bank Medici and its branches, HAM, and at least thirty other members of the Medici Enterprise sold the Medici Enterprise Feeder Funds around the world and all took a cut of their fake returns.  For over fifteen years, the Medici Enterprise Feeder Funds generated hundreds of millions of dollars in "retrocession fees," "management fees," "distribution fees," and other illicit proceeds of the Illegal Scheme for Kohn, Bank Medici, Bank Austria, BA Worldwide, UniCredit, HAM, and other members of the Medici Enterprise.

20.     Kohn solicited at least thirty direct BLMIS accounts for Madoff.  These include not only the Medici Enterprise Feeder Funds but, among others, Harley International (Cayman) Ltd. ("Harley"), Plaza Investments International ("Plaza"), and Optimal Multiadvisors Ltd. ("Optimal").  Harley fed over $2.3 billion into the Ponzi scheme.  Plaza fed over half a billion dollars into the Ponzi scheme.  Optimal fed over $1.6 billion into the Ponzi scheme.

21.     Feeding money into BLMIS while generating hundreds of millions of dollars in illegal proceeds for the members of the Medici Enterprise was the crux of the "Money-In" component of the Illegal Scheme, as depicted graphically in Exhibit C.  The "Money-Out" and "Money-In" components of the Illegal Scheme were entirely interdependent, coextensive, and concurrent.

### Bank Medici Is Kohn

22.     Kohn established Bank Medici in Austria as a mechanism to solicit investors for the Ponzi scheme in New York.  Although Bank Medici purported to be a

licensed and regulated bank in Vienna, it acted, under the protective aegis of Bank Austria, as an alter ego of Kohn. Bank Austria lent Kohn and Bank Medici the imprimatur of legitimacy they needed to begin soliciting investors for BLMIS on a breathtaking scale. For this, Bank Austria took its share of the proceeds of the Illegal Scheme. Bank Austria, for its various roles in the Illegal Scheme, received at least $31 million, and on information and belief, many times this amount, not including the fictitious profits it took from its direct account at BLMIS.

23.     Bank Medici had no banking infrastructure of its own. At all relevant times, it was a de facto branch of Bank Austria operating under the "Medici" name. All its accounts and portfolios were held and administered by Bank Austria, and Bank Medici had a revolving door with Bank Austria through which Bank Austria personnel staffed Bank Medici, even when such individuals had no relevant professional experience in Bank Medici's purported "fund of hedge funds" business. On information and belief, Kohn prohibited all Bank Medici employees from revealing Madoff's involvement with any of the investments managed, marketed, or distributed by Bank Medici.

24.     In exchange for staffing and maintaining Bank Medici, Bank Austria received 25% plus one share of its stock. Kohn owns the balance. Bank Medici existed only to provide money to BLMIS, for which Madoff secretly paid Kohn through her Sham Entities. Bank Medici itself received at least $62 million in 2007 and 2008 alone for its role in the Illegal Scheme, and on information and belief, many times this amount over the course of the Illegal Scheme.

**Herald Asset Management Is Kohn**

25.     HAM, another of Kohn's alter egos, was the primary funding mechanism for the Medici Enterprise. Scheithauer, a former officer of Bank Austria, one of the

creators of Primeo Fund, a director of Herald (Lux), and CEO of Bank Medici, understood that Bank Medici could not exist without HAM. Scheithauer knew that Bank Medici did nothing in return for the money that Kohn, through HAM, paid it. In fact, Scheithauer characterized all of HAM's payments to Bank Medici as "a gift" from Kohn.

26. With stolen Customer Property and other proceeds of the Illegal Scheme, Kohn, HAM, and Bank Austria opened branded and de facto Bank Medici "branches" around the world. HAM purported to "manage" Herald Fund and siphoned approximately $100 million from its fake returns from 2004 to 2008. Over the course of the Illegal Scheme, HAM made over 142 transfers totaling at least $50 million to other members of the Medici Enterprise.

27. To investors in the Medici Enterprise Feeder Funds, HAM and Bank Medici both claimed that they, not Madoff or BLMIS, selected the individual equities that BLMIS pretended to purchase for investors. Bank Medici and HAM claimed that they ran Madoff's so-called "Split-Strike Conversion" strategy ("SSC Strategy"), and that BLMIS was merely an executing broker. UniCredit, Bank Austria, and Bank Medici were aware that HAM and Bank Medici did not perform these fictitious services.

28. Kohn, Zapotocky, Kretschmer, Hemetsberger, Radel-Leszczynski, and other representatives of Bank Medici, Bank Austria, and BA Worldwide frequently traveled to New York to seek the advice, counsel, and consent of Madoff and BLMIS on how to market, explain, and sell the Medici Enterprise Feeder Funds to potential investors.

29.     Together, they and other members of the Medici Enterprise conspired to reap hundreds of millions of dollars for services that they never performed and never intended to perform.

### Kohn Anticipates the Collapse of BLMIS

30.     As the Ponzi scheme approached its inevitable collapse on December 11, 2008, Kohn conspired to protect herself, her family, and key members of the Medici Enterprise.

31.     In the months leading up to and after Madoff's confession, Kohn directed certain members of the Medici Enterprise to conceal the proceeds of the Illegal Scheme, including stolen Customer Property.

32.     Just before Madoff confessed, Kohn directed Herald Fund to withdraw $536 million from BLMIS, including $423 million in one transfer on November 4, 2008. Kohn's associate, Giefing, executed Herald Fund's withdrawal on behalf of Kohn's HAM.  BLMIS's bank account at J.P. Morgan Chase held approximately $500 million the day before Herald Fund's $423 million withdrawal.  Herald Fund withdrew the other $113 million just a month before.  This $536 million is almost sixteen times the total that Herald Fund had ever withdrawn before.

33.     On information and belief, Kohn and her husband maintained personal bank accounts at Bank Medici.  Just days before Madoff confessed, Kohn directed her husband to withdraw all of their personal assets from any member of the Medici Enterprise, including Bank Austria, that had the potential to be exposed to liability for its participation in the Illegal Scheme.

34. On December 11, 2008 (the "Filing Date"),[3] Madoff was arrested by federal agents for violations of the criminal securities laws, including, _inter_ _alia_, securities fraud, investment adviser fraud, as well as mail and wire fraud. Contemporaneously, the United States Securities and Exchange Commission ("SEC") filed a complaint in the District Court that remains pending. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

35. On December 12, 2008, the international news media publicized Madoff's arrest around the world.

36. After Madoff's confession, Kohn (through at least HAM, Tecno Gibraltar, Infovaleur, and Eurovaleur) continued to direct transfers of stolen Customer Property and other proceeds of the Illegal Scheme to Hassans, E. Kohn, R. Hartstein, M. Hartstein, R. Kohn, de Sury, and Palladium.

37. Days after Madoff confessed, Kohn completed a transfer of almost $15 million to Hassans, counsel to key members of the Medici Enterprise. Kohn appears to have initiated this transfer immediately prior to Madoff's confession. Kohn directed millions of dollars in other such transfers before and after Madoff's confession. On information and belief, this dissipation is ongoing.

38. On information and belief, Kohn has not returned to New York (or the United States) since Madoff confessed. Rather, she has conducted and continues to conduct the affairs of the Medici Enterprise from Europe and elsewhere through her family and her New York instrumentalities Eurovaleur and Infovaleur.

---

[3] In this case, the "Filing Date" is the date on which the SEC commenced its suit against BLMIS, Dec. 11, 2008, which resulted in the appointment of a receiver for the firm. See SIPA § 78_lll_(7)(B).

39.     The Trustee seeks to recover all $19.6 billion in damages to the business and property of the BLMIS estate caused by Defendants' violations of RICO under 18 U.S.C. §§ 1964, et seq.  The Trustee is authorized to bring this action under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 544, 547, 548(a), 550(a), and 551 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York Debtor and Creditor Law ("N.Y. DCL") § 270 et seq.), New York Civil Practice Law and Rules ("N.Y. CPLR") 203(g) and 213(8), and other applicable law, for the avoidance and recovery of preferential and fraudulent conveyances, conversion, and unjust enrichment in connection with stolen Customer Property that BLMIS transferred, directly or indirectly, to the Defendants.  The Trustee seeks, among other things, to avoid the transfers, preserve and recover the stolen Customer Property for the benefit of the estate, and recover all damages and other proceeds of the Illegal Scheme from the Defendants in whatever form it may now, or in the future, exist.

## THE TRUSTEE'S POWER AND RICO STANDING

40.     This is an adversary proceeding brought in the Court in which the main underlying SIPA Proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending. The Securities Investor Protection Corporation ("SIPC") originally brought the SIPA Proceeding in the United States District Court for the Southern District of New York as Securities Exchange Commission v. BLMIS et al., No. 08 CV 10791 (the "District Court Proceeding").  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA §§ 78eee(b)(2)(A) and (b)(4).

41.     This is a core proceeding under 28 U.S.C. §(b)(2)(A), (F), (H), and (O).

42.     This Court has jurisdiction over the Trustee's claims for violations of RICO under 18 U.S.C. § 1964.

43.     Venue is proper in this judicial district under 18 U.S.C. § 1965, 28 U.S.C. § 1391, and 28 U.S.C. §§ 1408 and 1409(a).  The injury to the business and property of the BLMIS estate occurred in New York.  Kohn and other members of the Medici Enterprise:  (i) organized and directed the Illegal Scheme from, among other places, New York; (ii) fed the Ponzi scheme via BLMIS's bank account number xxxxxxxxxxx703 (the "703 Account") at J.P. Morgan Chase in New York; and (iii) drew secret kickbacks of stolen Customer Property from the 703 Account and from Madoff's Bank of New York Inc. account number xxxxxxxxxxx621 (the "621 Account").  Venue is also proper in this judicial district under 18 U.S.C. § 1965(b) because, to the extent that any Defendant may reside outside of this district, the ends of justice require such Defendant or Defendants to be brought before this Court.

## THE SIPA LIQUIDATION

44.     On December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

45.     On December 15, 2008, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging that, among other things, BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On that same date, under SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

46.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (the "Protective Decree") which, in pertinent part:

a.	appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

b.	appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3);

c.	removed the case to this Bankruptcy Court under SIPA § 78eee(b)(4); and

d.	removed the Receiver for BLMIS.

47.	By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

48.	At a plea hearing (the "Plea Hearing") on Mar. 12, 2009, in the case captioned United States v. Madoff, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." Id. at 23. On June 29, 2009, Madoff was sentenced to 150 years in prison, the maximum possible sentence for his crimes. Madoff began serving his sentence at a federal penitentiary in Butner, North Carolina on July 14, 2009.

49.	On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009 in the case entitled United States v. DiPascali, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11), DiPascali pled guilty to a ten-

count criminal information. Among other things, DiPascali admitted that Madoff had been operating a Ponzi scheme since at least the 1990s. Id. at 46.

## THE PONZI SCHEME THAT THE ILLEGAL SCHEME FED

50.     BLMIS was founded in 1959 by Madoff and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: investment advisory, market-making, and proprietary trading. The Illegal Scheme perpetuated and fed into (and off of) Madoff's investment advisory business (the "IA Business").

51.     Since at least the inception of the Illegal Scheme, Madoff ran the IA Business as a Ponzi scheme.

52.     Outwardly, Madoff ascribed the consistent success of the IA Business to his so-called SSC Strategy. Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the S&P 100 Index—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100 Index.

53.     HAM and Bank Medici claimed to select these stocks for certain of the Medici Enterprise Feeder Funds and that Madoff was merely their executing broker. Madoff also asserted that he would carefully time purchases and sales to maximize value and, correspondingly, BLMIS customers' funds would, intermittently, be out of the

equity markets.  While out of the market, those funds were purportedly invested in United States Treasury bills or in money market funds holding Treasury bills.

54.     The second part of Madoff's purported SSC Strategy was a supposed hedge of the stock purchases with S&P 100 Index option contracts.  Those option contracts functioned as a "collar," limiting both the potential gains and the potential losses on the basket of stocks.  Madoff purported to use proceeds from the sale of S&P 100 Index call options to finance the cost of purchasing S&P 100 Index put options.  Madoff also told IA Business customers that he would enter and exit the market between six and ten times each year.

55.     BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts.  Although Kohn avoided exposure to the Ponzi scheme by never having a direct account with BLMIS, she directed that duplicate copies of BLMIS's fabricated statements be sent to her as well as to certain BLMIS accountholders that she fed into the Ponzi scheme.  On information and belief, other key members of the Medici Enterprise, such as Bank Austria, UniCredit, Bank Medici, and HAM had access to every fabricated statement sent to the Medici Enterprise Feeder Funds as early as 1993.

56.     The securities purchases and sales shown in such account statements, of course, never occurred and the profits reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts.  In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy.  Madoff's SSC Strategy was entirely fictitious.

57.     At times prior to his arrest, Madoff generally assured customers and regulators that he purchased and sold the put and call options over-the-counter rather than through an exchange. Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold any of the options described in customer statements. The Options Clearing Corporation, which clears all exchange-listed option contracts based on the stocks of S&P 100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of any IA Business customers.

58.     The money BLMIS received from investors was never invested in stocks or options, but was used to pay for withdrawals by other customers, and to make other transfers. Such other transfers of this stolen Customer Property include those made directly to Kohn, who was not a customer of BLMIS. Over the course of the Illegal Scheme, Madoff made at least 100 direct transfers of stolen Customer Property to Kohn.

59.     The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers. The Illegal Scheme facilitated the Ponzi scheme's survival for over twenty years as it simultaneously depleted BLMIS's assets and enriched Kohn and other members of the Medici Enterprise.

60.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

61.     The Ponzi scheme continued until December 2008 when the requests for redemptions overwhelmed the flow of new investments and caused its inevitable collapse.  The Illegal Scheme, however, continued well after Madoff's confession and, on information and belief, may still be operating.  The members of the Medici Enterprise are, unlike Madoff and DiPascali, still at large.

62.     This and similar complaints are being brought to recover moneys paid to, or for the benefit of, BLMIS's customers, including moneys that were subsequently transferred by BLMIS's investors to other entities (and damages to the BLMIS estate) so that these recovered funds can be placed in the Customer Property fund and be distributed pro rata in accordance with SIPA § 78fff-2(c)(1).

63.     The billions that the Illegal Scheme fed into BLMIS kept the Ponzi scheme going and made its protagonists rich.  Kohn's conduct indicates that she anticipated this impending collapse and directed members of the Medici Enterprise to respond in a way that preserved the criminal proceeds of the Illegal Scheme.

## PARTIES

### The Trustee

64.     As the Trustee appointed under SIPA, Mr. Picard seeks to recover all Customer Property and other damages caused to the business or property of the BLMIS estate.  The Trustee is in the process of marshalling BLMIS's assets, and its liquidation is well underway.  The present assets, however, will not be sufficient to reimburse the customers of BLMIS for the billions of dollars they invested with BLMIS over the years, hundreds of millions of which were distributed to members of the Medici Enterprise.

Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recovery from members of the Medici Enterprise who received avoidable transfers to the detriment of those whose money was stolen via the Ponzi scheme, and to seek damages from all Defendants for perpetuating the Ponzi scheme and depleting the assets of BLMIS. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

65.     Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA. Under SIPA § 78fff(b), chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case to the extent consistent with SIPA.

66.     In addition to the powers of a bankruptcy trustee, the Trustee has broader powers under SIPA.

67.     The Trustee is a real party in interest and has standing to bring these claims under SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

    a.    Kohn and other members of the Medici Enterprise received Customer Property;

    b.    the business and property of the BLMIS estate was damaged as a result of the Illegal Scheme;

    c.    BLMIS's customers were injured as a result of the Illegal Scheme;

    d.    the RICO claims alleged herein may be asserted only by the Trustee;

    e.    SIPC cannot, by statute, advance funds to the Trustee to fully reimburse all customers for all of their losses;

    f.    the Trustee will not be able to fully satisfy all claims;

g.     the Trustee, as bailee of customer property, can sue on behalf of the customer-bailors;

h.     as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted. As assignee, the Trustee stands in the shoes of persons who have suffered an injury-in-fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

i.     SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such customers, collectively, "Accountholders"). SIPC has expressly conferred upon the Trustee the power to enforce its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

j.     the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

## Defendants: The Medici Enterprise

### Kohn Family Defendants

68.    **Sonja Kohn ("Kohn").** Kohn is a citizen of Austria and resided in New York from 1983 to in or around 1994. Each Defendant has a unique relationship with Kohn. Kohn established and controls companies in New York that are critical members of the Medici Enterprise. These include Eurovaleur, Infovaleur, Erko, and Windsor (the "New York Sham Entities"). At all relevant times, Kohn was the controlling shareholder and de facto manager of the day-to-day operations of Bank Medici. At certain times, Kohn served as the President of Bank Medici's Supervisory Board President. She also owns and controls certain New York entities, such as Medici Fund Management and Medici Finance Services. Kohn is an "insider" of BLMIS as defined under section 101(31) of the Bankruptcy Code.

69.     This Court has personal jurisdiction over Kohn under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Kohn has maintained minimum contacts with New York in connection with the claims alleged herein.  Kohn maintains several offices in New York, including Eurovaleur and Infovaleur.  Both of these entities are ongoing New York corporations, and these New York offices are their principal places of business.  Infovaleur maintains a bank account at J.P. Morgan Chase in New York.  Kohn entered into agreements with Madoff in New York that were vital to the Illegal Scheme.  Kohn caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase and Bank of New York in New York.  Kohn has repeatedly and purposefully availed herself of the benefits of conducting business in New York.  Additionally, Kohn has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which she participated to damage the BLMIS estate in New York.  She derives substantial revenue from interstate or foreign commerce.

70.     **Erwin Kohn ("E. Kohn").**  Kohn's husband, E. Kohn, is a resident of Switzerland and resided in New York from 1983 to in or around 1994.  E. Kohn is a beneficial owner of HAM together with his wife and a director of Medici Realty Ltd. ("Medici Realty"), a Gibraltar entity owned by Bank Medici Gibraltar and Hassans.  He is also the registered agent for Medici Finance Services in New York.  This Court has personal jurisdiction over E. Kohn under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  E. Kohn has maintained minimum contacts with New York in connection with the claims alleged herein.  E. Kohn caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P.

Morgan Chase in New York.  E. Kohn has repeatedly and purposefully availed himself of the benefits of conducting business in New York.  Additionally, E. Kohn has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York.  He derives substantial revenue from interstate or foreign commerce.

71.    **Netty Blau ("Blau").**  Blau is Kohn's mother and a citizen of Austria. Blau owned and managed Kohn's Italian Sham Entity, Tecno Italy.  This Court has personal jurisdiction over Blau under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure Rule 4(k)(1)(A), and Bankruptcy Rule 7004.  Blau has maintained minimum contacts with New York in connection with the claims alleged herein.  Blau received proceeds of the Illegal Scheme from accounts at J.P. Morgan Chase in New York.  Blau has repeatedly and purposefully availed herself of the benefits of conducting business in New York.  Blau, as manager of Tecno Italy, facilitated the performance of Kohn's agreements with Madoff in New York that were vital to the Illegal Scheme. Additionally, Blau has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which she participated to damage the BLMIS estate in New York.  She derives substantial revenue from interstate or foreign commerce.

72.    **Moishe Hartstein ("M. Hartstein").**  M. Hartstein is one of Kohn's sons-in-law.  He is a resident of New York and a U.S. citizen.  As such, this Court has personal jurisdiction over him.  M. Hartstein is a director of investment banking at Palladium.  He also acted on behalf of Eurovaleur, which is located in the same office as Palladium.  M. Hartstein and his wife R. Hartstein, live in a house in Monsey, New York sold to them by

Kohn and E. Kohn on December 26, 2009. This residence also served as a mailing address for Infovaleur.

73. **Rina Hartstein ("R. Hartstein").** R. Hartstein is Kohn's daughter. R. Hartstein is a resident of New York, and information and belief, a U.S. citizen. As such, this Court has personal jurisdiction over her. R. Hartstein personally received a transfer of stolen Customer Property from Kohn, via Infovaleur, after Madoff confessed. R. Hartstein received proceeds of the Illegal Scheme from accounts at J.P. Morgan Chase.

74. **Mordechai Landau ("Landau").** Landau is one of Kohn's sons-in-law. He is a resident of Israel. Landau and Kohn owned Austrian Sham Entity, M-Tech. This Court has personal jurisdiction over Landau under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Landau has maintained minimum contacts with New York in connection with the claims alleged herein. Landau received proceeds of the Illegal Scheme from accounts at J.P. Morgan Chase. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Landau has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

75. **Robert Alan Kohn ("R. Kohn").** R. Kohn is Kohn's and E. Kohn's son. On information and belief, R. Kohn is a U.S. citizen and resident of New York. R. Kohn received proceeds of the Illegal Scheme from accounts at J.P. Morgan Chase. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, R. Kohn has committed a tort in New York State, and expects,

or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

**Kohn's Sham Entity Defendants**

**Kohn's New York Sham Entity Defendants**

76.     **Erko, Inc. ("Erko").** On April 15, 1987, Kohn incorporated Erko in New York. As a New York corporation, this Court has personal jurisdiction over Erko. At all relevant times, Kohn was the 100% owner and manager of Erko. Erko has no stated or known business purpose. Erko is an "insider" of BLMIS as defined under section 101(31) of the Bankruptcy Code.

77.     **Eurovaleur, Inc. ("Eurovaleur").** Kohn incorporated Eurovaleur in New York on March 26, 1990, and she is its sole shareholder. Eurovaleur remains active in New York and Kohn is its President and CEO. As a New York corporation, this Court has personal jurisdiction over Eurovaleur. At various times, Eurovaleur has shared its 230 Park Avenue, New York, New York address with Infovaleur and Palladium. M. Hartstein is a registered broker of Eurovaleur, and other Kohn family members acted on its behalf. Eurovaleur has held itself out as, among other things, a fund of hedge funds, a New York registered brokerage, a provider of research services, and "a European boutique investment bank." Eurovaleur registered the "Primeo" trademark in New York. Eurovaleur also registered Internet domain names in New York for key members of the Medici Enterprise: "bankmedicimaestro.com" and "heraldcashplus.com." Eurovaleur is an "insider" of BLMIS as defined under section 101(31) of the Bankruptcy Code.

78.     **Infovaleur, Inc. ("Infovaleur").** On February 22, 1996, Kohn incorporated Infovaleur in New York. As a New York corporation, this Court has

personal jurisdiction over Infovaleur. At all relevant times, Kohn was the 100% owner and manager of Infovaleur. Throughout its existence, it used the same New York mailing address and telephone number as, and shared employees with, Eurovaleur. Infovaleur has also used the same mailing address as the residence of M. and R. Hartstein in Monsey, NewYork. Infovaleur has no stated or known business purpose. Infovaleur maintains at least one bank account in New York at J.P. Morgan Chase. On information and belief, Infovaleur currently has unclaimed funds within New York State. Infovaleur is an "insider" of BLMIS as defined under section 101(31) of the Bankruptcy Code.

79. **Robert Reuss ("Reuss").** Reuss is a citizen of Austria. Reuss maintains a residence in New York, New York. As a New York resident, this Court has personal jurisdiction over Reuss under CPLR 301. He is a former Vice President of Eurovaleur and a former employee of Infovaleur. Reuss caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase and Bank of New York in New York. Reuss currently acts as in-house counsel for Bank Medici, although, on information and belief, Reuss is not a lawyer.

80. **Palladium Capital Advisors, LLC ("Palladium").** Palladium, an SEC registered broker-dealer, was formed in Delaware on May 12, 2004. Palladium maintains its principal place of business at the same New York address as Eurovaleur and Infovaleur. As such, this Court has personal jurisdiction over Palladium. As of April 1, 2005, M. Hartstein, Palladium's director of investment banking, registered with the Financial Industry Regulatory Authority ("FINRA") as a broker and with the SEC as a securities principal with Palladium.

81.    **Windsor IBC, Inc. ("Windsor").**  On July 15, 1987, Kohn incorporated Windsor in New York, New York.  At all relevant times, Kohn was the President and indirect owner of Windsor.  Erko was the general partner of Windsor IBC Holdings, the 100% owner of Windsor.  Erko and Windsor IBC Holdings shared employees.

### Kohn's Cayman Sham Entity Defendants

82.    **Herald Asset Management Ltd. ("HAM").**  HAM is an asset management company incorporated in the Cayman Islands on March 12, 2004.  HAM's last known registered address is Whitehall House, 238 North Church Street, P.O. Box 31362, Seven Mile Beach, George Town, Grand Cayman, Cayman Islands.  Kohn and her husband, E. Kohn, are technically the ultimate beneficial owners of HAM, though its ownership structure is obscured by a complex web of interrelated companies orchestrated by Kohn and Hassans (and which includes Hassans).  HAM operated from Bank Austria Cayman's offices in the Cayman Islands and Medici S.r.l. offices in Milan.  Bank Austria Cayman leased HAM its office space in the Cayman Islands.  This Court has personal jurisdiction over HAM under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  HAM has maintained minimum contacts with New York in connection with the claims alleged herein.  HAM caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York, as well as causing others to transfer money to the same.  It has repeatedly and purposefully availed itself of the benefits of conducting business in New York.  HAM derives substantial revenue from interstate or foreign commerce.

83.    **Franco Mugnai ("Mugnai").**  Mugnai is a citizen of Italy.  He is a director of HAM and Herald Fund.  Mariadelmar Raule, an employee at Medici S.r.l., served as personal secretary to both Mugnai and Kohn.  This Court has personal

jurisdiction over Mugnai under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Mugnai has maintained minimum contacts with New York in connection with the claims alleged herein. As a director of HAM and Herald Fund, Mugnai signed Herald Fund's BLMIS account opening documents. Mugnai caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Mugnai has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

84. **Paul de Sury ("de Sury").** De Sury is a resident of Italy. He was an employee of Medici S.r.l., a director of Herald Fund, and a director of HAM. de Sury was the liquidator of Tecno Italy. This Court has personal jurisdiction over de Sury under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. de Sury has maintained minimum contacts with New York in connection with the claims alleged herein. As a director of HAM, Herald Fund, and Medici S.r.l., de Sury caused agreements to be made in New York, in that he caused BLMIS accounts to be opened in New York. de Sury caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, de Sury has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

85.     **Daniele Cosulich ("Cosulich").**  Cosulich is a resident of the United Kingdom.  He ran the day-to-day activities of HAM.  He was an employee of Medici S.r.l. from March 15, 2007 to September 8, 2008 and acted in the capacity of Bank Medici at all relevant times.  He was the Managing Director of Kohn's Austrian Sham Entity, Sofipo.  This Court has personal jurisdiction over Cosulich under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Cosulich has maintained minimum contacts with New York in connection with the claims alleged herein.  Cosulich caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York.  He has repeatedly and purposefully availed himself of the benefits of conducting business in New York.  Additionally, Cosulich has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York.  He derives substantial revenue from interstate or foreign commerce.

### Kohn's Italian Sham Entity Defendants

86.     **Tecno Development & Research S.r.l. ("Tecno Italy").**  Tecno Italy is a Milan-based company incorporated on February 21, 2002 and liquidated on December 5, 2008.  Tecno Italy was located in the same offices as Medici S.r.l.—Via Andegari 18, 20121 Milan, Italy—and shared at least two of the same employees, de Sury and Mariadelmar Raule, defined below.  Blau managed and co-owned Tecno Italy.  On information and belief, Kohn owned and controlled Tecno Italy.  This Court has personal jurisdiction over Tecno Italy under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Tecno Italy has maintained minimum contacts with New York in connection with the claims alleged herein.  Tecno Italy received proceeds of the Illegal Scheme from accounts at J.P. Morgan Chase in New York.  Kohn

and Blau, through Tecno Italy, entered into agreements vital to the Illegal Scheme with Madoff in New York. Additionally, Tecno Italy has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York. Tecno Italy derives substantial revenue from interstate or foreign commerce. Tecno Italy is an "insider" of BLMIS as defined under section 101(31) of the Bankruptcy Code.

87. **Mariadelmar Raule ("Raule").** Raule is a citizen of Italy and was a personal assistant to Kohn. She was an employee of Medici S.r.l. from 2006 to 2008 and was an employee of Tecno Italy, both of which operated from the same offices in Milan. Raule was also an employee of HAM. She was the assistant to both Kohn and Mugnai, who was director of both HAM and Herald Fund. This Court has personal jurisdiction over Raule under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Raule has maintained minimum contacts with New York in connection with the claims alleged herein. Raule caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. Additionally, Raule has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which she participated to damage the BLMIS estate in New York. She derives substantial revenue from interstate or foreign commerce.

### Kohn's Gibraltar Sham Entity Defendants

88. **Tecno Development & Research Ltd. ("Tecno Gibraltar").** Tecno Gibraltar was incorporated on January 3, 2007 in Gibraltar. Tecno Gibraltar is located in the offices of Line Management, which is associated with Hassans. On information and belief, Kohn owns and controls Tecno Gibraltar. This Court has personal jurisdiction

over Tecno Gibraltar under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Tecno Gibraltar has maintained minimum contacts with New York in connection with the claims alleged herein. Tecno Gibraltar received proceeds of the Illegal Scheme from accounts at J.P. Morgan Chase in New York. Kohn and Amselem (defined below), through Tecno Gibraltar, entered into agreements vital to the Illegal Scheme with Madoff in New York. Additionally, Tecno Gibraltar has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York. Tecno Gibraltar derives substantial revenue from interstate or foreign commerce. Tecno Gibraltar is an "insider" of BLMIS as defined under section 101(31) of the Bankruptcy Code.

89. **Shlomo (Momy) Amselem ("Amselem").** Amselem is an Israeli national and resident of Gibraltar. He is the lone director of Tecno Gibraltar. He is also an employee of Line Management, which is associated with Hassans. This Court has personal jurisdiction over Amselem under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Amselem has maintained minimum contacts with New York in connection with the claims alleged herein. Amselem, through Tecno Gibraltar, received proceeds of the Illegal Scheme from accounts at J.P. Morgan Chase in New York. Kohn, through Amselem and as sole director of Tecno Gibraltar, entered into agreements vital to the Illegal Scheme with Madoff in New York. Additionally, Amselem has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

90.     **Sofipo Austria GmbH ("Sofipo").**  Sofipo is an Austrian private banking/wealth management firm registered on January 4, 2006.  Sofipo is owned by Bank Medici.  On information and belief, Kohn owns and controls Sofipo.  Until April 21, 2009, Sofipo was registered at the same address as Bank Medici.  This Court has personal jurisdiction over Sofipo under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Sofipo has maintained minimum contacts with New York in connection with the claims alleged herein.  Sofipo caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York.  It has repeatedly and purposefully availed itself of the benefits of conducting business in New York.  Additionally, Sofipo has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York.  Sofipo derives substantial revenue from interstate or foreign commerce.

91.     **M-Tech Service GmbH ("M-Tech").**  M-Tech is an Austrian data processing and information technology company founded on November 30, 2000.  From January 4, 2002 until January 4, 2007, Kohn owned 50% of M-Tech until she sold her interest in M-Tech to her son-in-law, Landau.  Kohn served as M-Tech's managing director from January 4, 2002 until November 29, 2003.  M-Tech also employed Bank Medici director, Pirkner, and Landau as managing directors.  M-Tech went into liquidation in 2007.  This Court has personal jurisdiction over M-Tech under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  M-Tech has maintained minimum contacts with New York in connection with the claims alleged herein.  M-Tech received proceeds of the Illegal Scheme from accounts at J.P.

Morgan Chase in New York.  It has repeatedly and purposefully availed itself of the benefits of conducting business in New York.  Additionally, M-Tech has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York.  M-Tech derives substantial revenue from interstate or foreign commerce.

### Bank Medici Defendants

### Bank Medici Corporate Defendants

92.	**Bank Medici AG now d/b/a 20:20 Medici AG ("Bank Medici").**  Bank Medici is an Austrian bank located at Hegelgasse 17/17, 1010 Vienna.  Bank Medici received an Austrian banking license in 2003, which was revoked in 2009.  At all relevant times, Kohn and Bank Austria were Bank Medici's sole shareholders.  Kohn is the controlling shareholder and de facto manager of its day-to-day operations.  At certain times, Kohn has served as Bank Medici's Supervisory Board President.  At all relevant times, Bank Austria operated Bank Medici as its "branch."  This ownership and operating structure remains to this day.  Members of the Medici Enterprise who acted on behalf of Bank Medici in furtherance of the Illegal Scheme include, but are not limited to:  Kohn, HAM, APM Cayman, MediciFinanz, Medici S.r.l., Medici Cayman, Bank Medici Gibraltar, Hassans, Revi, Scheithauer, Frey, Tripolt, Schindler, Duregger, Pirkner, Kastner, de Sury, Cosulich, Reuss, and Raule.  This Court has personal jurisdiction over Bank Medici under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Bank Medici has maintained minimum contacts with New York in connection with the claims alleged herein.  Bank Medici caused agreements to be made in New York in that it caused BLMIS accounts in relation to at least Primeo Fund, Alpha Prime Fund, Herald Fund, Senator Fund, and Herald (Lux) to be opened in New

York.  Bank Medici caused proceeds of the Illegal Scheme to be sent to and received from accounts at J.P. Morgan Chase in New York.  It has repeatedly and purposefully availed itself of the benefits of conducting business in New York.  Additionally, Bank Medici has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York.  Bank Medici derives substantial revenue from interstate or foreign commerce.

93.     **Absolute Portfolio Management Ltd. ("APM Cayman").**  Manfred Kastner, a Bank Medici Individual Defendant, incorporated APM Cayman under the laws of the Cayman Islands, on April 19, 1999.  APM Cayman received payment from HAM for its sister company MediciFinanz's marketing and distribution of certain of the Medici Enterprise Feeder Funds.  This Court has personal jurisdiction over APM Cayman under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  APM Cayman has maintained minimum contacts with New York in connection with the claims alleged herein.  APM Cayman caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York.  It has repeatedly and purposefully availed itself of the benefits of conducting business in New York.  Additionally, APM Cayman has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York.  It derives substantial revenue from interstate or foreign commerce.

94.     **MediciFinanz Consulting GmbH ("MediciFinanz")**.  Kastner incorporated MediciFinanz, a foreign corporation in Germany, on October 10, 1996.  Bank Medici had an indirect ownership interest in MediciFinanz, and MediciFinanz

operated as a branch of Bank Medici. MediciFinanz marketed and distributed certain of the Medici Enterprise Feeder Funds in Germany. This Court has personal jurisdiction over MediciFinanz under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. MediciFinanz has maintained minimum contacts with New York in connection with the claims alleged herein. MediciFinanz caused proceeds of the Illegal Scheme to be sent to an account at J.P. Morgan Chase in New York. It has repeatedly and purposefully availed itself of the benefits of conducting business in New York. Finally, MediciFinanz has committed a tort in New York State, and expects or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York. It derives substantial revenue from interstate or foreign commerce.

95. **Medici S.r.l. ("Medici S.r.l.").** Medici S.r.l. is the Italian branch of Bank Medici incorporated on October 24, 1997. Bank Medici held a majority shareholding until 2004, after which it appears to have held a 100% shareholding. Medici S.r.l. shared offices and personnel with Tecno Italy and HAM. This Court has personal jurisdiction over Medici S.r.l. under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Medici S.r.l. has maintained minimum contacts with New York in connection with the claims alleged herein. Medici S.r.l. caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. It has repeatedly and purposefully availed itself of the benefits of conducting business in New York. Additionally, Medici S.r.l. has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in

which it participated to damage the BLMIS estate in New York. It derives substantial revenue from interstate or foreign commerce.

96. **Medici Cayman Island Ltd. ("Medici Cayman").** Medici Cayman is a foreign company incorporated on April 20, 2007 in the Cayman Islands. It is a wholly-owned branch of Bank Medici. This Court has personal jurisdiction over Medici Cayman under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Medici Cayman has maintained minimum contacts with New York in connection with the claims alleged herein. Medici Cayman caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. It has repeatedly and purposefully availed itself of the benefits of conducting business in New York. Additionally, Medici Cayman has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York. Medici Cayman derives substantial revenue from interstate or foreign commerce.

97. **Bank Medici Gibraltar AG ("Bank Medici Gibraltar").** In November 2004, Bank Medici and Hassans announced the opening of Bank Medici's Gibraltar branch, Bank Medici Gibraltar. It ultimately opened in January 2005. Bank Medici Gibraltar is located in Hassans's offices. Bank Medici Gibraltar held itself out as a joint venture with Hassans. This Court has personal jurisdiction over Bank Medici Gibraltar under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Bank Medici Gibraltar has maintained minimum contacts with New York in connection with the claims alleged herein. Bank Medici Gibraltar caused proceeds of the Illegal Scheme to be sent to accounts at J.P. Morgan Chase in New York. It has

repeatedly and purposefully availed itself of the benefits of conducting business in New York. Additionally, Bank Medici Gibraltar has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York. It derives substantial revenue from interstate or foreign commerce.

98. **Hassans International Law Firm ("Hassans").** Hassans is a Gibraltar law firm and is counsel to Kohn, Herald Fund, and on information and belief, HAM. Kohn has a longstanding relationship with Hassans. Bank Medici Gibraltar and Medici Realty are located in Hassans's offices. Certain Hassans partners and associates also hold non-lawyer corporate positions at certain Holding Company Defendants controlled by Kohn, Hassans, or other members of the Medici Enterprise. These entities are part of a complex corporate structure that conceals the fact that Kohn and her husband are the beneficial owners of HAM. On information and belief, this structure also conceals Kohn's ownership of Tecno Gibraltar. This Court has personal jurisdiction over Hassans under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Hassans has maintained minimum contacts with New York in connection with the claims alleged herein. Specifically, Hassans caused or facilitated the sending and receipt of proceeds of the Illegal Scheme to and from accounts owned or controlled by Kohn and other members of the Medici Enterprise. It has repeatedly and purposefully availed itself of the benefits of conducting business in New York. It derives substantial revenue from interstate or foreign commerce.

99. **ReviTrust Services Est. ("Revi").** Revi is a Liechtenstein company that operates as a corporate registry and trust formation agent in Liechtenstein and

Switzerland.  This Court has personal jurisdiction over Revi under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Revi has maintained minimum contacts with New York in connection with the claims alleged herein.  Revi received proceeds of the Illegal Scheme from accounts at J.P. Morgan Chase in New York.  It has repeatedly and purposefully availed itself of the benefits of conducting business in New York.  Additionally, Revi has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York.  Revi derives substantial revenue from interstate or foreign commerce.

### Bank Medici Individual Defendants

100.    **Peter Scheithauer ("Scheithauer").**  Scheithauer is a citizen of Austria. On September 1, 2008, Kohn hired him as Bank Medici's CEO.  Scheithauer was a director of Herald (Lux).  Scheithauer was Bank Austria's area manager for foreign business from approximately 1989 to 1999.  This Court has personal jurisdiction over Scheithauer under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Scheithauer has maintained minimum contacts with New York in connection with the claims alleged herein.  As a director of Herald (Lux), Scheithauer caused BLMIS accounts to be opened in New York.  Scheithauer caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York.  He has repeatedly and purposefully availed himself of the benefits of conducting business in New York.  Additionally, Scheithauer has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York.  He derives substantial revenue from interstate or foreign commerce.

101.    **Helmuth Frey ("Frey").**  Frey is a citizen of Austria.  In 2006, he joined Bank Medici's Advisory Board and was CEO from 2006-2008.  He met Kohn while working as a Director of Bank of America in New York from 1973 to 1984.  He oversaw the creation of Herald (Lux).  This Court has personal jurisdiction over Frey under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Frey has maintained minimum contacts with New York in connection with the claims alleged herein.  As a director of Bank Medici and Herald (Lux), Frey caused BLMIS accounts to be opened in New York.  Frey caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York.  He has repeatedly and purposefully availed himself of the benefits of conducting business in New York.  Additionally, Frey has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York.  He derives substantial revenue from interstate or foreign commerce.

102.    **Manfred Kastner ("Kastner").**  Kastner is an Austrian citizen.  Kastner owns and controls MediciFinanz and APM Cayman.  Kastner and Kohn created MediciFinanz and APM Cayman.  He was an employee of Medici Cayman from 2000 until 2001.  This Court has personal jurisdiction over Kastner under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Kastner has maintained minimum contacts with New York in connection with the claims alleged herein.  Kastner caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York.  He has repeatedly and purposefully availed himself of the benefits of conducting business in New York.  Additionally,

Kastner has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

103. **Josef Duregger ("Duregger").** Duregger is a citizen of Austria. He was the head of the Participations Department at Bank Medici beginning in 2006. Duregger is also a member of Bank Austria Cayman's Supervisory Board. He was a director of BA Worldwide from 1993 until 2003 and a director of Primeo Fund. He was also a member of Bank Austria's commercial representation board from 1991 until 1993 and from 1999 to the present. Duregger continues to serve as a member of Bank Medici's Advisory Board. Duregger became a director for UniCredit CA-IB Securities UK Ltd. ("UniCredit UK"), a UniCredit subsidiary, on November 14, 2007. This Court has personal jurisdiction over Duregger under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Duregger has maintained minimum contacts with New York in connection with the claims alleged herein. As a director of Primeo Fund and an employee of both Bank Medici and Bank Austria, Duregger facilitated agreements vital to the Illegal Scheme with Madoff in New York and caused BLMIS accounts to be opened in New York. Duregger caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Duregger has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

104.    **Andreas Pirkner ("Pirkner").**  Pirkner is a citizen of Austria.  He was an employee of Bank Medici from 2003 to May 2008.  In 2005, Pirkner became the head of Institutional Sales at Bank Medici.  In 2007, Pirkner became a director of asset management at Bank Medici.  Pirkner was involved in the creation, management, and distribution of Herald (Lux), was a Managing Director of Herald (Lux), and was a director of M-tech.  Pirkner was in regular contact with Nograsek, the Head of Investment at Bank Austria.  Pirkner was also the Bank Medici contact for due diligence questions regarding the Medici Enterprise Feeder Funds.  This Court has personal jurisdiction over Pirkner under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Pirkner has maintained minimum contacts with New York in connection with the claims alleged herein.  As a director of Herald (Lux) and an employee of Bank Medici, Pirkner caused BLMIS accounts to be opened in New York.  Pirkner caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York.  He has repeatedly and purposefully availed himself of the benefits of conducting business in New York.  Additionally, Pirkner has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York.  He derives substantial revenue from interstate or foreign commerce.

105.    **Werner Tripolt ("Tripolt").**  Tripolt is a citizen of Austria.  He joined Bank Medici in 2007 as an assistant to the managing board of directors and officially became a member of the board on January 2008.  Tripolt was responsible for the entire financial policy of Bank Medici, including credit and debit management, regulatory reporting, the bank's company shareholdings, fund operations, and its infrastructure.

This Court has personal jurisdiction over Tripolt under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Tripolt has maintained minimum contacts with New York in connection with the claims alleged herein. As a director at Bank Medici, Tripolt caused BLMIS accounts to be opened in New York. Tripolt caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Tripolt has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

106. **Andreas Schindler ("Schindler").** Schindler is a citizen of Austria. He was the head of asset management at Bank Medici. Schindler helped create Herald (Lux) and served on its board in 2008. This Court has personal jurisdiction over Schindler under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Schindler has maintained minimum contacts with New York in connection with the claims alleged herein. As a director of Herald (Lux) and an employee of Bank Medici, Schindler caused BLMIS accounts to be opened in New York. Schindler caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Schindler has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

**Bank Austria Corporate Defendants**

107.    **UniCredit Bank Austria AG ("Bank Austria").** Bank Austria is an Austrian Bank headquartered in Vienna with a registered address at Scottengasse 6-8, 1010 Vienna, Austria. UniCredit owns 100% of Bank Austria. At all relevant times, Bank Austria maintained a New York branch located at 150 E. 42nd Street, New York, New York until it was acquired by UniCredit in 2005. Annual reports of UniCredit and Bank Austria and historical records and reports of and filings with the Federal Reserve Board, the SEC, FINRA and the Department of State of the State of New York list numerous Bank Austria-controlled and -directed subsidiaries and affiliates incorporated in New York, having principal executive offices at 150 E. 42nd St., New York, New York, and/or doing business in New York, including Bank Austria America, Inc., Bank Austria Holdings Inc., Bank Austria Commercial Paper, Inc., Bank Austria Mortgage Corp., Bank Austria Finance, Inc., Bank Austria Securities, Inc. ("BASI"), BA Alpine Holdings, Inc., Bank Austria Creditanstalt American Corporation, Bank Austria Creditanstalt Trade Finance Services, Inc., Bank Austria Creditanstalt Community Development, Inc., CA IB Securities (New York) Inc. and others. In addition, as early as 1993 and again in 2001, Bank Austria registered with the SEC and sponsored through BASI's offices in New York depositary receipts (with tickers including "BAAXY" and "BAAGY") for shares of its common stock to actively trade on exchanges in New York. As such, Bank Austria is present in New York, and this Court may exercise personal jurisdiction over it.

108.    **BA Worldwide Fund Management Ltd. ("BA Worldwide").** BA Worldwide was a subsidiary of Bank Austria incorporated in the British Virgin Islands on

September 29, 1993 with a registered address at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. BA Worldwide was voluntarily liquidated on or about February 22, 2008. BA Worldwide was the investment adviser to Primeo Fund from December 15, 1993 until April 25, 2007. Radel-Leszczynski was the President of BA Worldwide. Hemetsberger, Krestchmer, Nograsek, and Duregger served as directors of BA Worldwide. This Court has personal jurisdiction over BA Worldwide under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. BA Worldwide has maintained minimum contacts with New York in connection with the claims alleged herein. BA Worldwide caused Primeo Fund to make agreements with BLMIS in New York. BA Worldwide caused the proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. Its agents communicated with Madoff in New York on a regular basis, and traveled to New York to meet with him two to three times a year. BA Worldwide also made agreements with, and transferred proceeds of the Illegal Scheme to, Eurovaleur, a New York corporation. BA Worldwide has repeatedly and purposefully availed itself of the benefits of conducting business in New York. Additionally, BA Worldwide has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York. BA Worldwide derived substantial revenue from interstate or foreign commerce.

109. **Bank Austria Cayman Islands Ltd. ("Bank Austria Cayman").** Bank Austria Cayman is a branch of Bank Austria incorporated on October 12, 2000 in the Cayman Islands. Its principal place of business is located at Whitehall House, 238 North Church Street, P.O. Box 31362, Seven Mile Beach, George Town, Grand Cayman,

Cayman Islands, which is the last known address at which HAM is incorporated. This Court has personal jurisdiction over Bank Austria Cayman under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Bank Austria Cayman has maintained minimum contacts with New York in connection with the claims alleged herein. Bank Austria Cayman caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. Bank Austria Cayman has repeatedly and purposefully availed itself of the benefits of conducting business in New York. Additionally, Bank Austria Cayman has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York. Bank Austria Cayman derived substantial revenue from interstate or foreign commerce.

### Bank Austria Individual Defendants

110.    **Gerhard Randa ("Randa").** Randa is a citizen of Austria. From 1995 to 2003 he was the chairman of Bank Austria. Randa was instrumental to the creation of Primeo Fund. On information and belief, he introduced Kohn to Bank Austria in the early 1990s. This Court has personal jurisdiction over Randa under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Randa has maintained minimum contacts with New York in connection with the claims alleged herein. Randa caused and facilitated the opening of Primeo Fund's BLMIS accounts in New York. Randa caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Randa has committed a tort in New York State, and expects, or should reasonably expect, the

Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

111. **Fredrich Kadrnoska ("Kadrnoska").** Kadrnoska is a citizen of Austria. From 1995 to 2003, he was a director and member of the management board of Bank Austria. He was also a director of UniCredit. This Court has personal jurisdiction over Kadrnoska under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Kadrnoska has maintained minimum contacts with New York in connection with the claims alleged herein. Kadrnoska caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Kadrnoska has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

112. **Stefan Zapotocky ("Zapotocky").** Zapotocky is a citizen of Austria. He was the Director of Equities, and beginning in 1991, Head of Asset Management at Bank Austria beginning in 1991. He was a member of the Bank Austria's board of directors from 1997 until 2000. His responsibilities at Bank Austria included oversight of investments and the creation of Primeo Fund and overseeing Bank Austria's direct account with BLMIS. He served on Primeo Fund's and Alpha Prime Fund's boards of directors. This Court has personal jurisdiction over Zapotocky under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Zapotocky has maintained minimum contacts with New York in connection with the claims alleged

herein.  As a director of Primeo Fund and Alpha Prime Fund, Zapotocky caused BLMIS accounts to be opened in New York.  Zapotocky, on behalf of Bank Austria, traveled to New York two to three times a year to meet with Madoff to discuss Primeo Fund. Zapotocky caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York.  He has repeatedly and purposefully availed himself of the benefits of conducting business in New York.  Additionally, Zapotocky has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York.  He derives substantial revenue from interstate or foreign commerce.

113.    **Ursula Radel-Leszczynski ("Radel-Leszczynski").**  Radel-Leszczynski is a citizen of Austria.  She was first hired at Bank Austria in 1996 and became a President of BA Worldwide in 2000.  This Court has personal jurisdiction over Radel-Leszczynski under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004.  Radel-Leszczynski has maintained minimum contacts with New York in connection with the claims alleged herein.  She has filed Customer Claim number 003453 in the SIPA Proceeding, whereby she has expressly submitted to the jurisdiction of this Court.  Additionally, as a director of BA Worldwide and an employee of Bank Austria, Radel-Leszczynski caused BLMIS accounts to be opened in New York. Radel-Leszczynski, on behalf of Bank Austria and BA Worldwide, was in regular communication with Madoff and others in New York.  She traveled to New York two to three times a year to meet Madoff to discuss certain of the Medici Enterprise Feeder Funds.  Radel-Leszczynski caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York.  She has repeatedly and

purposefully availed herself of the benefits of conducting business in New York. Additionally, Radel-Leszczynski has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which she participated to damage the BLMIS estate in New York. She derives substantial revenue from interstate or foreign commerce.

114. **Werner Kretschmer ("Krestchmer").** Kretschmer is a citizen of Austria. He was a director of Bank Austria from May 2006 until May 2008 and a director of Bank Medici from 2004 until 2006. Kretschmer was also a director of BA Worldwide. This Court has personal jurisdiction over Krestchmer under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Kretschmer has maintained minimum contacts with New York in connection with the claims alleged herein. As a director of Bank Medici, Bank Austria, and BA Worldwide, Kretschmer caused BLMIS accounts to be opened in New York. Kretschmer, on behalf of Bank Austria, traveled to New York two to three times a year to meet with Madoff to discuss certain of the Medici Enterprise Feeder Funds. Kretschmer caused proceeds of the Illegal Scheme to be both sent to and from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Kretschmer has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

115. **Wilhelm Hemetsberger ("Hemetsberger").** Hemetsberger is an Austrian citizen. He was a director of Bank Austria from February 2001 to May 2008.

He was also a director of BA Worldwide from 1993 to 2003. This Court has personal jurisdiction over Hemetsberger under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Hemetsberger has maintained minimum contacts with New York in connection with the claims alleged herein. Specifically, as a director of Bank Austria and BA Worldwide, Hemetsberger caused BLMIS accounts to be opened in New York. Hemetsberger, on behalf of Bank Austria, traveled to New York two to three times a year to meet with Madoff to discuss the Medici Enterprise Feeder Funds. Hemetsberger caused proceeds of the Illegal Scheme to be both sent to and received from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Hemetsberger has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

116.    **Harald C**. **Nograsek ("Nograsek").**  Nograsek is an Austrian citizen. Nograsek worked at Bank Austria from 1991 to 2004. In 1991, Nograsek served as the Head of the Financial Investment Division at Bank Austria. In 1997, he became the Bank Austria employee responsible for all investments. Nograsek served as a director of BA Worldwide, Alpha Prime Fund, and Primeo Fund. This Court has personal jurisdiction over Nograsek under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Nograsek has maintained minimum contacts with New York in connection with the claims alleged herein. As a director of Bank Austria, BA Worldwide, Alpha Prime Fund, and Primeo Fund, Nograsek caused BLMIS accounts to

be opened in New York. Nograsek caused proceeds of the Illegal Scheme to be both sent to and from accounts at J.P. Morgan Chase in New York. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Nograsek has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

### UniCredit Corporate Defendants

117. **UniCredit S.p.A. ("UniCredit").** UniCredit is an Italian joint stock company headquartered in Milan at Piazza Cordusio 20123 that owns and controls one of the largest banking and financial services groups in Europe. UniCredit operates directly throughout the United States and New York through UniCredit, New York Branch, and indirectly through one or more subsidiary bank branches and representative offices, including UniCredit Bank, New York Branch, and other controlled operating subsidiaries and affiliates, such as Pioneer. UniCredit, New York Branch, and UniCredit Bank, New York Branch, maintain bank branch offices at 150 E. 42nd Street, New York, New York and, according to the Federal Reserve Board, hold assets and properties in New York and the United States – exclusive of other assets and properties directly or indirectly owned in New York and the United States by UniCredit – in excess of $17.5 billion as of June 30, 2010. In addition to UniCredit, New York Branch, and UniCredit Bank, New York Branch, UniCredit has operated, directed and controlled numerous subsidiaries and affiliates incorporated and/or doing business in New York, including UniCredit Capital Markets, Inc., UniCredit U.S. Finance, Inc., and UniCredit Capital Markets Conversion, LLC, each of which is incorporated in or qualified to do business in New York and has its principal executive offices at 150 E. 42nd St., New York, New York, where UniCredit's

New York bank branch offices are located. In addition, as early as 1993, UniCredit established with The Bank of New York in New York depositary receipts (with tickers including "UNCFY") for shares of its common stock to actively trade on exchanges in New York. Since at least 2000, UniCredit has been involved with Madoff and BLMIS through its investment arm Pioneer. In 2005, UniCredit acquired Bank Austria. In 2007, after UniCredit acquired Bank Austria and its share of Bank Medici, Pioneer took over from BA Worldwide as Primeo Fund's investment manager. Kohn's relationship with UniCredit and its former CEO, Profumo, predates its acquisition of Bank Austria. While Profumo was the CEO of UniCredit, he enjoyed a close working relationship with Kohn. As UniCredit maintains and operates branches and numerous other businesses in New York, this Court has jurisdiction over UniCredit.

118. **Pioneer Global Asset Management S.p.A. ("Pioneer").** Pioneer is a company organized under the laws of Italy on October 19, 2000, with its principal place of business at 1, Galleria San Carlo 6, 20122, Milan, Italy. Pioneer is wholly owned by UniCredit. This Court has personal jurisdiction over Pioneer under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure 4(k)(1)(A), and Bankruptcy Rule 7004. Pioneer has maintained minimum contacts with New York in connection with the claims alleged herein. Specifically, Pioneer's wholly-owned, controlled, and directed subsidiary, Pioneer Alternative Investments (New York) Limited, does business in and maintains its principal executive office in New York at 330 Madison Avenue, New York, New York, and, according to publicly available records of FINRA, Pioneer's wholly-owned, controlled, and directed subsidiary, Pioneer Funds Distributor, Inc., operates and is licensed to sell securities in New York. In addition, in its annual report for 2006,

UniCredit expressly acknowledged that Pioneer's "global network reaches from Sydney, Beijing and Milan to New York" and designated the focal point of its alternative investment and hedge fund management services as New York. Pioneer caused proceeds of the Illegal Scheme to be both sent to and from accounts at J.P. Morgan Chase in New York. Its agents communicated regularly with Reuss and others in New York in connection with the Illegal Scheme. Pioneer has repeatedly and purposefully availed itself of the benefits of conducting business in New York. Additionally, Pioneer has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which it participated to damage the BLMIS estate in New York. Pioneer derives substantial revenue from interstate or foreign commerce.

### UniCredit Individual Defendants

119. **Alessandro Profumo ("Profumo").** Profumo is an Italian citizen. He served as CEO of UniCredit from 1997 until September 21, 2010. This Court has personal jurisdiction over Profumo under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure Rule 4(k)(1)(A), and Bankruptcy Rule 7004. Profumo has maintained minimum contacts with New York in connection with the claims alleged herein. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Profumo has committed a tort in New York state, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

120. **Gianfranco Gutty ("Gutty").** Gutty is an Italian citizen. He served as Substitute Deputy Chairman of UniCredit from 2006 until 2008. Prior to this appointment, Gutty served on the board of UniCredit from 2005 until 2008. Gutty served

as a director of Bank Medici and PrivatLif AG ("PrivatLif"). PrivatLif is a Liechtenstein-based insurance company associated with Bank Medici of which Kohn is the majority shareholder. This Court has personal jurisdiction over Gutty under N.Y. CPLR 302, Federal Rule of Civil Procedure Rule 4(k)(1)(A), and Bankruptcy Rule 7004. Gutty has maintained minimum contacts with New York in connection with the claims alleged herein. He has repeatedly and purposefully availed himself of the benefits of conducting business in New York. Additionally, Gutty has committed a tort in New York State, and expects, or should reasonably expect, the Illegal Scheme in which he participated to damage the BLMIS estate in New York. He derives substantial revenue from interstate or foreign commerce.

### Kohn's Holding Company Defendants

121. **Brera Servizi Aziendiale S.r.l. ("Brera").** Brera is located in Milan, Italy, and was incorporated on November 7, 1981. It was the 95% owner of Tecno Italy. Blau owned the other 5%. On information and belief, Brera held this interest in Tecno Italy in trust for Kohn. This Court has personal jurisdiction over Brera under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure Rule 4(k)(1)(A), and Bankruptcy Rule 7004. Brera has committed torts in New York State or has committed torts outside of New York that it expected, or should reasonably have expected, to cause injury to, and did cause injury to, the estate of BLMIS, a New York resident.

122. **Redcrest Investments, Inc. ("Redcrest").** Redcrest is a company located in the British Virgin Islands and incorporated on January 20, 2003. It is the ultimate parent of Tecno Gibraltar, Herald Consult, Line Holdings, Line Management, and Line Group. This Court has personal jurisdiction over Redcrest under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure Rule 4(k)(1)(A), and Bankruptcy Rule 7004. Redcrest

has committed torts in New York State or has committed torts outside of New York that it expected, or should reasonably have expected, to cause injury to, and did cause injury to, the estate of BLMIS, a New York resident.

123. **Line Group Ltd. ("Line Group").**  Line Group is a company incorporated in Gibraltar on January 14, 2008 and wholly owned by Redcrest.  Line Group owns 100% of Line Management.  Certain Line Group directors are Hassans partners or associates.  This Court has personal jurisdiction over Line Group under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure Rule 4(k)(1)(A), and Bankruptcy Rule 7004.  Line Group has committed torts in New York State or has committed torts outside of New York that it expected, or should reasonably have expected, to cause injury to, and did cause injury to, the estate of BLMIS, a New York resident.

124. **Line Management Services Ltd. ("Line Management").**  Line Management is a company incorporated in Gibraltar on March 22, 1995.  Line Management is wholly owned by Line Group.  Line Management owns 100% of Line Holdings.  Certain Line Management directors are Hassans partners or associates. Amselem, Tecno Gibraltar's sole director is an employee of Line Management.  This Court has personal jurisdiction over Line Management under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure Rule 4(k)(1)(A), and Bankruptcy Rule 7004.  Line Management has committed torts in New York State or has committed torts outside of New York that it expected, or should reasonably have expected, to cause injury to, and did cause injury to, the estate of BLMIS, a New York resident.

125. **Line Holdings Ltd. ("Line Holdings").**  Line Holdings is a company incorporated in Gibraltar on July 15, 1988, and is wholly owned by Line Management.

Line Holdings holds 100% of Herald Consult in trust for E. Kohn. Certain Line Holdings directors are Hassans partners or associates. This Court has personal jurisdiction over Line Holdings under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure Rule 4(k)(1)(A), and Bankruptcy Rule 7004. Line Holdings has committed torts in New York State or has committed torts outside of New York that it expected, or should reasonably have expected, to cause injury to, and did cause injury to, the estate of BLMIS, a New York resident.

126. **Herald Consult Ltd. ("Herald Consult").** Herald Consult is a company incorporated in Gibraltar on March 12, 2004, and wholly owned by Line Holdings. Herald Consult owns 100% of HAM. This Court has personal jurisdiction over Herald Consult under N.Y. CPLR 301, 302, Federal Rule of Civil Procedure Rule 4(k)(1)(A), and Bankruptcy Rule 7004. Herald Consult has committed torts in New York State or has committed torts outside of New York that it expected, or should reasonably have expected, to cause injury to, the estate of BLMIS, a New York resident.

**John and Jane Does 1-100**

127. **John and Jane Does 1-100**. The Trustee asserts claims against those whose true identities, roles, and responsibilities in relation to the Medici Enterprise and Illegal Scheme have yet to be ascertained. They may include additional Kohn family members and others who participated in the Illegal Scheme. Given the deliberately complex and obfuscatory structure of the Medici Enterprise, the Trustee anticipates amending this Complaint and accompanying RICO Case Statement.

**Non-Defendant Bad Actors**

**Bernard L. Madoff Investment Securities**

128.     **Bernard L. Madoff Investment Securities LLC ("BLMIS")**.  Founded in or around 1959, BLMIS began operations as a sole proprietorship of Madoff and, effective January 2001, became a New York limited liability company wholly owned by Madoff.  At all relevant times, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.

129.     **Bernard L. Madoff ("Madoff")**.  Madoff is a citizen of the United States. He is currently a resident of the Butner Federal Correctional Complex in Butner, North Carolina.

130.     **Frank DiPascali ("DiPascali")**.  DiPascali is a citizen of the United States.  He is currently under house arrest in New York, New York.

**Cohmad Securities Corporation**

131.     **Cohmad Securities Corporation ("Cohmad")**.  Cohmad is a corporation organized and existing under the laws of the State of New York.  Its principal place of business is 885 Third Avenue, New York, New York.  Cohmad is registered with the United States Securities and Exchange Commission ("SEC") and is a member of FINRA.

132.     **Maurice (Sonny) Cohn ("Cohn")**.  Cohn is one of the owners of Cohmad and serves as its Chairman and CEO.  Cohn is a citizen and a resident of the State of New York.

**Madoff Securities International Ltd.**

133.     **Madoff Securities International Ltd ("MSIL")**.  MSIL is a foreign company located in London, England at 12 Berkeley, Mayfair, London, W1J 8, UK. Madoff created MSIL in 1983.  MSIL is BLMIS's London affiliate.

134.  **Leon Flax ("Flax").**  Flax is a citizen of South Africa and a resident of the United Kingdom.  He was a director of MSIL from 1986 to 2009.

135.  **Steven Raven ("Raven").**  Raven is a citizen of the United Kingdom and resident of United Kingdom.  He was a director of MSIL in 1983, and then formally rejoined the board from 1992 to 2008.

### Medici Enterprise Feeder Funds

136.  **Primeo Fund ("Primeo Fund").**  Primeo Fund is an investment fund organized under the laws of the Cayman Islands on November 18, 1993.  Its registered office is at the offices of Bank of Bermuda (Cayman) Limited, P.O. Box 513, 2nd Floor, Strathvale House, North Church Street, Grand Cayman KY1-11006, Cayman Islands.

137.  **Thema International Fund plc ("Thema International").**  Thema International is an investment fund organized under the laws of Ireland on May 9, 1996.  Its registered agent is William Fry, located at Fitzwilton House, Wilton Place, Dublin 2, Ireland.

138.  **Alpha Prime Fund Ltd. ("Alpha Prime Fund").**  Alpha Prime Fund is a partnership investment fund organized under the laws of Bermuda on March 12, 2003, with its registered address at Bank of Bermuda Building, 6 Front Street, Hamilton HM11, Bermuda.  Kohn served on the board of Alpha Prime Fund.

139.  **Herald Fund SPC ("Herald Fund").**  Herald Fund is an investment fund organized under the laws of the Cayman Islands on March 24, 2004.  Its registered agent is M&C Corporate Services Limited, P.O. Box 309 GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.

140.  **Senator Fund SPC ("Senator Fund").**  Senator Fund is an investment fund organized under the laws of the Cayman Islands on March 12, 2006.  Its registered

agent is Corporate Services Ltd., P.O. Box 1344, dms House, 20 Genesis Close, Grand Cayman KY1-1108, Cayman Islands.

141.     **Herald (Lux) SICAV ("Herald (Lux)").**  Herald (Lux) is an investment fund organized under the laws of Luxembourg on February 18, 2008.  Its registered agent is William Fry, located at Fitzwilton House, Wilton Place, Dublin 2, Ireland.

### Pioneer Global Asset Management S.p.A. Agents

142.     **Albert LaRocca ("La Rocca").**  La Rocca is a citizen of Italy.

143.     **Paul Tiranno ("Tiranno").**  Tiranno is a citizen of New York.

### Kohn Slush Fund Recipient

144.     **Gerila Beteiligungsverwaltungs GmbH ("Gerila").**  Gerila is a German company created by Kastner.

### Bank Medici Agents

145.     **Alexandra Lavi ("Lavi").**  Lavi is an Israeli citizen.

146.     **Susanne Giefing ("Giefing").**  Giefing is an Austrian citizen.

147.     **Medici Realty Ltd. ("Medici Realty").**  Medici Realty is a Gibraltarian company created by Kohn and Hassans.

148.     **FundsWorld Financial Services Ltd. ("FundsWorld").**  FundsWorld is a company that Kohn created in Ireland and operated from Milan, Italy.

### Eurovaleur Agents

149.     **Anne Kritzer ("Kritzer").**  Kritzer is an Austrian citizen.

150.     **Thomas Grasso ("Grasso").**  Grasso is a Swiss citizen.

### Kohn's Other New York Agents

151.     **Medici Fund Management Co., Inc. ("Medici Fund Management").**  Medici Fund Management was a Delaware company registered to do business in New

York.  Medici Fund Management had no known business purpose and, on information and belief, was used by Kohn to further the Illegal Scheme.  It was dissolved in 1999.

152.  **Medici Finance Services, Inc. ("Medici Finance Services").**  Medici Finance Services was a New York corporation dissolved on July 29, 2009.  Medici Finance Services had no known business purpose and, on information and belief, was used by Kohn to further the Illegal Scheme.  E. Kohn, at Eurovaleur's 767 Fifth Avenue address, was Medici Finance Service's registered agent.

## KOHN, MADOFF, AND THE ILLEGAL SCHEME

### Sonja Kohn in Europe

153.  Kohn was born in 1948 in Vienna, Austria.  Kohn has gone by many names, including Sonja Blau Kôhn, Sonja Blau, Sinja Kôhn, Sinja Blau, and Sinja Türk.  She married E. Kohn in 1970 and together they operated an import-export business in Vienna.  During this time, on information and belief, Kohn cultivated wealthy and influential contacts in Vienna and Eastern Europe.  These contacts included various Austrian and other government officials.

154.  Upon the creation of Bank Medici, Kohn recruited Johannes Farnleitner and Ferdinand Lacina, both former Austrian ministers of economics and finance, to serve on its Supervisory Board.  On information and belief, over the course of the Illegal Scheme, Kohn successfully solicited entities affiliated with the City of Vienna to invest in certain of the Medici Enterprise Feeder Funds.

155.  Sometime in the 1970s, the Kohns moved from Vienna to Milan, Italy where Kohn's mother, Blau, has lived on and off for years.  There she cultivated the base of contacts that they would later exploit during the perpetration of the Illegal Scheme.

156.     Kohn and her family have used Italy as a base of operations in furtherance of the Illegal Scheme.  Several critical members of the Medici Enterprise are located in Italy, including:  (i) Kohn's Sham Entity, Tecno Italy; (ii) Bank Medici's Italian branch, Medici S.r.l.; (iii) Bank Austria's parent, UniCredit; (iv) UniCredit's subsidiary, Pioneer; and (v) Kohn's FundsWorld.

157.     After establishing contacts that would later relate to key aspects of the Medici Enterprise in Austria, Italy, and elsewhere, Kohn and her husband moved to New York.

**The Kohn Family Moves to New York and Meets Madoff**

158.     On information and belief, around 1983, the Kohns moved to Monsey, New York and purchased the home in which their daughter, R. Hartstein, and her husband, M. Hartstein, now live.

159.     In 1985, Kohn began working at Merrill Lynch & Co. ("Merrill") in New York as, on information and belief, a retail stock broker.  On information and belief, Kohn has no formal training or education in finance or economics.

160.     While working at Merrill, in 1985, Kohn met Cohn of Cohmad.  Cohn and Cohmad were in the business of soliciting accounts for BLMIS and operated out of the same building as BLMIS.

161.     Kohn told Cohn that she was the "biggest producer" at Merrill and was looking for a partner with whom to do business.  Cohn declined Kohn's offer.

162.     A few months later, Cohn introduced Kohn to Madoff.  Madoff paid Cohmad at least $526,000 for this introduction.  Cohn has testified to the SEC that Kohn indeed brought accounts to BLMIS after he introduced Kohn to Madoff.

## Kohn and Madoff's Special Relationship

163.     After Madoff was arrested, Kohn denied to the Austrian authorities that she was close to Madoff.  The record uncovered to date, however, demonstrates that her denial is false.  Documents from BLMIS and its London arm, MSIL, as well as other sources, reflect scores of meetings, phone calls, and other communications among Madoff, his employees, Kohn, and other members of the Medici Enterprise.  She and her husband regularly met with Madoff and his representatives in New York, London, and elsewhere.

164.     Kohn held herself out to potential investors with BLMIS as Madoff's close friend and intimated that their special relationship yielded special returns on investments with BLMIS.  This privileged access was her greatest asset, and she was willing to sell it to those who wanted to invest with BLMIS.  Hence, Kohn was paid by both Madoff and by those who sought to invest with Madoff.

## Madoff Pays Kohn for Bringing Accounts into BLMIS

165.     On information and belief, Kohn and Madoff agreed that she would be paid under a different structure than the Cohmad sales representatives.  Rather than being paid a commission based on the amount of money she brought in for Madoff, Kohn would be paid a flat fee.  This flat fee fluctuated over time, but was usually over $6.5 million per year.  In fact, Madoff appears to have paid Kohn before she ever brought a single account into BLMIS.

166.     This agreement between Kohn and Madoff was secret even within BLMIS, and Madoff concealed Kohn's role as a BLMIS sales representatives not only from BLMIS employees, but from Cohn and Cohmad as well.

167.     Over the course of the Illegal Scheme, Madoff and Kohn's agreement allowed her to siphon at least $62 million in stolen Customer Property directly from the BLMIS estate.  Kohn, her family, and members of the Medici Enterprise owned or controlled by Kohn, received hundreds of millions of dollars in stolen Customer Property and other proceeds of the Illegal Scheme.

168.     Kohn concealed her theft from the BLMIS estate using an elaborate network of Sham Entities in New York and elsewhere, including Erko and Infovaleur in New York, Tecno Italy, and Tecno Gibraltar.  See Exhibits G, H, I, J, and K.  These four Sham Entities are key to the "Money-Out" component of the Illegal Scheme.

169.     Kohn contrived to further conceal these secret kickbacks by invoicing BLMIS for worthless "market research" that was summarily ignored and destroyed by Madoff's employees.

170.     With Kohn and Madoff's agreement in place, Kohn immediately began soliciting investors for Madoff's Ponzi scheme in New York, initiating the Illegal Scheme, and laying the foundation for the Medici Enterprise.

**Kohn and Madoff's Secret Payment Structure**

171.     Madoff kept internal records noting which BLMIS accounts were attributable to Kohn.  On information and belief, Madoff destroyed these records prior to his confession on December 11, 2008 as they were not among the BLMIS records seized by the authorities after Madoff confessed.

172.     Madoff had a single employee dedicated to processing his kickbacks to Kohn.  Madoff directed this employee to:  (i) tell no one inside or outside of BLMIS that Madoff was paying Kohn; and (ii) never leave any documentation relating to Kohn unattended.  Similarly, Kohn directed this employee to only speak directly to Kohn and

never through a third-party. Kohn also directed this employee to never mail Madoff's checks to her. Rather, Kohn or her emissary would personally pick up her checks at Madoff's New York or London office.

173. Kohn directed Madoff to pay her through Infovaleur. Madoff's employee, however, always thought that the checks were payable to Kohn's New York Sham Entity Eurovaleur. Indeed, Eurovaleur and Infovaleur share the same address and telephone number.

174. When this BLMIS employee called Kohn at Infovaleur's number, a Eurovaleur representative would answer. Like Kohn, Madoff and his employees did not distinguish among Kohn's Sham Entities and considered them all alter egos of Kohn.

**Kohn and the Medici Enterprise Sustained the Ponzi Scheme**

175. The accounts for which Madoff paid Kohn are set forth below:

| PONZI SCHEME INFLOW ATTRIBUTABLE TO KOHN | | | |
|---|---|---|---|
| **BLMIS ACCOUNT** | **ACCOUNT NUMBER** | **OPENING DATE** | **TOTAL INVESTMENT** |
| Howard Gottlieb | 1G0067 | April 18, 1989 | $3,000,000 |
| Mayfair Corporation | 1FN026 | March 23, 1992 | 1,000,054 |
| Lagoon Investment Ltd. | 1FN021 | May 1, 1992 | 134,624,947 |
| RIP Investments LP | 1CM222 | May 12, 1993 | 3,000,000 |
| Primeo Fund | 1FN060 | December 30, 1993 | 1,210,000 |
| Investments Alanis SA | 1FN064 | August 26, 1994 | 5,399,950 |
| Lagoon Investment Ltd. | 1FN066 | December 29, 1994 | 2,100,000 |
| Paolo Dini | 1FN072 | January 23, 1995 | 1,005,545 |
| GeoCurrencies Ltd. S.A. | 1FN079 | June 8, 1995 | 5,054,863 |
| Bank Austria AG | 1FN082 | August 15, 1995 | 1,500,000 |
| Zin Investments Ltd. | 1FN085 | December 7, 1995 | 3,249,985 |
| Optimal Multiadvisors Ltd. | 1FN091 | February 29, 1996 | 90,049,985 |
| Primeo Fund (Class B) | 1FN092 | March 1, 1996 | 370,483,000 |
| Harley International Fund Ltd. | 1FN094 | April 24, 1996 | 2,351,341,277 |
| Thema International Fund | 1FN095 | July 1, 1996 | 1,043,697,424 |
| Lagoon Investment Ltd. | 1FN096 | July 26, 1996 | 500,000 |
| Plaza Investments Int'l | 1FR002 | November 25, 1996 | 534,069,268 |

| | | | |
|---|---|---|---:|
| Leisure Enterprises Inc. | 1FR007 | January 24, 1997 | 3,500,000 |
| Optimal Multiadvisors Ltd. | 1FR008 | January 28, 1997 | 1,667,445,900 |
| FC Investment Holdings Ltd. | 1FR011 | March 7, 1997 | 2,674,988 |
| Lagoon Investment Ltd. | 1FR015 | April 29, 1997 | 49,862,000 |
| Lagoon Investment Ltd. | 1FR016 | April 29, 1997 | 422,908,000 |
| Iron Reserves Ltd. | 1FR022 | June 2, 1997 | 3,999,980 |
| Triangle Diversified Investments | 1FR042 | June 22, 1998 | 1,000,000 |
| Lexus Worldwide Ltd. | 1FR064 | November 1, 1999 | - |
| Alpha Prime Fund | 1FR097 | June 13, 2003 | 399,941,000 |
| Herald Fund SPC | 1FR109 | April 1, 2004 | 1,533,741,975 |
| Mayfair Corporation | 1M0206 | August 11, 2004 | - |
| Senator Fund | 1FR128 | September 6, 2006 | 247,499,980 |
| Herald (Lux) | 1FR135 | March 17, 2008 | 255,600,000 |
| **TOTAL INTO PONZI SCHEME** | | | **$9,139,460,121** |

## KOHN, HER FAMILY, AND THE MEDICI ENTERPRISE

176.     Although Kohn was the mastermind of the Illegal Scheme, she did not act alone.  Kohn's husband, mother, and certain of her children and their spouses also participated in, and profited from, the Illegal Scheme.  Together, E. Kohn, Blau, M. Hartstein, R. Hartstein, Landau, and R. Kohn all conspired to commit over one hundred RICO predicate acts in furtherance of the Illegal Scheme.  These predicate acts include money laundering, transactions in criminally derived property, wire fraud, financial institution fraud, and violations of the Travel Act.

177.     Certain Kohn Family Defendants conspired with Kohn, Reuss, Kritzer, and Grasso to operate members of the Medici Enterprise in New York, such as Erko, Eurovaleur, Infovaleur, Palladium, and Windsor.  The Kohn Family Defendants worked together to perpetrate the Illegal Scheme.

178.     The Kohn family used Kohn's Sham Entities as slush funds through which Kohn regularly disbursed proceeds of the Illegal Scheme.  These payments do not appear to be connected to any legitimate business activity by her family.  Rather, they appear to be a mechanism by which the Kohn family shares the proceeds of the Illegal Scheme.

179.    Although her daughter, son-in-law, and grandchildren live near New York City, on information and belief, Kohn has not travelled to New York since Madoff's arrest.  Kohn has, however, laundered proceeds of the Illegal Scheme to her family since that time.  She effected these transfers through Infovaleur in New York to R. Kohn (care of Eurovaleur), R. Hartstein, M. Hartstein, and Palladium.  Kohn also sent her husband nearly $300,000 on February 2, 2009 through Tecno Gibraltar.  On information and belief, Kohn continues to operate the Illegal Scheme and conceal its proceeds.

### Kohn's Husband Erwin

180.    Kohn's husband, E. Kohn, is intimately involved in his wife's business affairs and has participated in the Illegal Scheme since its inception.  His precise residence throughout the Illegal Scheme is difficult to ascertain.  He appears to have maintained multiple residences in New York, Austria, Switzerland, and, on information and belief, Israel.  On information and belief, E. Kohn maintained a residence in Austria while living with his wife in New York as they built the architecture of the Medici Enterprise and initiated the Illegal Scheme.

181.    On information and belief, E. Kohn laundered proceeds of the Illegal Scheme, including stolen Customer Property in the form of secret kickbacks from Madoff, through real estate transactions in Austria.

182.    E. Kohn and his wife are the ultimate beneficial owners of HAM.  As alleged fully below, HAM operated as the central funding and money laundering machine for the Medici Enterprise.  Kohn and E. Kohn also treated HAM as one of the many Kohn family checking accounts.

183.    E. Kohn traveled to London from New York on behalf of Erko to pick up Madoff's secret kickbacks to Kohn as early as 1987.  Madoff paid these particular

kickbacks to Kohn, via Erko, by among other means, physical checks. E. Kohn would then deposit the funds in an unknown family account for the benefit of himself and his wife. These travels were made with the intent to distribute the proceeds of unlawful activity, enriching the Medici Enterprise in furtherance of the Illegal Scheme. See RICO Case Statement section f(2), at 70, ¶ 12.

184. E. Kohn was a director of Medici Realty in Gibraltar. Medici Realty is a joint venture between Bank Medici Gibraltar and Hassans. The Trustee is unaware of the precise role of Medici Realty in the Medici Enterprise and the Illegal Scheme. Medici Realty is, however, located in the same offices as Hassans and Bank Medici Gibraltar. E. Kohn was also a director of FundsWorld in Milan, Italy. On information and belief, Kohn created FundsWorld to sell access to BLMIS though the Medici Enterprise Feeder Funds.

185. On information and belief, E. Kohn was present at certain meetings with Kohn, Scheithauer, and other Bank Medici representatives in which they misrepresented the role of BLMIS in the Medici Enterprise Feeder Funds.

186. Over the course of the Illegal Scheme, E. Kohn accepted regular payments of stolen Customer Property laundered by Kohn through Infovaleur in New York. Between at least March 27, 2002 and March 11, 2003, E. Kohn received at least nineteen of these payments via check from Infovaleur's New York account at J.P. Morgan Chase totaling over $100,000. Certain of these checks appear to have been structured to avoid U.S. transaction reporting requirements. For example, on March 27, 2002, Kohn, via Infovaleur, transmitted three checks to E. Kohn each in the amount of $3,026.20. See id. at 67-69, ¶ 11.

187.     After Madoff confessed, E. Kohn conspired with his wife to conceal the proceeds of the Illegal Scheme.  On February 2, 2009, Kohn caused Tecno Gibraltar to transfer $299,994.97 to certain Swiss bank accounts controlled by E. Kohn.  Id.

### Kohn's Mother Netty Blau

188.     Blau plays a key role in her daughter's business affairs and has participated in at least the Italian components of the Illegal Scheme.  Blau purported to be the "manager" of Kohn's Sham Entity, Tecno Italy, as it received a steady stream of kickbacks from Madoff.

189.     Blau also owned the 5% of Tecno Italy that was not held in trust by Brera.  Brera held its interest in Tecno Italy in trust for a beneficiary that is, on information and belief, Kohn.

190.     Blau conspired with Kohn and other Tecno Italy employees, such as Raule, to receive at least twenty payments totaling over $14 million from Madoff between at least May 21, 2002 and January 2, 2007.  See id. at 72-73, ¶ 13.

### Kohn's Son-in-Law Moishe Hartstein

191.     M. Hartstein was deposed by the Trustee on September 14, 2009.  M. Hartstein invoked his Fifth Amendment privilege at least 135 times.

192.     M. Hartstein refused to state, among many other things:  his date of birth; his citizenship; whether he has an occupation or a profession; whether he was married to his wife, R. Hartstein; whether he knows his mother-in-law, Kohn; whether he knows his father-in-law, E. Kohn; whether he has any children; whether he had worked for, or even heard of, Eurovaleur; whether he had worked for, or even heard of, Palladium; whether he had heard of Erko; whether he had heard of Bank Medici; and whether he had ever heard of Madoff.

193.    M. Hartstein lives in Monsey, New York with his wife, R. Hartstein.  The Hartsteins purchased this house from Kohn and E. Kohn in December 2006 which was, on information and belief, financed with two payments of stolen Customer Property from Infovaleur, totaling $440,000.  See id. at 67-69, ¶ 11.  This residence also served as a mailing address for Infovaleur and R. Kohn.

194.    M. Hartstein conspired with Kohn to operate Eurovaleur, with whom he was registered in New York as a broker in July 1998.  On information and belief, M. Hartstein solicited investors for the Medici Enterprise Feeder Funds at Eurovaleur.  M. Hartstein was also registered as a broker for Palladium in January 2005, and remains registered as of this filing.

195.    M. Hartstein received money from Infovaleur, both personally and through Palladium.  Kohn, through Infovaleur, directed at least sixteen payments to, or for, M. Hartstein via check beginning as early as February 19, 2002.  At least four of these payments occurred after Madoff confessed to running a Ponzi scheme and continued until at least March 4, 2009.  See id. at 67-70, ¶ 11.

**Kohn's Daughter Rina Hartstein**

196.    R. Hartstein was deposed by the Trustee on September 15, 2009.  R. Hartstein invoked her Fifth Amendment privilege well over 500 times.

197.    R. Hartstein refused to state, among many other things:  her citizenship; whether she has an occupation or a profession; the whereabouts of her brother, R. Kohn; whether M. Hartstein or their children live with her in Monsey, New York; and whether she had heard of Eurovaleur, Infovaleur, Erko, Windsor, M-Tech, FundsWorld, Tecno Italy, Tecno Gibraltar, Bank Medici, or Madoff.

198.    R. Hartstein has received proceeds of the Illegal Scheme from Kohn via Infovaleur in New York via check.  R. Hartstein received $26,438.33 in stolen Customer Property on January 6, 2009, less than a month after Madoff confessed to running a Ponzi scheme.  See id. at 67-69, ¶ 11.

### Kohn's Son-in-Law Mordechai Landau

199.    Landau is married to Kohn's daughter, Yvonne Landau, and is a resident of Israel.

200.    Landau and Kohn owned Kohn's Austrian Sham Entity M-Tech.  On December 29, 2006, Kohn sold her interest in M-Tech to Landau.

201.    Landau accepted payments via check from Kohn, via Infovaleur, both personally and through M-Tech.  Kohn, through Infovaleur, laundered at least $102,000 to or for the benefit of Landau over a ten month period in 2007-2008, including after the dissolution of M-Tech.  See id. at 67-70, ¶ 11.

### Kohn's Son Robert Alan Kohn

202.    R. Kohn is Kohn's and E. Kohn's son.  On information and belief, he is a U.S. citizen and resident of New York.  He has lived at the Kohn's Monsey, New York address as recently as 2002.

203.    R. Kohn appears to be concealing his current whereabouts and does not appear in any public record databases.

204.    R. Kohn, like other members of the Kohn family, acted on behalf of Eurovaleur.  He accepted checks of stolen Customer Property from Kohn, via Infovaleur, between 2004 and 2009.  On January 6, 2009, less than a month after Madoff confessed to running a Ponzi scheme, Kohn, through Infovaleur, laundered $57,334.03 to R. Kohn care of Eurovaleur.  See id. at 67-69, ¶ 11.

## KOHN INITIATES THE ILLEGAL SCHEME IN NEW YORK

### Kohn's Sham Entities and Her Secret Kickbacks from Madoff

205.     Kohn established and controls certain Defendants that had or have no legitimate business purpose and existed or exist only to receive stolen Customer Property from Madoff.  Certain of these Sham Entities are incorporated in New York, such as Erko and Infovaleur.  Certain other Sham Entities are incorporated in Europe, such as Tecno Italy and Tecno Gibraltar.  They are all critical members of the Medici Enterprise and are Kohn's mechanisms for the "Money-Out" component of the Illegal Scheme.

206.     In exchange for sustaining the Ponzi scheme, Kohn received at least $62 million in stolen Customer Property directly from Madoff.  These and hundreds of millions of dollars and other illicit proceeds of the Illegal Scheme unjustly and fraudulently enriched Kohn and her family and funded the expansion of the Medici Enterprise.  See Exhibits H, I, J, and K.

207.     On information and belief, by 1987, Kohn, via Erko, was already receiving secret kickbacks of stolen Customer Property from Madoff.  These payments were made by check and personally picked up by Kohn and E. Kohn in London.  The kickbacks to Erko continued through 2001 and totaled at least $11 million.  See RICO Case Statement section f(2), at 70-72, ¶ 12.

208.     In 2002, the kickbacks that Madoff paid to Kohn through Erko began to pass through Tecno Italy instead.  Madoff transmitted these payments via wire in foreign commerce.  Kohn, Blau, and Raule received and processed these kickbacks for their benefit and for the benefit of Tecno Italy, Medici S.r.l., Brera, and other members of the Medici Enterprise in furtherance of the Illegal Scheme.  The kickbacks to Tecno Italy continued until 2007 and totaled at least $14 million.  See id. at 72-73, ¶ 13.

209.    Finally, in 2007, Kohn began receiving Madoff's kickbacks via Tecno Gibraltar in 2007 in place of Tecno Italy.  Kohn and Amselem received and processed these kickbacks for their own benefit and for the benefit of Tecno Gibraltar, Line Holdings, Line Management, Line Group, Redcrest, and other members of the Medici Enterprise in furtherance of the Illegal Scheme.  These kickbacks totaled at least $4,400,000.  See id. at 73-75, ¶ 14-15.  On information and belief, Kohn distributed this Customer Property to her family and other members of the Medici Enterprise.

210.    In the meantime, in 1998, Kohn began receiving a separate stream of kickbacks from Madoff through Infovaleur.  Infovaleur drew these illegitimate proceeds from Madoff's 703 Account and 621 Account.  These kickbacks were the sole source of Infovaleur's income, and were subsequently transferred by Kohn to other members of the Medici Enterprise, including:  her friend and long-time business associate, Kastner, and Scheithauer, the former CEO of Bank Medici, until as late as March 2009.  On information and belief, these payments are ongoing.  Kohn and Reuss received and processed these kickbacks in furtherance of the Illegal Scheme.  These kickbacks to Infovaleur continued until 2008 and totaled at least $32 million.  See id. at 65-67, ¶ 10.

**Infovaleur**

211.    Incorporated in New York by Kohn on February 22, 1996, Infovaleur has no legitimate business purpose and has always existed solely to receive stolen Customer Property from BLMIS and to further the Illegal Scheme.  From 2000 to 2008, Infovaleur was BLMIS's third highest paid "vendor," although Infovaleur provided nothing of value to BLMIS.

212.    These kickbacks to Kohn through Infovaleur were authorized and executed by Madoff.  At all relevant times, Reuss managed the day-to-day operations of

Infovaleur and served as its contact for BLMIS with respect to these transactions. Reuss, on behalf of Kohn and Infovaleur, mailed invoices to BLMIS for worthless services under Kohn's sham invoicing system in furtherance of the Illegal Scheme. On information and belief, Reuss sent these invoices through the U.S. Mail. Madoff transmitted his payments to Kohn and Infovaleur via check and they were picked up in person at BLMIS by Kohn or her emissaries. See id. at 63-65, ¶ 10.

213.    Like all of her Sham Entities, the Kohn Family Defendants treated Infovaleur as a personal checking account. As early as 2002, and as recently as 2009, after Madoff confessed to running a Ponzi scheme, Infovaleur transferred over $900,000 to Kohn and members of her family, and over $1,000,000 to her other Sham Entities, Palladium and M-Tech, which are owned and operated by her sons-in-law, M. Hartstein and Landau. In furtherance of the Illegal Scheme, Kohn also made payments, through Infovaleur, to Kastner and Scheithauer.

**Erko**

214.    Incorporated in New York by Kohn on April 15, 1987, Erko has never had a legitimate business purpose and existed solely to receive stolen Customer Property from Madoff and further the Illegal Scheme.

215.    Throughout Erko's existence, it never had an address other than that of Kohn's counsel in New York. On information and belief, Erko employed certain individuals who worked for Kohn at Windsor, and Erko is the general partner of Windsor's holding company.

216.    On information and belief, beginning in 1987, Kohn and E. Kohn traveled to London from New York and elsewhere to pick up checks from Madoff and his affiliates. On December 12, 1997 and January 12, 1998, Flax sent facsimiles via wire on

MSIL letterhead to BLMIS wherein Flax requested that BLMIS transfer $200,000 and $323,500, respectively, to MSIL to fulfill Madoff's requests to pay Erko. Kohn and Erko caused this transmission by invoicing Madoff at MSIL. See id. At 70, ¶ 12.

217.    In 1998, the New York Secretary of State dissolved Erko, presumably for non-payment of taxes. In keeping with Kohn's practice of disregarding the corporate form of her multiple Sham Entities, Erko continued to invoice Madoff and receive kickbacks until 2002. Kohn, via Erko, invoiced Madoff from an address in Vienna that, on information and belief, is her childhood home.

218.    Although Erko stopped receiving payments from Madoff in 2002, it was directly succeeded by Tecno Italy, which was directly succeeded by Tecno Gibraltar in 2007.

**Tecno Italy**

219.    Tecno Italy is a Milan-based company incorporated on February 21, 2002. Kohn's mother, Blau, was responsible for overseeing the day-to-day activities of Tecno Italy. Kohn, via Eurovaleur, registered the internet domain name of Tecno Italy in New York on January 30, 2004.

220.    At all relevant times, Tecno Italy had no legitimate business purpose and existed only to receive stolen Customer Property from BLMIS and further the Illegal Scheme. From May 21, 2002 through January 2, 2007, Tecno Italy received secret kickbacks of stolen Customer Property. Kohn and Tecno Italy invoiced Madoff at MSIL, and Flax and Raven authorized and executed these transfers. Madoff paid Kohn through Tecno Italy via wire in foreign commerce.

221.    As with many of the Sham Entities owned and controlled by Kohn, Tecno Italy had strong connections to Bank Medici. Tecno Italy was located in the same offices

as Medici S.r.l. at Via Andegari 18, 20121 Milan, Italy and shared at least two of the same employees, Raule and de Sury.  Tecno Italy liquidated its assets on December 5, 2008, one week before Madoff confessed.

222.    Kohn also received correspondence for HAM and Bank Medici, and/or Medici S.r.l., at the same address.  Kohn treated Medici S.r.l. and Tecno Italy as indistinguishable entities.

223.    In addition to being a key employee of Tecno Italy, Raule was its contact with respect to the transfers from Madoff at MSIL, as executed by Flax and Raven.  Raule was also an employee of Medici S.r.l. and served as a secretary to Mugnai, a director of HAM and Herald Fund.

224.    The May 22, 2002 invoice from Tecno Italy to Madoff at MSIL contains handwritten notes regarding Madoff's payment approval.  The June 28, 2002 invoice from Tecno Italy also notes Madoff's approval and contains the handwritten notation "Erwin Kohn" and his Austrian phone number.  The September 26, 2002 invoice contains the handwritten notation "3rd October 2002.  Discussed with Bernie who approved payment today."  Kohn caused Tecno Italy to send its invoices to Madoff via wire in foreign commerce.  See id. at 72, ¶ 13.

**Tecno Gibraltar**

225.    Tecno Gibraltar was incorporated on January 3, 2007.  Tecno Gibraltar's mailing address is located in the offices of Line Management, which is associated with Hassans and HAM.  On information and belief, Kohn owns and controls Tecno Gibraltar.  Its ownership structure is obscured by a complex web of interrelated companies orchestrated by, and including, Hassans.  Tecno Gibraltar's sole director is Amselem, an

Israeli national residing in Gibraltar. Amselem is an employee of Line Management, a company associated with Hassans.

226. At all relevant times, Tecno Gibraltar had, on information and belief, no legitimate business purpose and existed only to receive stolen Customer Property from BLMIS and further the Illegal Scheme. In May 2007, Tecno Gibraltar replaced Tecno Italy as a vehicle for Kohn to kickbacks from Madoff. At all relevant times, Amselem was responsible for overseeing the day-to-day operations of Tecno Gibraltar. On at least June 4, 2007, Amselem corresponded with Flax at MSIL via e-mail in relation to confirming Madoff's kickbacks to Kohn through Tecno Gibraltar. See id. at 73-74, ¶ 14.

227. Kohn and Tecno Gibraltar invoiced Madoff at both BLMIS and MSIL, and Madoff, Flax, and Raven authorized and executed these transfers. The April 24, 2007 and July 5, 2007 Tecno Gibraltar invoices to Madoff at MSIL were payable to Wachovia Bank, NA in New York. On information and belief, Tecno Gibraltar sent each invoice to Madoff at MSIL via facsimile. The funds transmitted to Kohn and Tecno Gibraltar were provided by Madoff, and each payment is stolen Customer Property. See id. at 73, ¶ 14.

228. Each of Tecno Gibraltar's invoices to Madoff at BLMIS was payable to an account at NatWest Offshore Limited Gibraltar for ultimate credit to a Tecno Gibraltar account. On information and belief, Tecno Gibraltar sent each invoice to BLMIS in New York via mail or facsimile. Each invoice is marked by hand "TECNOKOHN." The January 14, 2008 invoice is also marked "BLM Special." Id. at 74, ¶15.

## THE NEW YORK GENESIS OF THE MEDICI ENTERPRISE

229. By late 1985, Kohn's agreement with Madoff to solicit investors for the Ponzi scheme was in place. Kohn had erected a structure based in New York by which

she could secretly receive Madoff's kickbacks.  In exchange for the millions of dollars that Madoff agreed to pay, and had already begun to pay Kohn, she needed a structure to solicit investors into the Ponzi scheme.  In keeping with Kohn's practice of representing that she had access to the wealthy and influential, Kohn established Windsor and Eurovaleur in New York, which she used to solicit direct accounts at BLMIS.

### Kohn Solicits Her First Account for Madoff Through Windsor

230.    On July 15, 1987, Kohn incorporated the purported securities firm Windsor in New York, New York.  At all relevant times, Kohn was the owner and manager of Windsor and Erko was the general partner of Windsor's holding company.  In keeping with Kohn's practice, Windsor employed certain individuals who also worked for her at Eurovaleur and Erko.  Through Windsor, Kohn began to solicit investors for Madoff's Ponzi scheme.

231.    The first account that Kohn brought to BLMIS was that of a Chicago-based investor named Howard Gottlieb ("Gottlieb").  Gottlieb is a former business partner of Kohn.  After Kohn arranged a meeting between Madoff and Gottlieb at BLMIS in New York, Kohn convinced Gottlieb to invest $3 million with BLMIS.  On April 18, 1989, Kohn, through Windsor, helped Gottlieb open BLMIS account number 1G0067.

232.    Kohn kept a close eye on Gottlieb's account.  On November 14, 1989, Gottlieb, on behalf of Kohn, directed BLMIS via facsimile to send duplicate copies of his account statements to Kohn, in care of Windsor.  This correspondence ensured that Kohn and Windsor had visibility with respect to Gottlieb's account, which allowed her to monitor his purported investment.  Id. at 60, ¶ 1.

233.    Gottlieb's account went on to earn an almost 50% return on investment in just under four years.  Kohn was aware of every purported transaction that BLMIS pretended to execute on Gottlieb's behalf.

234.    In 1990, Gottlieb severed his business and personal relationships with Kohn.  On information and belief, Gottlieb was uncomfortable with the fact that Kohn was receiving commissions for bringing accounts, including his own, to Madoff.  On information and belief, Kohn told Gottlieb that she was paid by Cohmad, rather than telling him the true nature of her secret agreement with Madoff.

235.    Gottlieb then sent his BLMIS statements to a certified investment management analyst, Ronald J. Surz ("Surz").  On information and belief, Surz was unable to explain the returns that BLMIS was reporting and told Gottlieb that BLMIS's stated returns were impossible.  Gottlieb closed his BLMIS account on June 24, 1993, after taking $1.4 million in fictitious profits from BLMIS.

236.    After Madoff confessed, Gottlieb spoke to the Chicago Tribune and stated that he figured out that Madoff was a fraud years ago:  "[o]n close examination of the returns, the purported trading and all the rest of it, it didn't add up as being a legitimate investment."  Mary Ellen Podmolik, Wary Investor Caught Off-Guard in Bernard Madoff Case, Chicago Tribune, February 6, 2009, available at http://articles.chicagotribune.com/2009-02-06/news/0902051216_1_bernie-madoff-invested-arbitrage-strategies.

**Kohn Launches Eurovaleur in New York to Help BLMIS Reach into Europe**

237.    Kohn laid the groundwork for the "Money-In" component of the Illegal Scheme in New York, primarily through Eurovaleur.

238.     The collapse of the Berlin Wall in 1989 created new opportunities for

Kohn to solicit investors for BLMIS from Eastern and Central Europe, particularly her

ancestral home of Austria.  On information and belief, Kohn characterized Austria as the

gateway to new investment opportunities in Eastern Europe.  At the same time, she

characterized herself as "Austria's woman on Wall Street," and the gateway to Madoff.

On information and belief, however, less than 10% of the investments in the Medici

Enterprise Feeder Funds originated in Austria.

239.     With this fertile ground in mind, she created Eurovaleur to market Madoff

abroad.  Through Eurovaleur, Kohn moved beyond soliciting individual BLMIS

accounts, such as Gottlieb's, and began to feed staggering amounts of money into

BLMIS.  On information and belief, Kohn also intended to leverage her connections with

European financial institutions, particularly Bank Austria and UniCredit, to expand the

Medici Enterprise and further the Illegal Scheme.  Kohn laid the groundwork for Bank

Medici itself through Eurovaleur by, among other things, registering the Internet domain

name "bankmedicimaestro.com" in New York.

240.     Kohn incorporated Eurovaleur in New York on March 26, 1990, and she is

its sole shareholder.  The company remains active in New York and Kohn is listed as its

President and CEO.  Eurovaleur held itself out to potential investors in BLMIS under

various guises, including a fund of hedge funds, a New York registered brokerage, a

provider of research services, and "a European boutique investment bank."

241.     At all relevant times, on information and belief, Eurovaleur had no

legitimate business purpose and existed only as a member of the Medici Enterprise and to

further the Illegal Scheme. Eurovaleur received proceeds of the Illegal Scheme, including, on information and belief, stolen Customer Property, through 2008.

242. Through Eurovaleur, Kohn, M. Hartstein, and on information and belief, Reuss solicited investors for BLMIS as early as 1991.

**Kohn Solicits Foreign Investors in New York Through Eurovaleur**

243. Although Madoff was paying Kohn millions of dollars, Kohn, on information and belief, had brought only four accounts to BLMIS by the time the Medici Enterprise's first BLMIS feeder fund Primeo Fund opened its first account on December 30, 1993.

244. With the imprimatur of Eurovaleur and the exclusivity of her special relationship with Madoff, Kohn finally began to solicit the wealthy European investors that she had always sought. On information and belief, Eurovaleur hosted luncheon events in New York for various international financiers.

245. On information and belief, Kohn introduced wealthy international investors to Madoff as early as 1991. When Kohn brought these investors to BLMIS, Madoff would greet Kohn "with a big hug and a kiss."

246.                              REDACTED

247.    Over the course of the Illegal Scheme, Madoff credited Kohn for bringing at least six Benbassat-related accounts to BLMIS.  Kohn's relationship with the Benbassat family continued for the duration of the Illegal Scheme and contributed to the growth of the Medici Enterprise.

248.    In 1996, Benbassat "gave" Kohn, through Eurovaleur, a 10% ownership interest in Thema International's investment management company as a "thank you" for introducing him to Madoff.  Also beginning in 1996, Kohn's relationship with the Benbassat family led to Bank Medici distributing and marketing Thema International.  In 2006, Bank Medici became the investment manager to Thema International and received fees for this purported service.

249.    On January 6, 2000, Grasso, on behalf of Kohn and Eurovaleur, sent a facsimile on Eurovaleur letterhead to Mark Madoff at BLMIS enclosing Italian newspaper articles regarding Kohn's Milan-based online investment sales platform, FundsWorld.  This correspondence evidences Kohn's coordination with BLMIS in relation to the solicitation of investors for the Ponzi scheme.  Id. at 63, ¶ 7.

250.    FundsWorld, owned and created by Kohn, offered mutual and hedge funds to institutional and wealthy investors.  On information and belief, Kohn established FundsWorld to sell access to the Medici Enterprise Feeder Funds.  FundsWorld paid Eurovaleur €750,000 in December 2000 and €1.5 million on December 31, 2002.

251.    In addition to soliciting investors for BLMIS, Eurovaleur functioned as an alter ego of, and money laundering mechanism for, Kohn and the Kohn Family Defendants.  In addition to Kohn's family, Eurovaleur employed Reuss, Grasso, and Kritzer.

## Kohn, Eurovaleur, and Bank Austria

252.    On information and belief, Kohn met Bank Austria's chairman, Randa, in the early 1990s.  Kohn was introduced to Randa by Zapotocky.  Around the same time, Kohn also met Scheithauer at a Bank Austria function in New York.  Kohn, Randa, and Scheithauer all discussed investment opportunities for Eastern European investors and governments in hedge funds and "alternative investments."

253.    Randa wanted to build Bank Austria into a global brand and the flagship financial institution of Eastern and Central Europe.

254.    At that time Bank Austria had recently been established by a merger of two Austrian banks, Zentralsparkasse und Kommerzialbank AG and Österreichische Länderbank AG.  Randa was the head of the new Bank Austria and responsible for its aggressive growth.  Randa shared Kohn's view of the new Europe, and felt that Bank Austria was poised to expand its role in the Central and Eastern European banking sectors.

255.    On information and belief, Kohn informed Randa, Scheithauer, and Zapotocky about Madoff and the consistent returns that he generated for the accounts that Kohn had thus far fed into BLMIS.  Kohn and Zapotocky met with Madoff in New York briefly and agreed that Bank Austria would market and distribute feeder funds into BLMIS.

256.    The Medici Enterprise Feeder Funds began with Primeo Fund.  On information and belief, Kohn and Zapotocky conceived the Cayman Islands-based Primeo Fund in New York.

**Primeo Fund:  The First of the Medici Enterprise Feeder Funds**

257.    Kohn, through Eurovaleur, conspired with Bank Austria, Randa, Zapotocky, Scheithauer, Nograsek, and Duregger to create Primeo Fund.

258.    On August 12, 1993, Kohn, through Eurovaleur, sent a trademark application to the United States Patent and Trademark Office ("USPTO") via the U.S. Mail to register the "Primeo" trademark.  On November 1, 1994, the USPTO granted Eurovaleur's trademark application.  The mark remained registered to Eurovaleur until 2001, when Eurovaleur assigned the "Primeo" trademark to Bank Austria.  Id. at 61-62, ¶ 3.

259.    Kohn and Eurovaleur held the mark for over seven years.  On December 17, 2001, Defendants Nograsek and Duregger, on behalf of Bank Austria, sent via the U.S. Mail, a letter to the USPTO appointing Bank Austria's New York attorney as Bank Austria's domestic representative as part of the assignment process of the "Primeo" trademark.  Bank Austria still owns the "Primeo" trademark.  These mailings were necessary to ensure the continuity of Primeo Fund and further the Illegal Scheme.  Id.

**Primeo Fund**

260.    Kohn, Bank Austria, Randa, Scheithauer, Zapotocky, Kretschmer, Nograsek, and Kadrnoska conspired to market Primeo Fund as a diversified "fund of funds" while concealing the fact that Madoff and BLMIS would act as both investment manager and de facto custodian.  In furtherance of the Illegal Scheme, Bank Austria generated misleading Primeo Marketing materials and distributed them to other members of the Medici Enterprise.

261.    Primeo Fund is an open-ended investment fund incorporated in the Cayman Islands on November 18, 1993, created by Kohn, Eurovaleur, Bank Austria,

Randa, Scheithauer, Zapotocky, Kretschmer, Kadrnoska, and Hemetsberger. On information and belief, Primeo Fund was initially capitalized entirely by Bank Austria's own funds.

262. Throughout the majority of its existence, Primeo Fund was 100% invested through BLMIS, holding account numbers 1FN060 and 1FN092. Primeo Fund also fed hundreds of millions of dollars into BLMIS indirectly through other Medici Enterprise Feeder Funds: Herald Fund, Alpha Prime Fund, and _____REDACTED_____.

263. Kohn, Eurovaleur, Bank Austria, Bank Medici and its branches, HAM, and other members of the Medici Enterprise marketed, distributed, and sold Primeo Fund.

264. Beginning with the 1993 launch of Primeo Fund, Kohn, Zapotocky, Radel-Lezczynski, Kretschmer, and Hemetsberger traveled from Europe to New York, personally and on behalf of Bank Medici, Bank Austria, and BA Worldwide, to meet with Madoff at BLMIS headquarters to discuss the Medici Enterprise Feeder Funds. Similar meetings continued two to three times a year for the next fifteen years. On information and belief, the purpose of these meetings was to discuss with Madoff how best to market Primeo Fund, and later the other Medici Enterprise Feeder Funds, in furtherance of the Illegal Scheme.

265. On information and belief, during these visits, Kohn, Zapotocky, Kretschmer, Hemetsberger, and Radel-Leszczynski also traveled to Bank Austria's New York branch. Kohn and Reuss facilitated these travels through Eurovaleur in New York. For example, on September 10, 2004, Reuss sent an e-mail, with a Eurovaleur signature, confirming a meeting between Madoff, Radel-Leszczynski, and Hemetsberger. See id. at 64, ¶ 8.

## SONJA KOHN RETURNS TO EUROPE TO CREATE BANK MEDICI

266.     With the New York architecture of the Medici Enterprise in place, Kohn left New York around 1994 and returned to her birthplace, Vienna.  Although she had no formal position at Bank Austria, on information and belief, Kohn worked closely with Bank Austria, Randa, and Scheithauer to build the architecture of Bank Medici.

### Kohn, BA Worldwide, and Primeo Fund

267.     Soon after Kohn's arrival in Austria, Kohn sought to aggressively market Primeo Fund in Europe.  To that end, Bank Austria incorporated BA Worldwide to be the supposed investment manager of Primeo Fund, despite the fact that Madoff actually performed these roles and would continue to do so for the duration of the Illegal Scheme.

268.     Bank Austria owned 95% of BA Worldwide and a majority of its board members were Bank Austria employees.     REDACTED

.  Radel-Leszczynski served as BA Worldwide's president after 2000 and was responsible for its management and operation at all relevant times.

269.     BA Worldwide was the investment adviser to Primeo Fund from December 15, 1993 until April 25, 2007, when Pioneer took over this role at UniCredit's direction.  On information and belief, BA Worldwide existed only to service the Medici Enterprise Feeder Funds.

270.     BA Worldwide received fees based on the net asset value of Primeo Fund, calculated on a monthly basis.  BA Worldwide received at least $55 million for its participation in this component of the Illegal Scheme.  Eurovaleur in New York received 20% of these fees for serving as a sub-adviser to BA Worldwide.  Bank Austria, Duregger, and Radel-Leszczynski directed these payments to Kohn and Eurovaleur

through BA Worldwide. On information and belief, the purpose of this agreement was to compensate Kohn for introducing Bank Austria to Madoff. See id. at 75-79, ¶ 16.

271. BA Worldwide also served as the investment adviser to Thema International and to Alpha Prime Fund. These funds paid BA Worldwide advisory fees, typically 0.2% of the net asset value of the fund, calculated on a monthly basis. BA Worldwide received at least $13 million for its participation in this component of the Illegal Scheme.

**Kohn Facilitates Bank Austria's BLMIS Account**

272. Prior to Bank Austria's wholesale distribution of Primeo Fund in 1996, Kohn provided Bank Austria with direct access to BLMIS. On information and belief, Randa, Kadrnoska, Kretschmer, Zapotocky, and Nograsek directed and supervised the creation of Bank Austria's direct BLMIS account.

273. On August 29, 1995, Kritzer, on behalf of Kohn, sent a facsimile from New York to BLMIS naming Bank Austria executive, Kretschmer, as the contact for Bank Austria's direct BLMIS account number 1FN082. This facsimile was sent via wire on Eurovaleur letterhead. Bank Austria's Account Maintenance File ("AMF"), recovered from BLMIS, contains Bank Austria's Zapotocky's business card. This card has a handwritten notation containing Kohn's name and phone number. See id. at 62, ¶ 4.

274. Bank Austria closed its direct account with BLMIS in 1996 as it began to distribute Primeo Fund in earnest. Bank Austria, through its membership in the Medici Enterprise and participation in the Illegal Scheme, continued to profit from the Ponzi scheme without the exposure of a direct account with BLMIS.

**Bank Austria's BLMIS Account Received Fictitious Profits**

275.     Bank Austria's account received fictitious profits from BLMIS in the amount of $249,627.82.  Bank Austria received three transfers of stolen Customer Property from BLMIS over the life of its direct account.  On July 10, 1996, BLMIS transmitted via wire in foreign commerce $1,743,641 to Bank Austria.  On August 8, 1996, BLMIS sent a check via the U.S. Mail in the amount of $1,351 to Bank Austria.  Finally, on September 20, 1996, BLMIS sent a check via the U.S. Mail in the amount of $826 to Bank Austria.  On information and belief, Randa, Kadrnoska, Kretschmer, and Zapotocky directed these withdrawals from the Bank Austria direct BLMIS account.  These checks were processed and received by Bank Austria.  Id. at 62-63, ¶ 5.

**Kohn Announces the Expansion of Primeo Fund**

276.     On December 21, 1995, Kohn sent a facsimile to BLMIS, on Eurovaleur letterhead, wherein she announced that Primeo Fund would begin issuing Class B shares and opening a new account with BLMIS.  This correspondence resulted in Primeo Fund opening BLMIS account number 1FN092.  Kohn, Randa, Scheithauer, Zapotocky, Kretschmer, Kadrnoska, Hemetsberger, and Bank Austria were instrumental to the creation of this fund and introduced Bank Austria officials to Madoff and other representatives of BLMIS in New York.  See id. at 63, ¶ 6.

## BANK MEDICI

**Bank Austria and Kohn Create a Special Purpose Vehicle to Sell Access to BLMIS**

277.     With Primeo Fund now in place, Kohn and Bank Austria sought to create a mechanism by which they could widely distribute it to Central and Eastern European investors.  Modeled on Eurovaleur, Kohn and Bank Austria created Bank Medici.

278.     Bank Austria already owned a company that Kohn could use for this purpose.  Bank Medici began as a company named "Anton-Schwarz GmbH," which was wholly owned by Bank Austria.  In 1994, Bank Austria sold Kohn 90% of Anton-Schwarz GmbH and kept 10% ownership.  Kohn named her new company various iterations of the "Medici" name, eventually settling on "Bank Medici."

279.     Kohn and Bank Medici immediately began marketing and distributing Primeo Fund, expanding upon what Eurovaleur started in New York in 1991.  Kohn was and is the majority shareholder of Bank Medici.  Bank Austria held a minority share.  At all relevant times, Bank Austria operated Bank Medici as a de facto "branch" and referred to it internally as "Branch 1199."

280.     Bank Medici and Bank Austria had a "revolving door" of officers, directors, and employees.  The following Defendants all acted for both Bank Austria and Bank Medici:  Kohn, Scheithauer, Kretschmer, Nograsek, Duregger, and Gutty (of UniCredit).  On information and belief, this mutual Kohn/Bank Austria ownership and operating structure as to Bank Medici remains in place to this day.

281.     On information and belief, Kohn refused to serve on Bank Medici's management board, because under Austrian corporate law that board has the "real power."  Rather, Kohn served on Bank Medici's supervisory board, which is relatively powerless, even as she controlled Bank Medici using other titles.  On information and belief, Kohn preferred this arrangement because members of the supervisory board may avoid legal liability for the actions of a company's activities.

282.     Bank Austria entered into several "Contracts of Agency" with Bank Medici under which all transactions of customers acquired and advised by Bank Medici

were to take place via Bank Austria. Bank Medici has no banking infrastructure of its own. All of its accounts and portfolios are held and administered by Bank Austria. Bank Austria also agreed to assist Bank Medici in undertaking its due diligence obligations. On information and belief, Bank Medici paid Bank Austria for these services.

283. On information and belief, Kohn and Bank Medici prevented certain Bank Austria personnel from conducting any internal examination of Madoff, BLMIS, or the Medici Enterprise Feeder Funds. When these Bank Austria personnel sought information about the performance and structure of the Medici Enterprise Feeder Funds, they were referred to Pirkner. Pirkner was manifestly unqualified to answer any questions about these or any other purported fund of hedge fund investment vehicles.

284. Pirkner has admitted to the Austrian authorities that he and Bank Medici had no visibility into the Medici Enterprise Feeder Funds, particularly its largest, Herald Fund, through which Primeo Fund also invested. In the same interview, however, Pirkner claimed that he personally implemented the supposed "collar" in Madoff's SSC Strategy.

**Bank Austria Willingly Participates in the Illegal Scheme**

285. Bank Austria lent its name and credibility to, and hence validated and bolstered Kohn, Bank Medici, and the Medici Enterprise Feeder Funds. Kohn and Bank Medici controlled Bank Austria's and the Medici Enterprise Feeder Funds' relationship with Madoff and BLMIS. In at least one instance, Bank Austria's parent corporation fired an employee for questioning the legitimacy of Herald Fund's returns.

286. On information and belief, Bank Medici also terminated those who sought information about Madoff, BLMIS, and the Medici Enterprise Feeder Funds. In 2008, Kohn solicited Thomas Lachs ("Lachs"), a prominent Austrian investor, to market and

distribute Herald (Lux).  When Lachs sought information about the investment manager

for Herald (Lux), Kohn directed Scheithauer to terminate Bank Medici's distribution and

marketing relationship with Lachs.

287.                          REDACTED


                                                    Nonetheless, Bank

Austria not only tolerated the activity of its rogue branch, it encouraged, facilitated, and

profited from it.

### Bank Medici's Banking License Furthers the Illegal Scheme

288.    In 2003, Bank Austria helped Kohn and Bank Medici procure an Austrian

banking license from the Austrian government.  On information and belief, Bank

Medici's application was supported by Bank Austria and, specifically, its head, Randa.

After Bank Austria and Randa helped Bank Medici procure its banking license, Bank

Austria's holding in Bank Medici increased from 10% to 25%.

289.    Bank Medici's acquisition of an Austrian banking license was a critical

point in the Illegal Scheme.  Bank Medici could now create its own Madoff investment

vehicles from which Bank Austria could profit while maintaining a purported distinction

in corporate form from Kohn and Bank Medici.

### Bank Medici Creates Its Own Investment Vehicles

290.    Herald Fund is the largest of the Medici Enterprise Feeder Funds and fed

at least $1.5 billion into BLMIS over its five-year existence.  Herald Fund was

incorporated in the Cayman Islands on March 24, 2004, and created by Kohn,

Eurovaleur, Bank Austria, and Bank Medici.  At all relevant times, Herald Fund was

100% invested through BLMIS, holding account number 1FR109.

291.     The Medici Enterprise extracted hundreds of millions of dollars from Herald Fund.  Herald Fund generated hundreds of millions of dollars in management, distribution, and other fees for HAM, Bank Medici, Bank Austria, UniCredit, and Pioneer.

292.     Kohn, Eurovaleur, Bank Austria, Bank Medici and its branches, HAM, and other members of the Medici Enterprise marketed, distributed, and sold Herald Fund. Herald Fund's purported investment manager was HAM, although Bank Medici oversaw its day-to-day operations.

293.     Bank Medici went on to be the primary marketer, distributor, and investment manager of Herald (Lux) and received an annual management fee equal to 2% of its net asset value and a performance fee equal to 10% of any increase in its net asset value, both calculated on a monthly basis.  Bank Medici received at least $2 million for participating in this component of the Illegal Scheme.

294.     Bank Medici also marketed, distributed, and managed Thema International, for which it received an annual fee up to 0.5% of the fund's net asset value. On information and belief, Bank Medici received at least $45 million for participating in this component of the Illegal Scheme.

295.     From 2006 to 2008, HAM paid Bank Medici at least $13 million as Herald Fund's largest distributor.  On information and belief, these fees were Bank Medici's primary source of income.  Kohn, Mugnai, de Sury, Cosulich, Bank Medici Gibraltar, Herald Consult, and Line Holdings, through HAM, transmitted these payments via wire to Bank Medici and Medici Cayman.  See id. at 79-81, ¶ 17.

**Herald Asset Management**

296.    HAM, Bank Medici, Bank Austria, and UniCredit are the operating nucleus of the "Money-In" component of the Illegal Scheme.  Without Herald Fund, the Medici Enterprise would not have HAM.  Without HAM, Bank Medici, Bank Austria, and UniCredit could not have continued to further the Medici Enterprise by feeding money into BLMIS.

297.    Kohn treated HAM as indistinguishable from Bank Medici itself and Kohn operated HAM from Bank Medici's offices.  HAM acted as a money laundering machine for the Medici Enterprise and as a personal checking account for Kohn.

298.    Kohn, through HAM, routinely wired millions of dollars to entities and individuals affiliated with Kohn, including de Sury, Mugnai, and Cosulich.  These three Milan-based Defendants were directors of HAM, and each had unique relationships with Kohn, outside of HAM.  Mugnai and Cosulich operated the Medici Enterprise's central funding mechanism. De Sury authorized hundreds of millions of dollars in payments to other members of the Medici Enterprise.

299.    Kohn created HAM under the laws of the Cayman Islands on March 12, 2004.  Its true ownership structure is obscured by a labyrinth of interrelated companies engineered by Hassans, and including Hassans.  The ultimate beneficial owners of HAM, however, are Kohn and her husband, E. Kohn.

300.    Although HAM was registered in the Cayman Islands, it operated from, among other places, Vienna, and Medici S.r.l.'s offices in Milan.  Bank Austria Cayman leased HAM its office space in the Cayman Islands.  Bank Austria Cayman, at Duregger's direction, accepted almost $60,000 from HAM over the course of the Illegal Scheme.  Kohn, Mugnai, de Sury, Cosulich, Herald Consult, and Line Holdings, through

HAM, transmitted these payments via wire to Bank Austria Cayman.  See id. at 82-83, ¶ 19.

301.    Mugnai and Kohn both worked at Medici S.r.l. and shared a personal secretary in Raule.  De Sury and Cosulich also worked for Kohn at Medici S.r.l.  From June 2006 to October 2008, Kohn, Herald Consult, and Line Holdings, through HAM, transmitted over $500,000 via wire to Mugnai, de Sury, and Cosulich.  Days after Madoff's confession, on December 17, 2008, Kohn, through HAM, transferred €15,000 to de Sury.  See id. at 86-87, ¶ 23.

302.    On December 15, 2008, days after Madoff confessed to running a Ponzi scheme, HAM transferred $6.5 million and €6.5 million to accounts in Gibraltar held by Hassans.  Hence, HAM is also critical to the "Money-Out" component of the Illegal Scheme.  Kohn, Mugnai, de Sury, and Cosulich, through HAM, transmitted these payments via wire to Hassans, Line Group, and Line Management.  See id. at 87-88, ¶ 24.

### The Expansion of Herald Fund

303.    Kohn, Bank Medici, and Bank Austria sought to distribute Herald Fund as widely as possible.  Bank Medici and Bank Austria used all of their affiliates to assist in the marketing and distribution of Herald Fund.  On information and belief, APM Cayman, Sofipo, Medici Cayman, and Bank Austria Cayman all received proceeds of the Illegal Scheme designated as "retrocession fees" from HAM for distributing Herald Fund.

### Bank Medici Distributes Herald Fund Through Its Branches and Affiliates

304.    Kohn, Bank Austria, and Bank Medici created branded and de facto branches through which they marketed and distributed the Medici Enterprise Feeder Funds.  Bank Medici's branches include at least the following:  (i) Medici S.r.l. in Milan,

Italy; (ii) Medici Cayman; (iii) MediciFinanz; (iv) APM Cayman; and (v) Bank Medici Gibraltar, a "joint venture" with Hassans.

### Medici S.r.l.

305.    Bank Medici's Italian branch Medici S.r.l. is located in Milan and shares an office with HAM.  Medici S.r.l. also shared an address with Tecno Italy, and both employed Raule.  De Sury was an employee of Medici S.r.l.  On information and belief, Kohn, de Sury, and other members of the Medici Enterprise solicited investors for the Medici Enterprise Feeder Funds through Medici S.r.l.'s offices.

### Medici Cayman

306.    Bank Medici's Cayman branch received payments from HAM designated as "retrocession fees" for soliciting investors for the Medici Enterprise Feeder Funds beginning at least as early as September 24, 2007.

307.    On information and belief, Kohn, Kastner, and other members of the Medici Enterprise solicited investors for the Medici Enterprise Feeder Funds through Medici Cayman's offices.

### Bank Medici Gibraltar

308.    In November 2004, Bank Medici and Hassans announced the opening of their "joint venture" Bank Medici Gibraltar.  It ultimately opened in January 2005.

309.    On information and belief, and as set forth fully below in relation to Hassans, Kohn and other members of the Medici Enterprise solicited investors for the Medici Enterprise Feeder Funds through Bank Medici Gibraltar's offices.

### MediciFinanz and APM Cayman

310.    MediciFinanz operated as Bank Medici's de facto branch in Germany. Bank Medici owned 50% of both MediciFinanz and APM Cayman.  Kastner owned the

other 50% of both MediciFinanz and APM Cayman. Kastner managed both MediciFinanz and APM Cayman. On information and belief, Kohn recruited Kastner to the Medici Enterprise to distribute the Medici Enterprise Feeder Funds.

311. On information and belief, Kohn introduced Kastner to Madoff in New York in the late 1990s. Shortly thereafter, Kastner returned to Germany and, with Kohn, created MediciFinanz. On information and belief, Kohn and Kastner also created APM Cayman to launder the funds received from HAM to Kastner and MediciFinanz. See id. at 80, ¶ 18.

312. Kastner, through MediciFinanz, was a primary distributor and marketer of Primeo Fund, Thema International, Alpha Prime Fund, and Herald Fund in Germany. Kohn, through HAM, paid Kastner through APM Cayman, for his distribution and marketing of the Medici Enterprise Feeder Funds.

313. On information and belief, Bank Austria directly mailed Kastner the marketing materials for Primeo Fund.

314. Beginning on February 10, 2006, APM Cayman received almost $13 million in payments from HAM via wire transfer. The subject lines in the transfers refer to these payments as "retrocession fees."

315. These "retrocession fees" are kickbacks for selling the Medici Enterprise Feeder Funds. Kastner, through APM Cayman, was the second-largest recipient of transfers from HAM after Bank Medici itself. Kohn, Mugnai, de Sury, Cosulich, Herald Consult, and Line Holdings, through HAM, transmitted these payments via wire to APM Cayman, MediciFinanz, and Kastner. See id. at 81-82, ¶ 18.

316.     Kastner, through APM Cayman, also received $780,047 from Infovaleur. Even within the structure of the Medici Enterprise, this personal payment from Kohn to one of her Bank Medici branches was unusual.  It was not, however, the only personal payment that Kohn made to Kastner.  See id. at 65-68, ¶ 11.

317.     Kastner also owns Gerila, through which Kastner received a loan of almost $1 million from Kohn, which was transferred to Kastner using HAM's accounts. On information and belief, this transfer was a personal loan from Kohn to Kastner in connection with his divorce.  Kohn, Mugnai, de Sury, Cosulich, Herald Consult, and Line Holdings, through HAM, transmitted these payments via wire to Kastner.  See id. at 87-88, ¶ 24.

**Sofipo**

318.     Until April 21, 2009, Sofipo was registered at the same address as Bank Medici and operated as an internal mechanism to distribute the Medici Enterprise Feeder Funds.  Kohn was an assistant chair of Sofipo.  Cosulich replaced Kohn as Sofipo's managing director.  In keeping with Kohn's practice of disregarding corporate formalities, she treated Sofipo, Bank Medici, and HAM as interchangeable.

319.     On information and belief, Kohn and other members of the Medici Enterprise solicited investors for the Medici Enterprise Feeder Funds through Sofipo's offices.

320.     Starting in 2007, Kohn, through HAM, began transmitting fees to Sofipo in furtherance of the Illegal Scheme.  HAM effected these payments to Sofipo via wire in foreign commerce.  Between November 2007 and October 2008, HAM transferred these proceeds of the Illegal Scheme to Sofipo.  Kohn, Mugnai, de Sury, Cosulich, Herald

Consult, and Line Holdings, through HAM, transmitted these payments via wire to Sofipo.  See id. at 85, ¶ 22.

## OTHER MEDICI ENTERPRISE FEEDER FUNDS

### Alpha Prime Fund

321.    Alpha Prime Fund is a Bermuda-based investment fund incorporated on March 12, 2003.  At all relevant times, Alpha Prime Fund was 100% invested through BLMIS, holding account number 1FR097.  Alpha Prime Fund fed approximately $400 million into BLMIS over its five-year existence.

322.    Alpha Prime Fund was created by Kohn, Zapotocky, and Radel-Leszczynski, and was a functional "clone" of Primeo Fund.  Zapotocky created this additional mechanism to feed investors into BLMIS to further the Illegal Scheme and enrich himself and Kohn.  Kohn served as a director of Alpha Prime Fund.  On information and belief, Zapotocky received at least $8 million for his participation in this component of the Illegal Scheme.

323.    On information and belief, Kohn, Kohn, Eurovaleur, Bank Austria, Bank Medici and its other branches, HAM, and other members of the Medici Enterprise marketed, distributed, and sold Alpha Prime Fund.  BA Worldwide was Alpha Prime Fund's investment adviser beginning in 2003.

### Senator Fund

324.    Senator Fund is a Cayman Island-based investment fund incorporated on July 14, 2006.  At all relevant times, Senator Fund was 100% invested through BLMIS, holding account number 1FR128.  Senator Fund fed at least $247 million into BLMIS over its two-year existence.

325.     Senator Fund was created by Radel-Leszczynski and was a functional clone of Alpha Prime Fund, which was in turn a functional clone of Primeo Fund. Radel-Leszczynski created this additional mechanism to feed money into BLMIS to further the Illegal Scheme and enrich herself, Kohn, and Bank Medici. On information and belief, Radel-Leszczynski received millions of dollars in fees for her participation in this component of the Illegal Scheme.

326.     On information and belief, Kohn, Eurovaleur, Bank Austria, Bank Medici and its branches, HAM, and other members of the Medici Enterprise marketed, distributed, and sold Senator Fund.

327.     On February 20, 2002, Radel-Leszczynski sent a facsimile to DiPascali at BLMIS requesting approval of language describing the investment strategy she, BA Worldwide, Bank Austria, and Bank Medici used to market Primeo Fund to investors. The facsimile was sent from a Bank Medici facsimile machine on BA Worldwide letterhead. See id. at 63, ¶ 6.

328.     On July 10, 2006, Radel-Leszczynski, on behalf of BA Worldwide, sent a facsimile to Madoff regarding on a recent meeting she had with him at BLMIS headquarters in New York. In the correspondence, Radel-Leszczynski profusely and obsequiously thanked Madoff for "granting" her a new BLMIS direct account. The purpose of the facsimile was to confirm that the accountholder would be Senator Fund, and to arrange for the account opening documents to be sent to the fund's custodian. Id. at 64, ¶ 8.

329.     On September 25, 2006, Radel-Leszczynski, on behalf of BA Worldwide, sent another facsimile to Madoff to notify him that she would serve as his primary

contact for Primeo Fund, Alpha Prime Fund, and Senator Fund. Radel-Leszczynski also proposed a future meeting with Madoff on October 23 of that year, purportedly to discuss this role. Id.

## COUNSEL TO THE MEDICI ENTERPRISE

330.    Hassans is a Gibraltar law firm and counsel to key members of the Medici Enterprise, including Kohn, Herald Fund, and, on information and belief, HAM. Kohn has a longstanding relationship with Hassans and its senior partner, James Levy. Hassans also provides legal services to Benbassat.

331.    Hassans has provided (and continues to provide) critical legal and corporate services for Kohn and HAM, including the establishment and maintenance of trusts and other structures that Kohn and E. Kohn used to launder stolen proceeds of the Illegal Scheme. Immediately after Madoff's confession, Kohn summoned a team of Hassans lawyers to Bank Medici's offices in Austria to coordinate Kohn's legal strategy.

### Kohn Conceals Her Ownership of HAM

332.    Hassans assisted Kohn in the creation and management of HAM. When Kohn sought to conceal the fact that she and her husband were the beneficial owners of HAM, Hassans supplied the necessary corporate camouflage. These Hassans-related entities purport to offer private company management and private banking services to, among other Defendants, HAM and Tecno Gibraltar.

333.    Certain partners and associates at Hassans also hold non-legal corporate positions at certain Holding Company Defendants controlled by Hassans, Kohn, or other members of the Medici Enterprise. They include Redcrest, Line Group, Line Management, Line Holdings, and Herald Consult. These are part of a deliberately

complex structure orchestrated by Kohn to disguise Kohn and E. Kohn's ownership of HAM.

## Tecno Gibraltar and Hassans

334.    Tecno Gibraltar did not have its own offices.  Rather, Tecno Gibraltar was co-located with Line Management, one of the Holding Company Defendants whose officers and directors are comprised of Hassans employees.  The plaque on the building in which Line Management is located reads "Line Management, Associated with Hassans."  Amselem, Tecno Gibraltar's lone director, is also an employee at Line Management.

## Hassans Creates and Hosts Bank Medici Gibraltar

335.    Bank Medici Gibraltar is a "joint venture" with Hassans and is located in its offices.  On information and belief, the Hassans conference rooms devoted to Bank Medici Gibraltar have chairs festooned with the Bank Medici's heraldic crest.  On information and belief, Kohn and other members of the Medici Enterprise solicited investors for the Medici Enterprise Feeder Funds in the offices of Hassans/Bank Medici Gibraltar.

336.    Bank Medici Gibraltar and Hassans also jointly own Medici Realty.  Both are located in the offices of Hassans.  E. Kohn is a director of Medici Realty.

## Kohn Receives Kickbacks from Madoff Care of Hassans

337.    Hassans received transfers from Kohn via HAM.  Rather, these transfers represent Kohn's and Hassans's efforts to conceal the proceeds of the Illegal Scheme. For example, on December 15, 2008, days after Madoff confessed to running a Ponzi scheme, HAM transferred $6.5 million and €6.5 million to accounts held by Hassans.  On

information and belief, Kohn initiated these transfers just before Madoff confessed on December 11, 2008.

## UNICREDIT FORMALIZES ITS ROLE IN THE MEDICI ENTERPRISE

338.     UniCredit has been involved with Madoff and BLMIS since at least 2000 through its wholly owned investment arm, Pioneer.  Prior to UniCredit's acquisition of Bank Austria in 2005, Pioneer invested in certain BLMIS feeder funds established by the Benbassats through Kohn.  Pioneer also invested in BLMIS feeder funds Fairfield Sentry Ltd. and Kingate Global Fund Ltd.

### Kohn Facilitates UniCredit's Acquisition of Bank Austria

339.     In 2005, UniCredit acquired Bank Austria and, hence, Bank Medici, and BA Worldwide.  On information and belief, Kohn's relationship with UniCredit predates its acquisition of Bank Austria.  On information and belief, while Profumo was the CEO of UniCredit, he enjoyed a close working relationship with Kohn.  During UniCredit's acquisition of Bank Austria, Randa was the COO of Bank Austria's holding company.

340.     On information and belief, Kohn bragged about her relationship with Profumo and would often remark that he frequently called her directly.  Bank Medici employees understood that Kohn introduced UniCredit and Bank Austria and facilitated the acquisition.

### UniCredit Participates in the Illegal Scheme Despite Its Concerns About BLMIS

341.     Shortly after the acquisition, UniCredit undertook to examine its newly-acquired additional involvement with BLMIS.  UniCredit identified significant defects in the relationships between and among Bank Austria, Bank Medici, BA Worldwide, and Primeo Fund.

## UniCredit Conspires with Kohn to Conceal Its Madoff Investment

342.    Rather than refusing to continue to do business with BLMIS, UniCredit undertook to further the Illegal Scheme by disguising Primeo Fund's 100% investment in BLMIS.

343.    UniCredit effected this deception not by divesting Primeo Fund from BLMIS, but by directing Primeo Fund to close its direct account with BLMIS and invest in BLMIS indirectly through Herald Fund and other Medici Enterprise Feeder Funds.

344.    At the same time, UniCredit replaced BA Worldwide with Pioneer as Primeo Fund's investment manager. So as not to upset the relationship with Madoff, UniCredit hired BA Worldwide's Radel-Leszczynski, Madoff's personal contact and the "figurehead" of Primeo Fund, and placed her at Pioneer.

345.    UniCredit sought to obfuscate Primeo Fund's investment structure by electing to invest in BLMIS indirectly through Herald Fund, Alpha Prime Fund, and on information and belief,     REDACTED     Although this decision cost Primeo Fund's investors more in fees, and further enriched Kohn, HAM, Bank Medici, BA Worldwide, Radel-Leszczynski, Zapotocky, and others, the result was the same: 100% investment in BLMIS.

346.    Primeo Fund's prospectus promised diversification and never mentioned Madoff or BLMIS. The concealed indirect investment in BLMIS allowed Primeo Fund to appear to comply with its prospectus, while in fact Primeo Fund was still 100% invested with BLMIS.

## UniCredit and Kohn Use Eurovaleur, Sofipo, and HAM to Effect This Deception

347.

REDACTED

REDACTED

349. On April 2, 2007, Cosulich, the managing director of Sofipo, sent a facsimile to BLMIS from a Sofipo facsimile machine using HAM letterhead. Cosulich, on behalf of Kohn, notified BLMIS that: (i) Herald Fund planned to infuse $35 million of Primeo Fund's money into Herald Fund's BLMIS account; and (ii) at the direction of UniCredit, Profumo, and Gutty, Primeo Fund would stop investing directly with BLMIS and begin covertly investing indirectly through Herald Fund. Id. at 85, ¶ 22.

350. On April 30, 2007, Pirkner sent a facsimile to BLMIS, on behalf of Kohn and Bank Medici, attaching Herald Fund's board of directors resolution accepting Primeo Fund's shares and agreeing to invest these shares into BLMIS. The Herald Fund resolution contains Mugnai's signature as director of Herald Fund. Id. at 65, ¶ 9.

**UniCredit Becomes a Full Member of the Medici Enterprise**

351. After the integration of UniCredit, Pioneer, Bank Austria, Bank Medici, and Primeo Fund, UniCredit began to be paid in the pattern and practice of the Medici Enterprise.

352. In 2007, Pioneer paid over $1,394,350 to Bank Medici for, on information and belief, the privilege of UniCredit's undisclosed access to BLMIS. The same year, UniCredit memorialized its participation in the Illegal Scheme and entry into the Medici Enterprise by, on information and belief, directing Pioneer to produce false prospectuses that concealed Primeo Fund's investment in BLMIS. Id. at 83, ¶ 20.

353. In 2008, Kohn, through HAM, kicked back to Pioneer approximately $10 million in Herald Fund's extra fees from this arrangement. These payments were, on information and belief, the product of Kohn's conspiracy with UniCredit, Pioneer, Profumo, and Gutty to invest Primeo Fund through Herald Fund. Kohn, Mugnai, de Sury, Cosulich, Herald Consult, and Line Holdings, through HAM, transmitted these payments via wire to Pioneer. See id. at 83-84, ¶ 20.

354. After UniCredit's acquisition of Bank Austria, it appointed key members of the Medici Enterprise to prominent positions at UniCredit.

355. Radel-Leszczynski was hired at UniCredit's Pioneer.

356. Hemetsberger was named to UniCredit's Executive Management Committee in 2006.

357. Kretschmer became UniCredit's Global Head of Retail, Executive Vice President of Asset Management, and Country Head of Austria and Eastern Europe.

358. Kadrnoska joined UniCredit's board in December 2005.

359.    Duregger joined the board of a UniCredit subsidiary, UniCredit UK, on November 14, 2007.

## KOHN ANTICIPATES THE COLLAPSE OF BLMIS

### Herald (Lux):  The Last Medici Enterprise Feeder Fund

360.    Herald (Lux) was one of Kohn and Bank Medici's last efforts to feed money into BLMIS before Madoff confessed to running a Ponzi scheme.

361.    Herald (Lux) was incorporated in Luxembourg on February 18, 2008, and was created by Kohn, Eurovaleur, Bank Austria, Bank Medici, Kastner, and Frey solely for the purpose of investing with BLMIS.  Herald (Lux) fed at least $255 million into BLMIS.

362.    Kohn, Eurovaleur, Bank Austria, Bank Medici and its branches, HAM, and other members of the Medici Enterprise marketed, distributed, and sold Herald (Lux).  Bank Medici was the fund's investment manager and Scheithauer was a director.

363.    Like her Sham Entities, Kohn treated the Medici Enterprise Feeder Funds as interchangeable as they all were 100% invested with BLMIS.  On information and belief, Kohn disregarded the directions of Bank Austria and Bank Medici clients to place their money with specific Medici Enterprise Feeder Funds.

364.    In particular, Kohn and Bank Medici steered investors into Herald (Lux) when she, Bank Medici, and HAM were directing redemptions from Herald Fund.  At the same time, she was placing Herald Fund investors' money with Herald (Lux).

365.    For example, in 2008, Kohn told Bank Medici client Elena Shpe ("Shpe") that her money would be invested in Herald Fund when it was, in fact, invested in Herald (Lux).  Kohn, Bank Medici, Bank Austria, and other members of the Medici Enterprise represented that Herald Fund and Herald (Lux) were different investments.  In fact, they

and all the Medici Enterprise Feeder Funds were functionally identical, doing nothing more than feeding investors' money into BLMIS. Kohn and other members of the Medici Enterprise conspired to disguise this fact.

### Kohn Attempts to "Diversify" Bank Medici

366.    In the months leading up to Madoff's confession, Kohn embarked on a campaign to "diversify" Bank Medici given that over 90% of its revenue came from Madoff's Ponzi scheme. In early 2008, Kohn, through HAM, transferred $5.3 million to Revi to launder proceeds of the Illegal Scheme and for the ostensible purpose of capitalizing several purported insurance companies. Kohn, Mugnai, de Sury, Cosulich, Herald Consult, and Line Holdings through HAM, transmitted these payments via wire to Revi. See id. at 87-88, ¶ 24.

367.    Hence, Kohn needed to distance herself from Bank Medici and install someone who could credibly operate outside of the realm of the Medici Enterprise's pattern of racketeering activity. On information and belief, Kohn and her husband planned to move to Switzerland to protect themselves from liability and shield the stolen proceeds of the Illegal Scheme once BLMIS collapsed.

368.    Prior to their move, Kohn replaced Frey as head of Bank Medici and installed her longtime friend, and former Bank Austria executive, Scheithauer. Scheithauer was intimately involved with the creation and management of Primeo Fund and understood the structure of the Medici Enterprise and how the Illegal Scheme operated.

369.    Scheithauer's new role at Bank Medici was to introduce private banking services and oversee its expansion into insurance products for the wealthy. Kohn specifically instructed Scheithauer not to diminish Bank Medici's roles with respect to

Herald Fund and Herald (Lux). Rather, Kohn directed Scheithauer to grow these new aspects of Bank Medici until revenue from those funds represented approximately half of Bank Medici's total profits. Scheithauer was willing to cash his paycheck from HAM, and his "bonus" from Kohn's Infovaleur in New York, and focus on making Bank Medici appear legitimate. On August 25, 2008, weeks before beginning he joined Bank Medici, Kohn and Reuss, through Infovaleur, sent proceeds of the Illegal Scheme to Scheithauer. See id. at 67-69, ¶ 11.

### The Impending Collapse of BLMIS

370. At the same time, BLMIS was receiving more withdrawal requests than new investors' deposits. On information and belief, Madoff began telling certain Medici Enterprise Feeder Fund representatives that if they did not reduce their monthly withdrawals, they would be cut off from BLMIS. Kohn began seeking other sources of cash to meet investors' withdrawals from Herald Fund, so as to honor Madoff's requests while continuing to profit from the Illegal Scheme for as long as possible.

371.                                    REDACTED

372. Nonetheless, Kohn, via HAM, was directing massive withdrawals from Herald Fund. Just before Madoff confessed, Herald Fund withdrew $536 million from BLMIS, including $423 million in one transfer on November 4, 2008.

### Kohn Conceals the Proceeds of the Illegal Scheme

373. On October 20, 2008, Kohn, through HAM, transferred almost $3 million to Pioneer.

374.    Two days later, Kohn, through HAM, made two transfers to Bank Medici: one for over $1 million and another for €275,071.

375.    Although Kohn had not paid Kastner or APM for months, on October 22, 2008, Kohn, through HAM, transferred over $1.8 million to Kastner through APM Cayman.  This extraordinary payment was made in three installments on the same day.

376.    On November 12, 2008, Kohn, through HAM, transferred $1.2 million to Pioneer.

377.    On November 20, 2008, Kohn, through HAM, transferred $361,434 and €142,958 to Bank Medici.  On the same day, Kohn, through HAM, transferred $62,729 to Medici Cayman.

**Kohn Conspires to Conceal Bank Medici's Involvement with Madoff**

378.    In addition to concealing stolen Customer Property and other proceeds of the Illegal Scheme, Kohn needed to explain Bank Medici's blanket exposure to BLMIS to its clients.  A few days after Madoff's confession, Bank Medici client and Herald (Lux) investor, Shpe, contacted her Bank Medici investment agent, Lavi, and demanded answers.

379.    Like all who invested in the Medici Enterprise Feeder Funds through Bank Medici, Bank Austria, BA Worldwide, and Pioneer, the fact that every cent of every investment was fed directly to BLMIS was never disclosed.

380.    On information and belief, to the extent that anyone specifically asked if Madoff and/or BLMIS was involved in these investments, Bank Medici, through its representatives, Kohn, Scheithauer, Tripolt, Duregger, Frey, Pirkner, Schindler, Lavi, and Cosulich, categorically denied any involvement.  Also, on information and belief, the

same was true for Bank Austria representatives, such as Randa, Kadrnoska, Zapotocky, Kretschmer, Nograsek, Hemetsberger, and Radel-Leszczynski.

381.     In light of these misrepresentations, Shpe was, on information and belief, upset.  On December 23, 2008, Shpe attended a meeting in Austria with Lavi and Scheithauer to discuss her investments with Bank Medici.  During the meeting, Scheithauer stated to Shpe that he too was surprised that the bank's investments were involved with BLMIS, and that she should not engage in "blame games."  On information and belief, Kohn expressly directed Scheithauer and others to make the misrepresentation that the Medici Enterprise Feeder Funds were not invested with BLMIS.

382.     On information and belief, after meeting with Scheithauer, Shpe was finally able to reach Kohn via telephone.  Kohn, like Scheithauer, denied any knowledge of Bank Medici's exposure to BLMIS.  Kohn also lied about her personal financial exposure to BLMIS, and claimed that she also lost money with BLMIS.  See id. at 88, ¶ 25.

383.     On information and belief, immediately after speaking with Kohn, Shpe contacted Lavi for the last time.  During this conversation, Lavi admitted that Kohn and Bank Medici knew that the Medici Enterprise Feeder Funds were all 100% invested in BLMIS.  Moreover, Lavi told Shpe that Kohn prohibited all Bank Medici employees from revealing Madoff's involvement with any of the investments managed, marketed, or distributed by Bank Medici.

384.     On May 28, 2009, the Austrian government seized control of Bank Medici's assets.  On June 24, 2009, the Austrian government stripped Bank Medici of its banking license.  Kohn and Bank Austria still operate Bank Medici as 20:20 Medici AG.

## KOHN CONTINUES TO DIRECT THE MEDICI ENTERPRISE

385.    Kohn continued the Illegal Scheme long after Madoff's confession using Eurovaleur and Infovaleur in New York, Tecno Gibraltar, HAM, and Hassans.

386.    On December 17. 2008, Kohn, through HAM, laundered €15,000 to de Sury.

387.    On January 6, 2009, Kohn, through Infovaleur, laundered $70,587 to M. Hartstein, $57,334 to R. Kohn (care of Eurovaleur), and $26,438 to R. Hartstein.

388.    On January 30, 2009, Kohn, through Infovaleur, laundered $6,020 to Palladium.

389.    On February 2, 2009, Kohn, through Tecno Gibraltar, laundered almost $300,000 to her husband, E. Kohn.

390.    On March 3, 2009, Kohn, through Infovaleur, laundered almost $30,000 to Palladium.

391.    On March 4, 2009, Kohn, through Infovaleur, laundered $4,000 to M. Hartstein.

392.    On information and belief, this dissipation is ongoing.

## THE ILLEGAL SCHEME TRANSFERS

393.    Prior to the Filing Date, Madoff effected payments or other transfers of more than $642,326,889 (the "Illegal Scheme Transfers") to, or for the benefit of, Infovaleur, Tecno Gibraltar, Tecno Italy, Erko, Bank Austria, and Herald Fund as set forth in Exhibits E, F, G, H, I, J, and K. A portion of the Illegal Scheme Transfers was subsequently transferred to other Defendants (the "Illegal Scheme Subsequent Transfers"). The Illegal Scheme Transfers and Illegal Scheme Subsequent Transfers are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and

recoverable by the Trustee under 11 U.S.C. §§ 544, 547, 548, 550, and 551, N.Y. DCL §§ 273-279, and N.Y. CPLR 203(g) and 213(8), as alleged fully herein.

394.    Of the $642,326,889, BLMIS transferred approximately $578,033,847 to or for the benefit of Herald Fund (the "Herald Fund Initial Transfers") as set forth in Exhibit F.  The Trustee is seeking to avoid and recover the Herald Fund Transfers in a separate action.

### The Fraudulent Sham Entity Transfers

395.    Prior to the Filing Date, Madoff effected payments or other transfers of more than $62,543,414 (the "Sham Entity Transfers") to, or for the benefit of, Infovaleur, Tecno Gibraltar, Tecno Italy, and Erko (hereafter, the "Sham Entity Transferee Defendants").  Madoff directed the Sham Entity Transfers to the Sham Entity Transferee Defendants through accounts of BLMIS and MSIL.  The Sham Entity Transfers included transfers of at least $32,484,360 to Infovaleur, $4,400,000 to Tecno Gibraltar, $14,601,000 to Tecno Italy, and $11,058,054 to Erko as set forth in Exhibits G, H, I, J, and K.  A portion of the Sham Entity Transfers was subsequently transferred to other defendants (the "Sham Entity Subsequent Transfers") in furtherance of the Illegal Scheme, as indicated below in paragraph 398.  The Sham Entity Transfers and the Sham Entity Subsequent Transfers are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable by the Trustee under 11 U.S.C. §§ 544, 547, 548, 550, and 551, N.Y. DCL §§ 273-279, and N.Y. CPLR 203(g) and 213(8), as alleged fully herein.

396.    At least $36,801,000 of the Sham Entity Transfers was transferred during the six years preceding the Filing Date (the "Six-Year Transfers").  The Six-Year Transfers included transfers of approximately $4,400,000 to Tecno Gibraltar,

approximately $12,276,000 to Tecno Italy, and approximately $20,125,000 to Infovaleur. See Exhibits G, H, I, and K. The Six-Year Transfers were and continue to be Customer Property and are avoidable and recoverable under 11 U.S.C. §§ 544, 550, and 551, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and N.Y. DCL §§ 273–279.

397. At least $11,225,000 of the Six-Year Transfers were transferred during the two years preceding the Filing Date (the "Two-Year Transfers"). The Two-Year Transfers consisted of approximately $4,400,000 to Tecno Gibraltar, approximately $700,000 to Tecno Italy, and approximately $6,125,000 to Infovaleur. See Exhibits G, H, I, and K. The Two-Year Transfers were and continue to be Customer Property and are avoidable and recoverable under 11 U.S.C. §§ 548, 550, and 551, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

398. Defendants Kohn, Eurovaleur, APM Cayman, Palladium, M-Tech, E. Kohn, Scheithauer, M. Hartstein, R. Hartstein, Landau, R. Kohn, Kastner, Amselem, and Reuss (the "Sham Entity Subsequent Transferee Defendants") were immediate or mediate transferees of the Sham Entity Subsequent Transfers. The Sham Entity Subsequent Transfers include at least $440,000 to Kohn, $780,047 to APM Cayman, $158,245 to Palladium, $97,000 to M-Tech, $399,996 to E. Kohn, $15,000 to Scheithauer, $302,229 to M. Hartstein, $26,438 to R. Hartstein, $60,037 to R. Kohn, and $5,000 to Landau as set forth in Exhibit L. On information and belief, in addition to the transfers described immediately above, Eurovaleur, Reuss, and Amselem were immediate or mediate transferees of the Sham Entity Subsequent Transfers.

399.     The Sham Entity Subsequent Transfers constitute subsequent transfers of the Sham Entity Transfers from Madoff to the Sham Entity Subsequent Transferee Defendants.  Because the Sham Entity Transfers are avoidable, the Sham Entity Subsequent Transfers are recoverable by the Trustee under 11 U.S.C. § 550.

**The Preference Period Sham Entity Transfers**

400.     Infovaleur and Tecno Gibraltar were "insiders" of BLMIS as defined under section 101(31) of the Bankruptcy Code.

401.     During the one-year period prior to the Filing Date—the preference period for insiders—Madoff effected payments of at least $5,625,000 to Infovaleur and Tecno Gibraltar (the "Preference Period Sham Entity Transfers") as set forth in Exhibits G, H, and K.  Of this amount, BLMIS made payments or other transfers that amount to at least $2,625,000 to Infovaleur during the Preference Period.  BLMIS also made payments or other transfers that amount to at least $3,000,000 to Tecno Gibraltar during the Preference Period.

402.     The Preference Period Sham Entity Transfers were and continue to be Customer Property and are avoidable and recoverable under 11 U.S.C. §§ 547, 550, and 551, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

403.     At least $1,141,444 of the Preference Period Sham Entity Transfers were subsequently transferred from Infovaleur and/or Tecno Gibraltar to or for the benefit of Kohn, Eurovaleur, E. Kohn, R. Kohn, M. Hartstein, R. Hartstein, Scheithauer, M-Tech, APM Cayman, Palladium, Amselem, and Reuss (the "Preference Period Sham Entity Subsequent Transfers").  The Preference Period Sham Entity Subsequent Transfers include at least $299,995 to E. Kohn, $57,334 to R. Kohn, $179,587 to M. Hartstein, $26,438 to R. Hartstein, $15,000 to Scheithauer, $97,000 to M-Tech, $375,000 to APM

Cayman, and $91,090 to Palladium as set forth in <u>Exhibit L</u>. On information and belief, in addition to the transfers described immediately above, Kohn, Eurovaleur, Amselem, and Reuss were immediate or mediate transferees of subsequent transfers of the Preference Period Sham Entity Transfers. The Preference Period Sham Entity Subsequent Transfers were and remain Customer Property and are recoverable under 11 U.S.C. § 550.

### The Fraudulent Bank Austria Transfers

404. Prior to the Filing Date, BLMIS transferred at least $1,749,628 (the "Bank Austria Transfers") to Bank Austria's direct BLMIS account, 1FN082 (hereafter, the "Bank Austria Account"), under circumstances which should have put Bank Austria on notice that the Bank Austria Transfers were fraudulent. <u>See</u> <u>Exhibit E</u>.

405. The Bank Austria Transfers are Customer Property and avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) and 213(8) and N.Y. DCL sections 276, 276-a, 278, and/or 279.

### The Herald Fund Subsequent Transfers

406. Defendants Kohn, HAM, Bank Medici, Bank Austria, UniCredit, APM Cayman, Hassans, Pioneer, Revi, Sofipo, Kastner, Medici Cayman, Bank Austria Cayman, Cosulich, de Sury, and Mugnai (the "Herald Fund Subsequent Transferee Defendants") received subsequent transfers from Herald Fund, which was not named as a defendant herein, but rather in a separate avoidance action,

407. The Trustee has filed an action against Herald Fund to avoid and recover the initial transfers of Customer Property under sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, and N.Y. DCL sections 273-279. <u>See</u> <u>Picard v. Alpha Prime Fund</u>

Ltd., et al., No. 09-01364 (Bankr. S.D.N.Y. filed December 5, 2010) (the "Herald Fund Complaint"). The Trustee incorporates by reference the allegations contained in the Herald Fund Complaint as if fully rewritten herein.

408. During the six years preceding the Filing Date, BLMIS made transfers to Herald Fund (account number 1FR109) of approximately $578 million (the "Six-Year Herald Fund Transfers"). See Exhibit F. The Six-Year Herald Fund Transfers include approximately $563 million that BLMIS transferred to Herald Fund during the two years preceding the Filing Date (the "Two-Year Herald Fund Transfers"). The Six-Year Herald Fund Transfers and Two-Year Herald Fund Transfers include approximately $537 million that BLMIS transferred to Herald Fund during the 90 days preceding the Filing Date (the "Preference Period Herald Fund Transfers"). The Six-Year Herald Fund Transfers, Two-Year Herald Fund Transfers and the Preference Period Herald Fund Transfers are set forth more fully in Exhibits F and K.

409. Some or all of the Herald Fund Initial Transfers was subsequently transferred by Herald Fund to, or for the benefit of, the Herald Fund Subsequent Transferee Defendants (the "Herald Fund Subsequent Transfers").

410. The Herald Fund Subsequent Transfers were and remain Customer Property and are recoverable from the Herald Fund Subsequent Transferee Defendants under 11 U.S.C. § 550.

411. To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as pleadings in the alternative, in accordance with Rule 8(d) of the FRCP.

412. The Trustee's investigation is ongoing and the Trustee reserves the right: (i) to supplement the information on the Illegal Scheme Transfers, the Illegal Scheme Subsequent Transfers, and any additional transfers; and (ii) to seek recovery of such additional transfers.

## CAUSES OF ACTION

## COUNT ONE:  CIVIL RACKETEERING – 18 U.S.C. § 1962(c)

### Against All Defendants[4]

413. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

414. At all times relevant to this Complaint, all Defendants were "persons" as defined by 18 U.S.C. § 1961(3).

415. At all times relevant to this Complaint, all Defendants as alleged herein engaged in the operation or management of the Medici Enterprise, which is an enterprise as defined by 18 U.S.C. § 1961(4), the activities of which affect interstate and foreign commerce.

416. At all times relevant to this Complaint, all Defendants conducted the Medici Enterprise's affairs through a pattern of racketeering activity alleged herein that was directed at the business and property of the BLMIS estate since at least 1985.

417. The Medici Enterprise:  (i) is an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; (ii) has associated members with a common purpose that function as a continuing unit; and (iii) is separate and apart from the pattern of racketeering activity.  Conduct of the members of

---

[4] See fn. 3.

the Medici Enterprise, as it relates to the Illegal Scheme, is for the most part directed by Kohn and her instrumentality Bank Medici, a branch of Bank Austria, which acted through, among others, Randa and Zapotocky. This is the structure of the Medici Enterprise as it relates to the "Money-In" component of the Illegal Scheme.

418. Kohn orchestrated the siphoning of stolen Customer Property directly from the BLMIS estate through her family and her network of Sham Entities in New York and elsewhere. This is the structure of the Medici Enterprise as it relates to the "Money-Out" component of the Illegal Scheme.

419. All Defendants, as members of the Medici Enterprise, are participants in the Illegal Scheme in different capacities, functions, and roles calculated to enrich and expand the Medici Enterprise so that it could continue to perpetrate the "Money-In" and "Money-Out" components of the Illegal Scheme.

420. Medici Enterprise governance occurred through frequent communications among its members by means of interstate and international wire communication via telephone, facsimile, and e-mail in interstate and foreign commerce in addition to travel to and from New York and internationally.

421. The predicate acts form a "pattern of racketeering activity" and are all part of a common criminal plan to perpetrate the Illegal Scheme and enrich the Medici Enterprise through the Defendants' criminal and fraudulent conduct. The Illegal Scheme began in or about 1985 when Kohn met Madoff in New York, continued through Madoff's confession on December 11, 2008, and may be ongoing. Kohn has concealed stolen Customer Property and other criminally derived proceeds of the Illegal Scheme since the collapse of the Ponzi scheme.

422.     All of the predicate acts relate to one another because they represent a common scheme to further the Illegal Scheme and enrich the Medici Enterprise.  Each of the over 8,000 predicate acts by the fifty-seven members of the Medici Enterprise is also attributable to Kohn herself.  The predicate acts progressed in a logical fashion as the Illegal Scheme expanded from its core in New York and as it fed (and fed off of) BLMIS in New York.  Kohn received stolen Customer Property directly from BLMIS at least quarterly from at least 1987 until 2008 with few (if any) interruptions to this pattern of transfers.

423.     Each transfer in this twenty-year pattern constitutes repeated and related predicate acts of:  (i) money laundering in violation of 18 U.S.C. § 1956; (ii) engaging in monetary transactions in property derived from specific unlawful activity in violation of 18 U.S.C. § 1957; (iii) wire fraud in violation of 18 U.S.C. § 1343; (iv) financial institution fraud in violation of 18 U.S.C. § 1344; (v) mail fraud in violation of 18 U.S.C. § 1341; and/or (vi) interstate and international travel in violation of the Travel Act, 18 U.S.C. § 1952.

424.     The Ponzi scheme could not have continued without the influx of over $9.1 billion in fresh capital provided by the Illegal Scheme.  The effect of the collapse of BLMIS on interstate commerce is a matter of public record and a fact of which this Court can take judicial notice.  Kohn and other Defendants used and exploited U.S. financial institutions, the USPTO, lawyers in New York, other states and overseas, as well as interstate and international telephone, facsimile, e-mail, and wire transfer communications from no later than 1985 to the present.  The activities of the Medici

Enterprise directly affected U.S. interstate and foreign commerce through the Illegal Scheme.

425.     As a direct and proximate result of the violations set forth above, the BLMIS estate has been injured in its business and property.  The Defendants' violations of 18 U.S.C. § 1962(c) are the proximate cause of these losses.  Under the provisions of 18 U.S.C. § 1964(c), the Trustee is entitled to bring this action and recover herein treble damages, the cost of bringing this suit, prejudgment interest, and recoverable attorneys' fees.

426.     This Complaint incorporates by reference its accompanying RICO Case Statement that sets forth the details of each and every predicate act alleged therein.  To the extent that any predicate act must be alleged with the particularly required by Rule 9(b) of the Federal Rules of Civil Procedure, it has been so pled.

## COUNT TWO:  CIVIL RACKETEERING – 18 U.S.C. § 1962(d)

### Against All Defendants[5]

427.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

428.     The Defendants entered into a series of agreements between and among each other to engage in a conspiracy to violate 18 U.S.C. § 1962(c).  Each Defendant entered into at least one agreement with at least one other Defendant to join the conspiracy, took acts in the furtherance of the conspiracy, and knowingly participated in the conspiracy.

---

[5] See fn. 3.

429.    The Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by participating, directly or indirectly, in the conduct of the affairs of the Medici Enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

430.    By engaging in the overt acts and other conduct alleged herein and in the accompanying RICO Case Statement, Defendants have agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c).

431.    Each Defendant is a member of the Medici Enterprise and hence each conspired to perpetrate the Illegal Scheme.  As co-conspirators, the Defendants are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the BLMIS estate that were caused by any members of the conspiracy, regardless of whether the Defendants were themselves directly involved in a particular aspect of the Medici Enterprise.

432.    As a direct and proximate result of the violations set forth above, the BLMIS estate has been injured in its business and property.  The Defendants' violations of 18 U.S.C. § 1962(d) are the proximate cause of these losses.  Under the provisions of 18 U.S.C. § 1964(c), the Trustee is entitled to bring this action and recover herein treble damages, the cost of bringing this suit, prejudgment interest, and recoverable attorneys' fees.

433. This Complaint incorporates by reference its accompanying RICO Case Statement that sets forth the details of each and every predicate act alleged therein. To the extent that any predicate act must be alleged with the particularly required by Rule 9(b) of the Federal Rules of Civil Procedure, it has been so pled.

## COUNT THREE: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a), AND 551

### Against Infovaleur and Tecno Gibraltar

434. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

435. At the time of each of the Preference Period Sham Entity Transfers, Infovaleur and Tecno Gibraltar were "creditors" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

436. Each of the Preference Period Sham Entity Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

437. Each of the Preference Period Sham Entity Transfers was to, or for the benefit of, Infovaleur and Tecno Gibraltar.

438. Each of the Preference Period Sham Entity Transfers was made for or on account of an antecedent debt owed by BLMIS to Infovaleur and Tecno Gibraltar before such transfer was made.

439. Each of the Preference Period Sham Entity Transfers was made while BLMIS was insolvent.

440. Defendants Infovaleur and Tecno Gibraltar are insiders as defined under section 101(31) of the Bankruptcy Code.

441. Each of the Preference Period Sham Entity Transfers was made during the one-year preference period under section 547(b)(4) of the Bankruptcy Code.

442. Each of the Preference Period Sham Entity Transfers enabled Infovaleur and Tecno Gibraltar to receive more than it would receive if: (i) this case was under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferee received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

443. Each of the Preference Period Sham Entity Transfers constitutes a preferential transfer avoidable by the Trustee under section 547(b) of the Bankruptcy Code and recoverable from Infovaleur and Tecno Gibraltar as initial transferee or the entities for whose benefit such transfers were made under section 550(a) of the Bankruptcy Code.

444. As a result of the foregoing, under sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (i) avoiding and preserving the Preference Period Sham Entity Transfers; (ii) directing that the Preference Period Sham Entity Transfers be set aside; and (iii) recovering the Preference Period Sham Entity Transfers, or the value thereof, from Infovaleur and Tecno Gibraltar for the benefit of the estate of BLMIS.

## COUNT FOUR:  PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE)
## 11 U.S.C. §§ 547(b), 550(a), AND 551

**Against Kohn, Eurovaleur, E. Kohn, R. Kohn, M. Hartstein, R. Hartstein, Scheithauer, M-Tech, APM Cayman, Palladium, Amselem, and Reuss**

445.	The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

446.	Each of the Preference Period Sham Entity Transfers is avoidable under section 78fff-2(c)(3) of SIPA and section 547(b) of the Bankruptcy Code.  Furthermore, each of the Preference Period Sham Entity Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

447.	On information and belief, Kohn, Eurovaleur, E. Kohn, R. Kohn, M. Hartstein, R. Hartstein, Scheithauer, M-Tech, APM Cayman, Palladium, Amselem, and Reuss were immediate or mediate transferees of the Preference Period Sham Entity Subsequent Transfers.

448.	Each of the Preference Period Sham Entity Subsequent Transfers was made directly or indirectly to or for the benefit of Kohn, Eurovaleur, E. Kohn, R. Kohn, M. Hartstein, R. Hartstein, Scheithauer, M-Tech, APM Cayman, Palladium, Amselem, and Reuss.

449.	As a result of the foregoing, the Trustee is entitled to a judgment under sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Preference Period Sham Entity Subsequent Transfers, or the value thereof, from Kohn, Eurovaleur, E. Kohn, R. Kohn, M. Hartstein, R. Hartstein, Scheithauer, M-

Tech, APM Cayman, Palladium, Amselem, and Reuss for the benefit of the estate of BLMIS.

## COUNT FIVE: PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) 11 U.S.C. §§ 547(b), 550(a), AND 551

**Against Bank Medici, HAM, Kohn, Medici Cayman, APM Cayman, Pioneer, Hassans, Sofipo, de Sury, and Mugnai**

450.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

451.    Herald Fund received transfers from BLMIS 90 days before the Filing Date. At the time of each of the Preference Period Herald Fund Transfers, Herald Fund was a "creditor" of BLMIS within the meaning of 11 U.S.C. § 101(10) and under SIPA § 78fff-2(c)(3).

452.    Each of the Preference Period Herald Fund Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. § 101(54) and under SIPA § 78fff-2(c)(3).

453.    Each of the Preference Period Herald Fund Transfers was to, or for the benefit of, Herald Fund.

454.    Each of the Preference Period Herald Fund Transfers was made for, or on account of, an antecedent debt owed by BLMIS to Herald Fund before such transfer was made.

455.    Each of the Preference Period Herald Fund Transfers was made while BLMIS was insolvent.

456.    Each of the Preference Period Herald Fund Transfers was made during the 90-day preference period under 11 U.S.C. § 547(b)(4).

457.     Each of the Preference Period Herald Fund Transfers enabled Herald Fund to receive more than each would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferee received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

458.     Each of the Preference Period Herald Fund Transfers constitutes a preferential transfer avoidable and recoverable by the Trustee under 11 U.S.C. § 547(b), 550(a), and 551 of the Bankruptcy Code.

459.     The Trustee has filed a lawsuit against Herald Fund to avoid the Preference Period Herald Fund Transfers under 11 U.S.C. § 547(b) and to recover the Preference Period Herald Fund Transfers, or the value thereof, from Herald Fund under 11 U.S.C. § 550(a).

460.     On information and belief, Bank Medici, HAM, Kohn, Medici Cayman, APM Cayman, Pioneer, Hassans, Sofipo, de Sury, and Mugnai were immediate or mediate transferees of some portion of the Preference Period Herald Fund Transfers (the "Preference Period Herald Fund Subsequent Transfers").

461.     Each of the Preference Period Herald Fund Subsequent Transfers was made directly or indirectly to, or for the benefit of, Bank Medici, HAM, Kohn, Medici Cayman, APM Cayman, Pioneer, Hassans, Sofipo, de Sury, and Mugnai.

462.     As a result of the foregoing, under 11 U.S.C. §§ 547(b), 550(a), and 551 and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  recovering the Preference Period Herald Fund Subsequent Transfers, or the value thereof, from Bank Medici, HAM, Kohn, Medici Cayman, APM Cayman, Pioneer, Hassans, Sofipo, de Sury, and Mugnai for the benefit of the estate of BLMIS.

## COUNT SIX: FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

### Against Infovaleur, Tecno Gibraltar, and Tecno Italy

463.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

464.    Each of the Two-Year Transfers was made on or within two years before the Filing Date.

465.    Each of the Two-Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a) and under SIPA § 78fff-2(c)(3).

466.    Each of the Two-Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then-existing or future creditors. BLMIS made the Two-Year Transfers to, or for the benefit of, Infovaleur, Tecno Gibraltar, and Tecno Italy in furtherance of a fraudulent investment scheme.

467.    Each of the Two-Year Transfers constitute a fraudulent transfer avoidable by the Trustee under section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Infovaleur, Tecno Gibraltar, and Tecno Italy under 11 U.S.C. § 550(a) and SIPA § 78fff-(2)(c)(3).

468.    As a result of the foregoing, under 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551, the Trustee is entitled to a judgment: (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; and (iii) recovering the Two-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS.

## COUNT SEVEN:  FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

### Against Infovaleur, Tecno Gibraltar, and Tecno Italy

469.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

470.    Each of the Two-Year Transfers was made on or within two years before the Filing Date.

471.    Each of the Two-Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a) and under SIPA § 78fff-2(c)(3).

472.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two-Year Transfers.

473.    At the time of each of the Two-Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two-Year Transfers.

474.    At the time of each of the Two-Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

475.    At the time of each of the Two-Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

476.    Each of the Two-Year Transfers constitutes fraudulent transfers avoidable by the Trustee under 11 U.S.C. § 548(a)(1)(B) and recoverable from Infovaleur, Tecno Gibraltar, and Tecno Italy under 11 U.S.C. § 550(a) and SIPA § 78fff-(2)(c)(3).

477.     As a result of the foregoing, under sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Infovaleur, Tecno Gibraltar, and Tecno Italy:  (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; and (iii) recovering the Two-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS.

## COUNT EIGHT:  FRAUDULENT TRANSFER – N.Y. DCL §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

### Against Infovaleur, Tecno Gibraltar, and Tecno Italy

478.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

479.     At all times relevant to the Six-Year Transfers, there have been one or more creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS that are allowable under 11 U.S.C. § 502 or that are not allowable only under 11 U.S.C. § 502(e).

480.     Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

481.     Each of the Six-Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six-Year Transfers to or for the benefit of Infovaleur, Tecno Gibraltar, and Tecno Italy in furtherance of a fraudulent investment scheme.

482.     Each of the Six-Year Transfers was received by Infovaleur, Tecno Gibraltar, and Tecno Italy with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six-Year Transfers and/or future creditors of BLMIS.

474.     As a result of the foregoing, under N.Y. DCL §§ 276, 276-a, 278 and/or 279, 11 U.S.C. §§ 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Infovaleur, Tecno Gibraltar, and Tecno Italy:  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; (iii) recovering the Six-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS; and (iv) recovering attorneys' fees from Infovaleur, Tecno Gibraltar, and Tecno Italy.

### COUNT NINE:  FRAUDULENT TRANSFER – N.Y. DCL §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

**Against Infovaleur, Tecno Gibraltar, and Tecno Italy**

483.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint and accompanying RICO Case Statement as if fully rewritten herein.

484.     At all times relevant to the Six-Year Transfers, there have been one or more creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS that are allowable under 11 U.S.C. § 502 or that are not allowable only under 11 U.S.C. § 502(e).

485.     Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

486.     BLMIS did not receive fair consideration for the Six-Year Transfers.

487.  BLMIS was insolvent at the time it made each of the Six-Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six-Year Transfers.

488.  As a result of the foregoing, under N.Y. DCL §§ 273, 278 and/or 279, 11 U.S.C. §§ 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Infovaleur, Tecno Gibraltar, and Tecno Italy:  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS.

**COUNT TEN:  FRAUDULENT TRANSFER – N.Y. DCL §§274, 278 AND/OR 279
AND 11 U.S.C. §§ 544, 550(a), AND 551**

**Against Infovaleur, Tecno Gibraltar, and Tecno Italy**

489.  The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint and accompanying RICO Case Statement as if fully rewritten herein.

490.  At all times relevant to the Six-Year Transfers, there have been one or more creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS that are allowable under 11 U.S.C. § 502 or that are not allowable only under 11 U.S.C. § 502(e).

491.  Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

492.  BLMIS did not receive fair consideration for the Six-Year Transfers.

493.  At the time BLMIS made each of the Six-Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property

remaining in its hands after each of the Six-Year Transfers was an unreasonably small capital.

494. As a result of the foregoing, under N.Y. DCL §§ 274, 278 and/or 279, 11 U.S.C. §§ 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Infovaleur, Tecno Gibraltar, and Tecno Italy: (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS.

## COUNT ELEVEN: FRAUDULENT TRANSFER – N.Y. DCL §§ 275, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

### Against Infovaleur, Tecno Gibraltar, and Tecno Italy

495. The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint and accompanying RICO Case Statement as if fully rewritten herein.

496. At all times relevant to the Six-Year Transfers, there have been one or more creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS that are allowable under 11 U.S.C. § 502 or that are not allowable only under 11 U.S.C. § 502(e).

497. Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

498. BLMIS did not receive fair consideration for the Six-Year Transfers.

499. At the time BLMIS made each of the Six-Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

500.    As a result of the foregoing, under N.Y. DCL §§ 275, 278 and/or 279, 11 U.S.C. §§ 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Infovaleur, Tecno Gibraltar, and Tecno Italy:  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS.

### COUNT TWELVE:  RECOVERY OF ALL FRAUDULENT TRANSFERS – N.Y. CPLR 203(g), 213(8), N.Y. DCL §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

**Against Bank Austria and the Sham Entity Transferee Defendants**

501.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

502.    At all relevant times, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

503.    At all times relevant to the Sham Entity Transfers and Bank Austria Transfers, there have been one or more creditors who have held, and still hold, matured or unmatured, unsecured claims against BLMIS that are allowable under 11 U.S.C. § 502 or that are not allowable only under 11 U.S.C. § 502(e).

504.    Each of the Sham Entity Transfers and Bank Austria Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

505.    Each of the Sham Entity Transfers and Bank Austria Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Sham Entity Transfers and Bank Austria Transfers to or for the benefit

of Bank Austria and the Sham Entity Transferee Defendants in furtherance of a fraudulent investment scheme.

506.　Each of the Sham Entity Transfers and Bank Austria Transfers was received by Bank Austria and the Sham Entity Transferee Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS existing at the time of each of the Sham Entity Transfers and Bank Austria Transfers and/or future creditors of BLMIS.

507.　As a result of the foregoing, under N.Y. CPLR 203(g) and 213(8), N.Y. DCL §§ 276, 276-a, 278 and/or 279, 11 U.S.C. §§ 544, 550, and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Bank Austria and the Sham Entity Transferee Defendants:　(i) avoiding and preserving the Sham Entity Transfers and Bank Austria Transfers; (ii) directing that the Sham Entity Transfers and Bank Austria Transfers be set aside; (iii) recovering the Sham Entity Transfers and Bank Austria Transfers, or the value thereof, from Bank Austria and the Sham Entity Transferee Defendants for the benefit of the estate of BLMIS; and (iv) recovering attorneys' fees from Bank Austria and the Sham Entity Transferee Defendants.

## COUNT THIRTEEN:　RECOVERY OF SUBSEQUENT TRANSFERS –N.Y.  DCL §§ 273-279 AND 276-a AND 11 S.C. § 544, 548, 550(a), AND 551

### Against Sham Entity Subsequent Transferee Defendants

508.　The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

509.　Each of the Sham Entity Transfers are avoidable under 11 U.S.C. §§ 544 and 548 of the Bankruptcy Code, N.Y. DCL §§ 273-276, and SIPA § 78fff-2(c)(3).

510.     On information and belief, the Sham Entity Subsequent Transferee Defendants received the Sham Entity Subsequent Transfers which are recoverable under 11 U.S.C. § 550(a).

511.     Each of the Sham Entity Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Sham Entity Subsequent Transferee Defendants.

512.     The Sham Entity Subsequent Transferee Defendants are immediate or mediate transferees of the Sham Entity Subsequent Transfers.

513.     Each of the Sham Entity Subsequent Transfers was received by the Sham Entity Subsequent Transferee Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Sham Entity Transfers and/or future creditors of BLMIS.

514.     As a result of the foregoing, N.Y. DCL §§ 278 and/or 279 and 276-a, 11 U.S.C. §§ 544, 550, and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Sham Entity Subsequent Transferee Defendants recovering the Sham Entity Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS, and attorneys' fees.

### COUNT FOURTEEN: RECOVERY OF FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

**Against Herald Fund Subsequent Transferee Defendants**

515.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and Accompanying RICO Case Statement as if fully rewritten herein.

516.     The Two-Year Herald Fund Transfers were made on or within two years before the Filing Date.

517. Each of the Two-Year Herald Fund Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

518. Each of the Two-Year Herald Fund Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing and/or future creditors. BLMIS made the Two-Year Herald Fund Transfers to, or for the benefit of, Herald Fund in furtherance of a fraudulent investment scheme.

519. Each of the Two-Year Herald Fund Transfers constitutes a fraudulent transfer avoidable by the Trustee under section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Herald Fund under section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

520. The Trustee has filed a lawsuit against Herald Fund to avoid the Two-Year Herald Fund Transfers under section 548(a)(1)(A) of the Bankruptcy Code, and to recover the Two-Year Herald Fund Transfers, or the value thereof, from Herald Fund under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

521. The Herald Fund Subsequent Transferee Defendants were immediate or mediate transferees of some portion of the Two-Year Herald Fund Transfers (the "Herald Fund Two-Year Subsequent Transfers").

522. Each of the Herald Fund Two-Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the Herald Fund Subsequent Transferee Defendants.

523. As a result of the foregoing, the Trustee is entitled to a judgment under sections 550(a) and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the

Herald Fund Two-Year Subsequent Transfers, or the value thereof, from the Herald Fund

Subsequent Transferee Defendants for the benefit of the estate.

### COUNT FIFTEEN: RECOVERY OF FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

**Against Herald Fund Subsequent Transferee Defendants**

524.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and Accompanying RICO Case Statement as if fully rewritten herein.

525.     The Two-Year Herald Fund Transfers were made on or within two years before the Filing Date.

526.     Each of the Two-Year Herald Fund Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

527.     BLMIS received less than a reasonably equivalent value in exchange for each of the Two-Year Herald Fund Transfers.

528.     At the time of each of the Two-Year Herald Fund Transfers, BLMIS was insolvent, or became insolvent, as a result of each of the Two-Year Herald Fund Transfers.

529.     At the time of each of the Two-Year Herald Fund Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

530.     At the time of each of the Two-Year Herald Fund Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

531.     Each of the Two-Year Herald Fund Transfers constitutes a fraudulent transfer avoidable by the Trustee under section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Herald Fund under section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

532.     The Trustee has filed a lawsuit against Herald Fund to avoid the Two-Year Herald Fund Transfers under section 548(a)(1)(B) of the Bankruptcy Code, and to recover the Two-Year Herald Fund Transfers, or the value thereof, from Herald Fund under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

533.     The Herald Fund Subsequent Transferee Defendants were immediate or mediate transferees of the Herald Fund Two-Year Subsequent Transfers.

534.     Each of the Herald Fund Two-Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the Herald Fund Subsequent Transferee Defendants.

535.     As a result of the foregoing, the Trustee is entitled to a judgment under sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Herald Fund Two-Year Subsequent Transfers, or the value thereof, from the Herald Fund Subsequent Transferee Defendants for the benefit of the estate.

## COUNT SIXTEEN: RECOVERY OF FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) - N.Y. DCL §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

### Against Herald Fund Subsequent Transferee Defendants

536.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and Accompanying RICO Case Statement as if fully rewritten herein.

537.     At all times relevant to the Six-Year Herald Fund Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable under section 502(e).

538.     Each of the Six-Year Herald Fund Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

539.     The Six-Year Herald Fund Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six-Year Herald Fund Transfers to, or for the benefit of, Herald Fund in furtherance of a fraudulent investment scheme.

540.     Each of the Six-Year Herald Fund Transfers were received by Herald Fund with actual intent to hinder, delay, or defraud creditors and/or future creditors of BLMIS at the time of each of the Six-Year Herald Fund Transfers.

541.     The Trustee has filed a lawsuit against Herald Fund to avoid the Six-Year Herald Fund Transfers under section 544 of the Bankruptcy Code, and N.Y. DCL sections 276, 276-a, 278, and/or 279, and to recover the Herald Fund Initial Transfers, or the value thereof, and attorneys' fees from Herald Fund under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

542.     The Herald Fund Subsequent Transferee Defendants were immediate or mediate transferees of some portion of the Six-Year Herald Fund Transfers which are recoverable from the Herald Fund Six-Year Subsequent Transferee Defendants under section 550(a) of the Bankruptcy Code (the "Herald Fund Six-Year Subsequent Transfers").

543.     Each of the Herald Fund Six-Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the Herald Fund Subsequent Transferee Defendants.

544.     Each of the Herald Fund Six-Year Subsequent Transfers was received by the Herald Fund Subsequent Transferee Defendants with actual intent to hinder, delay, or defraud creditors and/or future creditors of BLMIS at the time of each of the Herald Fund Six-Year Subsequent Transfers.

545.     As a result of the foregoing, the Trustee is entitled to a judgment under N.Y. DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Herald Fund Six-Year Subsequent Transfers, or the value thereof, and attorneys' fees from the Herald Fund Subsequent Transferee Defendants for the benefit of the estate.

### COUNT SEVENTEEN: FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
### N.Y. DCL §§ 273 AND 278
### AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

**Against Herald Fund Subsequent Transferee Defendants**

546.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

547.     At all times relevant to the Six-Year Herald Fund Transfers, there have

been one or more creditors who have held and still hold matured or unmatured unsecured

claims against BLMIS that were and are allowable under section 502 of the Bankruptcy

Code or that were and are not allowable under section 502(e).

548.     Each of the Six-Year Herald Fund Transfers constituted a conveyance by

BLMIS as defined under N.Y. DCL § 270.

549.     BLMIS did not receive fair consideration for the Six-Year Herald Fund

Transfers.

550.     BLMIS was insolvent at the time it made each of the Six-Year Herald

Fund Transfers or, in the alternative, BLMIS became insolvent as a result of each of the

Six-Year Herald Fund Transfers.

551.     The Trustee has filed a lawsuit against Herald Fund to avoid the Six-Year

Herald Fund Transfers under section 544 of the Bankruptcy Code, and N.Y. DCL

sections 273, 278, and/or 279, and to recover the Six-Year Herald Fund Transfers, or the

value thereof, from Herald Fund under section 550(a) of the Bankruptcy Code and SIPA

§ 78fff-2(c)(3).

552.     The Herald Fund Subsequent Transferee Defendants were immediate or

mediate transferees of the Herald Fund Six-Year Subsequent Transfers.

553.     Each of the Herald Fund Six-Year Subsequent Transfers was made,

directly or indirectly, to, or for the benefit of, the Herald Fund Subsequent Transferee

Defendants.

554.     As a result of the foregoing, the Trustee is entitled to a judgment under

N.Y. DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Herald Fund Six-Year Subsequent Transfers, or the value thereof, from the Herald Fund Subsequent Transferee Defendants for the benefit of the estate.

### COUNT EIGHTEEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) N.Y. DCL §§ 274, 278, AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

### Against Herald Fund Subsequent Transferee Defendants

555. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

556. At all times relevant to the Six-Year Herald Fund Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable under section 502(e).

557. Each of the Six-Year Herald Fund Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

558. BLMIS did not receive fair consideration for the Six-Year Herald Fund Transfers.

559. At the time BLMIS made each of the Six-Year Herald Fund Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six-Year Herald Fund Transfers was an unreasonably small capital.

560. The Trustee has filed a lawsuit against Herald Fund to avoid the Six-Year Herald Fund Transfers under section 544 of the Bankruptcy Code, and N.Y. DCL

sections 274, 278, and/or 279, and to recover the Six-Year Herald Fund Transfers, or the value thereof, from Herald Fund under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

561. The Herald Fund Subsequent Transferee Defendants were immediate or mediate transferees of the Six-Year Herald Fund Transfers under section 550(a) of the Bankruptcy Code the Herald Fund Six-Year Subsequent Transfers.

562. Each of the Herald Fund Six-Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the Herald Fund Subsequent Transferee Defendants.

563. As a result of the foregoing, the Trustee is entitled to a judgment under N.Y. DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Herald Fund Six-Year Subsequent Transfers, or the value thereof, from the Herald Fund Subsequent Transferee Defendants for the benefit of the estate.

### COUNT NINETEEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) N.Y. DCL §§ 275, 278, AND/OR 279 AND 11 U.S.C. §§ 544, 550(a), AND 551

**Against Herald Fund Subsequent Transferee Defendants**

564. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

565. At all times relevant to the Six-Year Herald Fund Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured

claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable under section 502(e).

566.    Each of the Six-Year Herald Fund Transfers constituted a conveyance by BLMIS as defined under N.Y. DCL § 270.

567.    BLMIS did not receive fair consideration for the Six-Year Herald Fund Transfers.

568.    At the time BLMIS made each of the Six-Year Herald Fund Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

569.    The Trustee has filed a lawsuit against Herald Fund to avoid the Six-Year Herald Fund Transfers under section 544 of the Bankruptcy Code, and N.Y. DCL sections 275, 278, and/or 279, and to recover the Six-Year Herald Fund Transfers, or the value thereof, from Herald Fund under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

570.    The Herald Fund Subsequent Transferee Defendants were immediate or mediate transferees of the Six-Year Herald Fund Subsequent Transfers.

571.    Each of the Herald Fund Six-Year Subsequent Transfers was made, directly or indirectly, to, or for the benefit of, the Herald Fund Subsequent Transferee Defendants.

572.    As a result of the foregoing, the Trustee is entitled to a judgment under N.Y. DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Herald Fund Six-Year

Subsequent Transfers, or the value thereof, from the Herald Fund Subsequent Transferee Defendants for the benefit of the estate.

## COUNT TWENTY: UNJUST ENRICHMENT

### Against All Defendants[6]

573.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

574.     All Defendants have been unjustly enriched by their participation in the Illegal Scheme.  They have wrongfully and unconscionably benefited from the receipt of: (i) stolen Customer Property from BLMIS, for which they did not, in good faith, provide fair value; and (ii) other proceeds of the Illegal Scheme.

575.     Over the course of the Illegal Scheme, these proceeds took the form of, among other things, direct payments from Madoff of stolen Customer Property, retrocession fees, management fees, custodial fees, advisory fees, incentive fees, interest payments, and other means of profiting from the Illegal Scheme.  None of this money has been returned to the Trustee for distribution in the liquidation of the BLMIS estate.

576.     As alleged herein, all Defendants are members of the Medici Enterprise and acted in furtherance of the Illegal Scheme.  Defendants received millions of dollars in direct payments of stolen Customer Property from Madoff and other proceeds of the Illegal Scheme.

577.     Accordingly, equity and good conscience require full restitution of all proceeds of the Illegal Scheme, all of which should rightfully be returned to the Trustee for distribution in the liquidation of the BLMIS estate.

---

[6] See fn. 3.

## COUNT TWENTY-ONE:  CONVERSION

### Against All Defendants[7]

578.    The Trustee incorporates by reference the allegations in the preceding paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

579.    BLMIS customers have the possessory right to and interest in the billions of dollars they personally invested with BLMIS.

580.    The proceeds of the Illegal Scheme derived by the Defendants through their participation in the Illegal Scheme were taken from moneys consisting of stolen Customer Property and other proceeds of the Illegal Scheme.

581.    The Defendants have intentionally exercised dominion and control over stolen Customer Property and other proceeds of the Illegal Scheme in a manner inconsistent with and in willful disregard of the solvency of the BLMIS estate.  The Defendants are therefore liable for having wrongfully converted these moneys and are now obligated to return all such moneys to the Trustee for distribution in the liquidation of the BLMIS estate.

## COUNT TWENTY-TWO:  MONEY HAD AND RECEIVED

### Against All Defendants[8]

582.    The Trustee incorporates by reference the allegations in the preceding paragraphs of this Complaint and accompanying RICO Case Statement as if fully rewritten herein.

---

[7] Id.
[8] Id.

583.     The Defendants are currently in possession of, or have control over, stolen Customer Property and other proceeds of the Illegal Scheme.  These moneys belong to the customer fund under the Trustee's control.  The Defendants have no lawful or equitable right to these moneys, having obtained the moneys through fraud, deceit, or mistake.

584.     In equity and good conscience, the Defendants may not retain possession or control of these moneys, which rightfully belong to the customer fund under the Trustee's control.  The Defendants are obligated to return all such moneys to the Trustee for distribution in the liquidation of the BLMIS estate.

## DEMAND FOR RELIEF

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants[9] as follows:

(i)     On Count One, damages, including interest, against all Defendants, jointly and severally, for threefold such actual damages as the Court finds the BLMIS estate has sustained, the Trustee's cost of suit, including reasonable attorneys' fees under 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs of suit, and other relief as the Court deems just and equitable;

(ii)     On Count Two, damages, including interest, against all Defendants, jointly and severally, for threefold such actual damages as the Court finds the BLMIS estate has sustained, the Trustee's cost of suit, including reasonable attorneys' fees under 18 U.S.C. § 1964(c), and such additional

---

[9] Id.

compensatory damages, punitive damages, costs of suit, and other relief as the Court deems just and equitable;

(iii) On Count Three, under sections 11 U.S.C. §§ 547(b), 550(a)(1), and 551, and § 78fff-2(c)(3) of SIPA recovering the Preference Period Sham Entity Transfers, or the value thereof, from Infovaleur and Tecno Gibraltar for the benefit of the estate of BLMIS;

(iv) On Count Four, under 11 U.S.C. §§ 547(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Preference Period Sham Entity Subsequent Transfers, or the value thereof, from Kohn, Eurovaleur, E. Kohn, R. Kohn, M. Hartstein, R. Hartstein, Scheithauer, M-Tech, APM Cayman, Palladium, Amselem, and Reuss for the benefit of the estate of BLMIS;

(v) On Count Five, under 11 U.S.C. §§ 547(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Preference Period Herald Fund Subsequent Transfers, or the value thereof, from Bank Medici, HAM, Kohn, Medici Cayman, APM Cayman, Pioneer, Hassans, Sofipo, de Sury, and Mugnai for the benefit of the estate of BLMIS;

(vi) On Count Six, under 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; and (iii) recovering the Two-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS;

(vii)    On Count Seven, under 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; and (iii) recovering the Two-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS;

(viii)    On Count Eight, under N.Y. DCL §§ 276, 276-a, 278, and/or 279, 11 U.S.C. §§ 544(b), 550(a)(1), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; (iii) recovering the Six-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS; and (iv) recovering attorneys' fees from Infovaleur, Tecno Gibraltar, and Tecno Italy;

(ix)    On Count Nine, under §§ 273, 278 and/or 279 of the N.Y. DCL, 11 U.S.C. §§ 544, 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS;

(x)    On Count Ten, under §§ 274, 278 and/or 279 of the N.Y. DCL, 11 U.S.C. §§ 544 and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-

Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS;

(xi)     On Count Eleven, under §§ 275, 278 and/or 279 of the N.Y. DCL, 11 U.S.C. §§ 544, 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from Infovaleur, Tecno Gibraltar, and Tecno Italy for the benefit of the estate of BLMIS;

(xii)     On Count Twelve, under N.Y. CPLR 203(g) and 213(8), N.Y. DCL §§ 276, 276-a, 278, and/or 279, 11 U.S.C. §§ 544, 548, 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (i) avoiding and preserving the Sham Entity Transfers and Bank Austria Transfers; (ii) directing that the Sham Entity Transfers and Bank Austria Transfers be set aside; (iii) recovering the Sham Entity Transfers and Bank Austria Transfers, or the value thereof, from Bank Austria and the Sham Entity Transferee Defendants for the benefit of the estate of BLMIS; and (iv) recovering attorneys' fees from Bank Austria and the Sham Entity Transferee Defendants;

(xiii)     On Count Thirteen, under N.Y. DCL §§ 273 to 279 and 276-a, 11 U.S.C. §§ 544, 548, 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Sham Entity Subsequent Transfers, or the value thereof, from the Sham Entity Subsequent Transferee Defendants for the benefit of the estate of BLMIS;

(xiv)　On the Fourteenth Claim for Relief, under §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Herald Fund Subsequent Transferee Defendants recovering the Two-Year Herald Fund Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xv)　On the Fifteenth Claim for Relief, under §548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Herald Fund Subsequent Transferee Defendants recovering the Two-Year Herald Fund Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xvi)　On the Sixteenth Claim for Relief, under N.Y. DCL §§ 276, 276-a, 278 and/or 279, Bankruptcy Code sections 550(a) and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Herald Fund Subsequent Transferee Defendants recovering the Two-Year Herald Fund Subsequent Transfers, or the value thereof, and attorneys' fees from the Herald Fund Subsequent Transferee Defendants for the benefit of the estate;

(xvii)　On the Seventeenth Claim for Relief, under N.Y. DCL §§ 273, 278, and/or 279, Bankruptcy Code sections 550(a) and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Herald Fund Subsequent Transferee Defendants recovering the Six-Year Herald Fund Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xviii)　On the Eighteenth Claim for Relief, under N.Y. DCL §§ 274, 278, and/or 279, Bankruptcy Code sections 550(a) and 551, and SIPA §

78fff-2(c)(3), the Trustee is entitled to a judgment against the Six-Year Herald Fund Subsequent Transferee Defendants recovering the Herald Fund Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xix)   On the Nineteenth Claim for Relief, under N.Y. DCL §§ 275, 278, and/or 279, Bankruptcy Code sections 550(a) and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Herald Fund Subsequent Transferee Defendants recovering the Six-Year Herald Fund Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(xx)   On Count Twenty, the Trustee is entitled to a judgment directing that all retrocession fees, management fees, custodial fees, advisory fees, incentive fees, interest payments, and any other proceeds of the Illegal Scheme unjustly received by all Defendants be recovered by the Trustee for the benefit of the estate of BLMIS;

(xxi)   On Counts Twenty-One and Twenty-Two, compensatory, exemplary, and punitive damages with the specific amount to be determined at trial;

(xxii)   On all Counts, under federal common law and N.Y. CPLR 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

(xxiii)  On all Counts, establishment of a constructive trust over the proceeds of all Transfers, unjust enrichment, converted Customer Property, and all other proceeds of the Illegal Scheme in favor of the Trustee for the benefit of the estate of BLMIS;

(xxiv)  On all Counts, assignment of Defendants' rights to seek

refunds from the government for federal, state, and local taxes paid on the

Transfers and all other proceeds of the Illegal Scheme;

(xxv)   On all Counts, awarding the Trustee all applicable interest,

costs, and disbursements of this action; and

(xxvi)  On all Counts, granting the Trustee such other, further, and

different relief as the Court deems just, proper, and equitable.

Dated:  New York, New York
        December 10, 2010

/s/  Timothy S. Pfeifer
_____
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10111
Telephone:  212.589.4200
Facsimile:  212.589.4201
David J. Sheehan
Timothy S. Pfeifer
Keith R. Murphy
Denise D. Vasel
Marco Molina
George Klidonas

*Of Counsel:*
Oren J. Warshavsky
Deborah H. Renner
Gonzalo S. Zeballos
Mark A. Kornfeld
Marc Skapof

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*