SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Marco E. Schnabl
Susan L. Saltzstein
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Defendant*
*UniCredit S.p.A.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | SIPA LIQUIDATION <br><br> No. 08-01789 (BRL) <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> SONJA KOHN, et al., <br><br> Defendants. | Adv. Pro. No. 10-5411 (BRL) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**UNICREDIT S.p.A.'s MOTION TO WITHDRAW THE REFERENCE**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ii

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND .............................................................................................................5

    A.    The Appointment of the Trustee ...........................................................5

    B.    The Kohn Action .................................................................................5

    C.    The Securities Litigations ....................................................................6

WITHDRAWAL STANDARDS ......................................................................................7

ARGUMENT ..................................................................................................................9

I. WITHDRAWAL OF THE KOHN ACTION IS MANDATORY BECAUSE ITS
RESOLUTION IMPLICATES "SUBSTANTIAL AND MATERIAL" ISSUES OF
NON-BANKRUPTCY FEDERAL LAW ......................................................................9

    A.    The Trustee's Purported Standing To Bring This Action Raises Possibly
Dispositive  Issues of Non-Bankruptcy Federal Law ............................9

    B.    The Trustee's RICO Claims Will Require Substantial and Material
Interpretation of Non-Bankruptcy Federal Law ..................................16

    C.    Determining Whether the Trustee's Common Law Claims Are Barred by
SLUSA Will Require Substantial and Material Interpretation of Non-
Bankruptcy Federal Law ...................................................................27

II. THE KOHN ACTION SATISFIES THE STANDARDS FOR PERMISSIVE
WITHDRAWAL OF THE REFERENCE ...................................................................30

    A.    The Kohn Action Principally Involves Non-Core Claims ...................30

    B.    Efficiency and Uniformity Favors Withdrawal of the Reference ........32

    C.    Neither Delay nor Forum Shopping Is Threatened by Withdrawing the
Reference .........................................................................................33

CONCLUSION .............................................................................................................34

Exhibit A: Selected Examples of Overlapping Allegations in the Kohn Action and the
Securities Litigations .................................................................................1

i

**CASES**

*In re Adelphia Communications Corp.*,
No. 02 Civ. 8495, 2003 U.S. Dist. LEXIS 9349 (S.D.N.Y. June 4, 2003) .......................... 31

*In re Adelphia Communications Corp. Securities & Derivatives Litigation*,
No. 03 MDL 1529(LMM), 2006 WL 337667 (S.D.N.Y. Feb. 10, 2006) ....... 8, 16, 31, 32, 33

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010) ................................................................................ 29

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006 ) ...................................................................................................... 3, 21

*Appel v. Mainstar Oil Co.* (In re B & L Oil Co.),
46 B.R. 731 (Bankr. D. Colo. 1985) .................................................................................. 31

*Bald Eagle Area School District v. Keystone Finance, Inc.*,
189 F.3d 321 (3rd Cir. 1999) .............................................................................................. 20

*Bianco v. Erkins* (In re Gaston & Snow),
243 F.3d 599 (2d Cir. 2001) ............................................................................................... 28

*Boyle v. United States*,
129 S. Ct. 2237 (2009) ........................................................................................................ 23

*Burger King Corp. v. B-K of Kansas, Inc.*,
64 B.R. 728 (D. Kan. 1986) ............................................................................................... 17

*Cedeno v. Intech Group, Inc.*,
733 F. Supp. 2d 471 (S.D.N.Y. Aug. 25, 2010) ................................................................. 17

*Central Illinois Savings & Loan Association* (In re IQ Telecommunications., Inc.),
70 B.R. 742 (N.D. Ill. 1987) ............................................................................................... 16

*Cohain v. Klimley*,
No. 08 Civ. 5047(PGG), 2010 WL 3701362 (S.D.N.Y. Sept. 20, 2010) ........................... 19

*Complete Management, Inc. v. Arthur Andersen, LLP* (In re Complete
Management, Inc.),
No. 02 Civ. 1736, 2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002) .............................. 30, 33

*Department of Economic Development v. Arthur Andersen & Co. (USA)*,
924 F. Supp. 449 (S.D.N.Y. 1996) ..................................................................................... 25

*Enron Corp. v. J.P. Morgan Sec., Inc.* (In re Enron Corp.),
    388 B.R. 131 (S.D.N.Y. 2008) ........................................................................ 10

*Enron Power Marketing, Inc. v. California Power Exchange Corp.* (In re Enron
    Corp.),
    No. 04 Civ. 8177, 2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004) ........................ 8

*In re Ephedra Products Liability Litigation*,
    329 B.R. 1 (S.D.N.Y. 2005) ............................................................................ 16

*First Capital Asset Managemen , Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) .......................................................................... 26

*Giddens v. D.H. Blair & Co.* (In re A.R. Baron & Co.),
    280 B.R. 794 (Bankr. S.D.N.Y. 2002) ............................................................ 12

*Gulf States Exploration Co. v. Manville forest Prods. Corp.* (In re Manville
    Forest Prods. Corp.), 896 F.2d 1384 (2d Cir. 1990) ........................................ 31

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
    492 U.S. 229 (1989) ..................................................................................... 27

*Hassett v. BancOhio National Bank* (In re CIS Corp.),
    172 B.R. 748 (S.D.N.Y. 1994) ................................................................. 30, 31

*Hemi Group, LLC v. City of New York*,
    130 S. Ct. 983 (2010) ................................................................................... 21

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992) ................................................................... 3, 13, 21, 22

*Keene Corp. v. Williams Bailey & Wesner, L.L.P.* (In re Keene Corp.),
    182 B.R. 379 (S.D.N.Y. 1995) ........................................................................ 8

*LTV Steel Co. v. City of Buffalo* (In re Chateaugay Corp.),
    No. 00 Civ. 9429(SHS), 2002 WL 484950 (S.D.N.Y. Mar. 29, 2002) ............... 32

*LaSala v. Bordier et Cie*,
    519 F.3d 121 (3d Cir. 2008) .......................................................................... 28

*LaSala v. UBS, AG*,
    510 F. Supp. 2d 213 (S.D.N.Y. 2007) ............................................................ 28

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003) ................................................................... 21, 22

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................... 16

*MLSMK Investments Co. v. JP Morgan Chase & Co.*,
  No. 09 Civ. 4049, 2010 WL 2925403 (S.D.N.Y. July 15, 2010) ....................................... 25

*In re MV Securities, Inc.*,
  48 B.R. 156 (Bankr. S.D.N.Y. 1985) ................................................................. 12

*Gulf States Exploration Co. v. Manville Forest Prods. Corp.* (In re Manville
  Forest Products Corp.),
  896 F.2d 1384 (2d Cir. 1990) ........................................................................... 31

*Meadowlands Communications, Inc. v. Banker's Trust Co.*,
  79 B.R. 198 (D.N.J. 1987) ............................................................................... 31

*Mishkin v. Ageloff*,
  220 B.R. 784 (S.D.N.Y. 1998) ........................................................... 9, 23, 24, 33

*Mishkin v. Peat, Marwick, Mitchell & Co.*,
  744 F. Supp. 531 (S.D.N.Y.1990) ..................................................................... 13, 15

*Morrison v. National Australia Bank, Ltd.*,
  130 S. Ct. 2869 (2010) ................................................................................. 2, 17

*Newbro v. Freed*,
  409 F. Supp. 2d 386 (S.D.N.Y. 2006) .............................................................. 10

*Newman v. Family Management Corp.*,
  No. 08 Civ. 11215(LBS), 2010 WL 4118083 (S.D.N.Y. Oct. 20, 2010) ........................... 29

*Norex Petroleum Ltd. v. Access Industrial, Inc.*,
  No. 07-4553-cv, 2010 WL 4968691 (2d Cir. Dec. 8, 2010) .................................. 3, 17, 18

*Northwest Airlines, Inc. v. City of Los Angeles* (In re Northwest Airlines Corp.),
  384 B.R. 51 (S.D.N.Y. 2008) .............................................................................. 9

*OSRecovery, Inc. v. One Groupe International, Inc.*,
  354 F. Supp. 2d 357 (S.D.N.Y. 2005) .............................................................. 20

*Orion Pictures Corp. v. Showtime Networks, Inc.* (In re Orion Pictures Corp.),
  4 F.3d 1095 (2d Cir. 1993) ................................................................... 8, 9, 30, 32

*Pan Am Corp. v. Delta Air Lines, Inc.* (In re Pan Am Corp.),
  163 B.R. 41 (S.D.N.Y. 1993) ........................................................................... 32

*In re Park South Securities, LLC,*
    326 B.R. 505 (Bankr. S.D.N.Y. 2005) ............................................................. 12

*Picard v. Cohmad Securities Corp.,*
    No. 09 Civ. 7655(US), 2009 WL 4729927 (S.D.N.Y. Dec. 10, 2009) ............................... 33

*RGH Liquidating Trust v. Deloitte & Touche LLP,*
    71 A.D.3d 198, 891 N.Y.S.2d 324 (N.Y. App. Div. 2009) .................................. 29

*Rechberger v. Hurlburt,*
    No. 07-CV-00061A(F), 2010 U.S. Dist. LEXIS 17815 (W.D.N.Y. Jan. 12,
    2010) .................................................................................................. 20

*Reda, Inc. v. Harris Trust & Savings Bank* (In re Reda, Inc.),
    60 B.R. 178 (Bankr. N.D. Ill. 1986) ............................................................... 31

*Redington v. Touche Ross & Co.,*
    592 F.2d 617 (2d Cir. 1978) .................................................................. 13, 14

*Redington v. Touche Ross & Co.,*
    612 F.2d 68 (2d Cir. 1979) ........................................................... 14, 16, 17, 27

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ................................................................................. 24

*Rosner v. Bank of China,*
    528 F. Supp. 2d 419 (S.D.N.Y. 2007) ........................................................... 25

*SIPC v. BDO Seidman LLP,*
    49 F. Supp. 2d 644 (S.D.N.Y. 1999) ........................................................ 12, 15

*SIPC v. BDO Seidman, LLP,*
    222 F.3d 63 (2d Cir. 2000) ......................................................................... 15

*Schmidt v. Fleet Bank,*
    16 F. Supp. 2d 340 (S.D.N.Y. 1998) ............................................................ 25

*Sedima, S.P.R.L. v. Imrex Co. Inc.,*
    473 U.S. 479 (1985) ................................................................................. 26

*Shearson Lehman Hutton, Inc. v. Wagoner,*
    944 F.2d 114 (2d Cir. 1991) ....................................................................... 11

*Shugrue v. Air Line Pilots Association International* (In re Ionosphere Clubs,
    Inc.),
    922 F.2d 984, 995 (2d Cir. 1990) ................................................................... 8

*South St. Seaport Ltd. Partnership v. Burger Boys, Inc.* (In re Burger Boys, Inc.),
94 F.3d 755 (2d Cir. 1996) ................................................................. 9, 30, 31

*Spool v. World Child Intern. Adoption Agency*,
520 F.3d 178 (2d Cir. 2008) .................................................................... 27

*Stechler v. Sidley, Austin, Brown & Wood, L.L.P.*,
382 F. Supp. 2d 580 (S.D.N.Y. 2005) ....................................................... 19

*In re Texaco Inc.*,
84 B.R. 911 (S.D.N.Y. 1988)) ................................................................. 10

*Thomas H. Lee Equity Fund V, L.P., v. Mayer Brown, Rowe & Maw LLP*,
612 F. Supp. 2d 267 (S.D.N.Y. 2009) ....................................................... 20

*United States v. Turkette*,
452 U.S. 576 (1981) ............................................................................... 23

*United States v. Viola*,
35 F.3d 37 (2d Cir. 1994) ....................................................................... 24

*Van Dorn Retail Management., Inc. v. Sovran Bank/DC Naional, Inc.*,
No. 90-2974 (JHG), 1991 WL 222061 (D.D.C. Oct. 9, 1991) .......................... 31

*Wechsler v. Squadron, Ellenoff, Plesent, & Sheinfeld LLP*,
201 B.R. 635 (S.D.N.Y. 1996) ................................................................. 30

*Wight v. BankAmerica Corp.*,
219 F.3d 79 (2d Cir. 2000) ..................................................................... 12

*In re WorldCom, Inc.*,
No. 07 Civ. 9590(DC), 2008 WL 2441062 (S.D.N.Y. June 18, 2008) ............... 31

*Zito v. Leasecomm Corp.*,
No. 02 Civ. 8074 (GEL), 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003) ........... 25

## STATUTES

15 U.S.C. § 77p(b) ................................................................................. 27

15 U.S.C. § 77p(f)(2)(A) ..................................................................... 4, 28

15 U.S.C. § 77r(b) ............................................................................. 3, 29

15 U.S.C. § 77z-1 ................................................................................. 28

15 U.S.C. §§ 77-78 ................................................................................................. 3, 19

15 U.S.C. § 78u-4 .................................................................................................... 28

15 U.S.C. §§ 78aaa-78*lll* ...................................................................................... 1

15 U.S.C. § 78bb(f)(1) ............................................................................................. 3

15 U.S.C. § 78bb(f)(5)(D) ....................................................................................... 29

15 U.S.C. § 78bbb .................................................................................................... 17

15 U.S.C. § 78eee(b)(2)(A) ..................................................................................... 10

15 U.S.C. § 78eee(b)(4) ........................................................................................... 10

15 U.S.C. § 78fff-1(a) .............................................................................................. 12

15 U.S.C. § 78fff-1 ............................................................................................. 9, 11

15 U.S.C. § 78fff-3(a) .............................................................................................. 13

15 U.S.C. § 78fff(a)(1)(B) ....................................................................................... 9

15 U.S.C. § 78*lll*(11) ............................................................................................. 9

15 U.S.C. § 78*lll*(2) ............................................................................................... 9

18 U.S.C. §§ 1341-1343 .......................................................................................... 25

18 U.S.C. §§ 1956 .................................................................................................... 25

18 U.S.C. §§ 1957 .................................................................................................... 25

18 U.S.C. § 1961(1) ................................................................................................. 25

18 U.S.C. § 1961(4) ................................................................................................. 23

18 U.S.C. § 1962(c) ................................................................................................. 25

18 U.S.C. § 1964 ................................................................................................. 3, 19

18 U.S.C. § 1964(c) .......................................................................................... 3, 19, 21

28 U.S.C. § 157(a) .................................................................................................... 7

28 U.S.C. § 157(d)........................................................................................... 1, 2, 4, 8, 9, 16, 28, 32

## OTHER AUTHORITIES

Pub. L. No. 104-67, 109 Stat. 737 (1995)............................................................. 3, 19

Fed. R. Bankr. P. 5011(a) ................................................................................. 8

Fed R. Bankr. P. 5011, advisory committee's note ................................................ 8

Defendant UniCredit S.p.A. ("UniCredit") moves pursuant to 28 U.S.C. § 157(d) to

withdraw the reference to the Bankruptcy Court for the Southern District of New York of

adversary proceeding No. 10-5411 (BRL) (Bankr. S.D.N.Y. filed Dec. 2, 2010 and amended Feb.

3, 2011), captioned *Picard v. Kohn, et al.*, (the "Action" or the "Kohn Action"), filed by Irving

Picard (the "Trustee"), the trustee appointed at the request of the Securities Investor Protection

Corporation ("SIPC") pursuant to the Securities Investor Protection Act of 1970, 15 U.S.C. §§

78aaa-78*lll* ("SIPA"), for the liquidation of Bernard L. Madoff Investment Securities LLC

("BLMIS").[1]  Controlling law compels the requested withdrawal of the Kohn Action to the

United States District Court for the Southern District of New York (the "District Court").

## PRELIMINARY STATEMENT

In one of the largest civil claims ever, and arguably acting far beyond the authority

bestowed on him by Congress through SIPA, the Trustee invokes principally the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), as well as common law claims such as

"unjust enrichment" and "conversion," in seeking to extract $59 *billion* from more than 50

mostly foreign defendants[2] (including the largest regulated banks in Italy and Austria) on claims

that this disparate group of foreigners is responsible for the *entirety* of the $19.6 billion in losses

the Trustee asserts were recorded by *all* Madoff investors, and then *tripling* that amount under

---

[1]  UniCredit submits this motion without prejudice to, and without waiver of, any rights, arguments or defenses it
(or its affiliate Defendant Pioneer Global Asset Management S.p.A., also named in the Action sought to be
withdrawn) might otherwise have at law or in equity including, without limitation, its right to contest personal
jurisdiction.  UniCredit (or any of its affiliates) does not hereby submit to the jurisdiction of this Court.
Furthermore, the relief sought in this application is the withdrawal of the reference only.  Neither this
application nor this memorandum seek a merits determination of any issue discussed, such as the Trustee's
"standing" under SIPA, the applicability of the Securities Litigation Uniform Standards Act of 1998, or of the
Racketeer Influenced and Corrupt Organizations Act.  UniCredit addresses these issues here to illustrate the
principal arguments it believes are central to any determination of the Kohn Action.  UniCredit reserves the
right fully to address such matters on the merits at the appropriate time.

[2]  UniCredit is not aware of any other Defendant (except its affiliate Pioneer Global Asset Management S.p.A.)
that has accepted service or been served in this matter as of the time of this filing.

RICO.[3]  No more need be said why this case does not belong in a bankruptcy court.[4]
Unsurprisingly, the governing standards for mandatory and permissive withdrawal of the
reference are amply met here.

Withdrawal is mandatory because the Court must address many complex matters of non-bankruptcy federal law to resolve the Trustee's unbounded claims and extravagant assertions of power.  *See* 28 U.S.C. § 157(d) ("[T]he district court *shall* . . . withdraw a proceeding if . . . resolution of the proceeding requires consideration of both title 11 and other laws of the United States . . . .").  A sample of the possibly dispositive non-bankruptcy federal law issues presented by the Action, each of which separately supports mandatory withdrawal, includes:

Standing/SIPA:

(1)  Does the Trustee have standing to sue (under RICO or otherwise) on behalf of thousands of BLMIS customers (and not only on behalf of the BLMIS estate itself), including for amounts far exceeding his own estimate of the aggregate of all losses?

(2)  Does the Trustee have the power to bring the Action on *any* basis identified in the Amended Complaint—*i.e.,* as representative of the BLMIS estate, representative of BLMIS customers, purported "bailee" of customer property, or supposed "assignee" or "subrogee" of claims paid?

RICO and the Private Securities Litigation Reform Act of 1995 ("PSLRA"):

(1)  May RICO be applied extraterritorially in the wake of the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), confirming the presumption against extraterritorial application of U.S. law where, as here, the Action focuses on *foreign* defendants (located in, among other places, Italy, Austria, Ireland and the Cayman Islands), engaged in *foreign* acts, often under *foreign* regulatory supervision or law, involving

---

[3]  The Amended Complaint in the Kohn Action is annexed at Exhibit 1 to the February 17, 2011 declaration of Shannon T. Lazzarini submitted herewith, exhibits to which are cited at "Ex. #."  References to the Amended Complaint are cited as "Am. Compl. ¶__."  References to "Ex. A" are to an exhibit to this memorandum summarizing overlapping allegations in the Kohn Action Complaint and in three complaints filed in securities class actions pending in the District Court further described below as the "Securities Litigations."

[4]  The Trustee's own press release accompanying this filing confirms that RICO is the focus of the Action:  "Trustee . . . Files Civil Racketeering Claims Against Members of the 'Medici Enterprise' Masterminded by Sonja Kohn, and Including Bank Medici, Unicredit, Bank Austria and 53 other Defendants."  Press Release of Irving Picard (Dec. 10, 2010), annexed as Ex. 2.

sales to *foreigners*, of *foreign* securities, for placement in *foreign* investment vehicles?[5]

(2) Are RICO claims separately barred here by the "PSLRA" amendment[6] to RICO[7], which was expressly intended to prevent RICO claims from being grounded on allegations of securities fraud, as they arguably are here?

(3) Can the Trustee's bedrock premise that these foreign Defendants "caused" damages to BLMIS customers coexist with Supreme Court RICO authority that requires a closer nexus of "proximate cause" between the charged conduct and the alleged damages, particularly where, as here, Madoff through BLMIS was the master of the Ponzi scheme at issue and the singular cause of all harm?[8]

(4) Does the Action push well beyond accepted limits each of RICO's elements, including the asserted existence of: (i) an association-in-fact enterprise to which some supposed members, including UniCredit, allegedly belonged for short periods, having allegedly joined it more than a decade after the enterprise's inception, (ii) operational and managerial control over the enterprise through mere ownership of other alleged participants or the rendering of banking or investment services, and (iii) a "pattern of racketeering activity" that is arguably no more than a receipt of fees or dividends in the ordinary course of business?

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA"):

(1) Whether in seeking to act for *thousands* of investors in BLMIS, the common law claims asserted by the Trustee are barred as a "covered class action," based on "state law," alleging fraud in connection with the purchase of "covered securities" under SLUSA.[9]

(2) Indeed, do the common law claims in the Action involve "covered securities" under SLUSA, 15 U.S.C. § 77r(b)—namely, the listed stocks and options Madoff professed to buy, but did not?

---

[5]  *See Norex Petroleum Ltd. v. Access Indus., Inc.*, No. 07-4553-cv, 2010 WL 4968691, at *1 (2d Cir. Dec. 8, 2010) (to be published in F.3d) (holding that *Morrison* bars the application of RICO to claims primarily involving foreign actors or facts).

[6]  *See* Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified as amendments to 15 U.S.C. §§ 77-78).

[7]  *See* 18 U.S.C. § 1964(c) ("no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962").

[8]  *See, e.g., Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (proximate causation in RICO turns on "whether the alleged violation led directly to the plaintiff's injuries"); *see also Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-71 (1992) (SIPC barred from bringing RICO claim against third parties on behalf of failed broker's customers for lack of "proximate cause").

[9]  15 U.S.C. § 78bb(f)(1) ("No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging -- (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security[.]").

(3) Under what law should "common law" claims be determined (local or foreign law), what choice-of-law rules apply to that determination (federal or New York), and, if foreign law governs, are such claims "state law" claims triggering the application of SLUSA?

(4) Does the Action otherwise trigger the SLUSA bar as to common law claims despite not being labeled a class action, in light of SLUSA's definition of "covered class action" as including claims brought in a representative capacity or on behalf of more than 50 persons? 15 U.S.C. § 77p(f)(2)(A).

Answers to these questions must be sought from an Article III Court under the plain text of 28 U.S.C. § 157(d) and its settled interpretations in this Circuit. Withdrawal is thus mandatory.

Separately, there is ample "cause" here to order withdrawal under the "permissive" prong of 28 U.S.C. § 157(d), which turns on whether the claims are "core" or "non-core" and then on efficiency, uniformity, and economy.[10] In short, the focus, facts, and circumstances of the Kohn Action overlap with those in certain securities litigations that have been pending in the District Court since 2009 (the "Securities Litigations").[11] Further, all these litigations seek damages against many of the same defendants, but do it on behalf of different classes of plaintiffs: in the Securities Litigations, on behalf of foreign investors who invested in funds that, in turn, invested with BLMIS, and in the Kohn Action ostensibly on behalf of all customers of BLMIS. Absent withdrawal, there is therefore a serious risk of duplicative recoveries and inconsistent results, and a virtual certainty of judicial inefficiency and of a monumental waste of effort, time, and resources inflicted on dozens of parties by proceedings in different courts. Permissive withdrawal is therefore appropriate for prudential considerations that the Trustee has elsewhere also endorsed.[12]

---

[10] 28 U.S.C. § 157(d) ("The district court may withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court] under this section, on its own motion or on timely motion of any party, for cause shown.").

[11] *See* Ex. A (illustrating allegations common to these actions).

[12] In seeking earlier this year to dismiss a duplicative adversary proceeding, the Trustee acknowledged that dismissing the similar action will "conserve judicial resources and avoid the prospect of having various defendants defending multiple lawsuits. A single proceeding will also avoid the costs of duplicative discovery

*(cont'd)*

## BACKGROUND

### A.    The Appointment of the Trustee

On December 15, 2008, in the wake of Madoff's admission that he had been operating a Ponzi scheme through BLMIS, District Judge Louis L. Stanton granted SIPC's application to appoint Irving H. Picard as trustee of BLMIS pursuant to SIPA, and referred the BLMIS SIPA liquidation proceeding to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), where it was assigned to Bankruptcy Judge Burton R. Lifland.

Since his appointment, the Trustee has filed approximately 1,000 adversary proceedings, primarily to recover funds transferred from BLMIS under the avoidance and recovery sections of chapter 5 of title 11 of the United States Code (*i.e.*, the Bankruptcy Code) and the fraudulent conveyance provisions of the New York Debtor and Creditor Law. The litigation sought to be withdrawn here is one of the few filed by the Trustee that seek recoveries on grounds beyond his statutorily recognized attempts to "claw back" funds paid out from the BLMIS estate and the only RICO case known to have been filed by the Trustee in this matter.

### B.    The Kohn Action

In the Action, the Trustee asserts that a broad group of over 50 principally foreign Defendants (including UniCredit and its subsidiary Bank Austria, the largest regulated banks in Italy and Austria) were all part of a vague international "Illegal Scheme"—which he has dubbed the "Medici Enterprise"—masterminded by a certain Sonja Kohn profiting from her relationship with Bernard Madoff to feed some $9.1 billion of "other people's money [mostly from Eastern European investors] into his Ponzi scheme" (Am. Compl. ¶¶ 1-6) through international funds, several of which are also involved in the Securities Litigations pending in the District Court.

---

*(cont'd from previous page)*
     and the danger of inconsistent results. . . ."  Memorandum of Law in Support of Trustee's Proposed Order at 11,
*(cont'd)*

(*See id.* ¶¶ 252, 257-65, 277, 290-91, 321-29.) The Trustee extravagantly asserts that by providing Madoff with a "constant influx of fresh capital" (*id.* ¶ 8), the Defendants "caused" the *entirety* of the $19.6 billion in damages allegedly inflicted by the Madoff scheme.

The Trustee then triples those alleged losses under RICO to approximately $59 billion. (Am. Compl. ¶¶ 413-433.) He further asserts common law claims such as unjust enrichment and conversion (*id.* ¶¶ 573-584), and also seeks to avoid and recover under bankruptcy law alleged transfers and fees (*id.* ¶¶ 434-572), while characterizing instances of payments or communications as "predicate acts" of, among other offenses, wire or mail fraud and money laundering in support of the central RICO claim. A gargantuan demand for almost $60 billion does not merely "overlap" with claims brought elsewhere on behalf of *any* alleged Madoff victim, such as the Securities Litigations. Rather, it self-evidently engulfs and subsumes them all.[13]

## C. The Securities Litigations

In January 2009, investors in Thema International Fund ("Thema"), Herald Lux. and Herald Fund SPC ("Herald") and Primeo Fund ("Primeo," and collectively the "Funds")—all foreign funds that invested with BLMIS and whose shares were available for purchase abroad only by non-U.S. investors—sued more than 60 mostly-foreign defendants (including UniCredit) in purported class actions, including the Funds, their directors, investment managers, promoters, administrators, custodians, and auditors.[14] These cases have been consolidated for pre-trial

_____

(cont'd from previous page)

*Picard v. Herald Fund*, No. 09-01359 (BRL), (Bankr. S.D.N.Y. Jan. 14, 2011) ECF No. 47.

[13] In a related adversary proceeding, *Picard v. HSBC Bank plc*, No. 09-1364 (BRL) (the "HSBC Action"), the Trustee likewise seeks recovery of avoidable transfers, as well as some $2 billion in damages for having "aided and abetted" Madoff's fraud and breach of fiduciary duty, against dozens of mostly foreign defendants, including UniCredit. HSBC-related and UniCredit-related defendants in the HSBC Action have separately moved to withdraw that reference. Both motions are pending before District Judge Jed S. Rakoff.

[14] *See* Consolidated Amended Complaint, *In re Herald, Primeo & Thema Funds Sec. Litig.*, No. 09-Civ.-289 (RMB) (HBP) (S.D.N.Y. Feb. 11, 2010), ECF No. 75 ("Primeo Compl."), annexed as Ex. 3; Amended Class Action Complaint, *In re Herald, Primeo & Thema Funds Sec. Litig.*, No. 09-Civ.-289 (RMB) (HBP) (S.D.N.Y. Feb. 11, 2010), ECF No. 74 ("Herald Compl."), annexed as Ex. 4; Amended Class Action Complaint, *In re*

*(cont'd)*

purposes[15] and a briefing schedule ending in October of 2011 for motions directed against the repeatedly-amended pleadings has been established by District Judge Richard M. Berman, before whom these actions are pending.[16]

The Action and the Securities Litigations stem from much the same underlying facts. For example, Sonja Kohn and her alleged associates, who are the alleged nucleus of the Action, are also defendants in all three Securities Litigations.[17] Like the Action, the Securities Litigations charge defendants, UniCredit included, with involvement in alleged misrepresentations about investments in BLMIS, and with breach of contractual and other duties to plaintiffs.[18] (*See generally* Ex. A.) The amount and propriety of fees that defendants, including UniCredit, are alleged to have received are at issue in each Securities Litigation, as they are in the Action.[19]

## WITHDRAWAL STANDARDS

Although under 28 U.S.C. § 157(a), the District Court may refer to the Bankruptcy Court any case under title 11 of the U.S. Code (*i.e.*, a bankruptcy case) and this District has a standing order to do so automatically, this Court is *required* in some circumstances, and is permitted whenever there is "cause," to withdraw all or a portion of such case or proceeding:

> The district court *may* withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court] under this section, on its own motion or on timely motion of any party, for cause shown [(permissive withdrawal)]. The district court *shall*, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both

_____
*(cont'd from previous page)*

*Herald, Primeo & Thema Funds Sec. Litig.,* No. 09-Civ.-289 (RMB), (S.D.N.Y. Feb. 11, 2010), ECF No. 76 ("Thema Compl."), annexed as Ex. 5.

[15] Order at 8, *In re Herald, Primeo & Thema Funds Sec. Litig.*, No. 09-Civ.-289 (RMB) (HBP), (S.D.N.Y. Oct. 5, 2009), ECF No. 60 , annexed as Ex. 6.

[16] Transcript of Proceedings at 37:23-38:15, *In re Herald, Primeo & Thema Funds Sec. Litig.*, No. 09-Civ.-289 (RMB) (S.D.N.Y. Jan. 10, 2011), ECF No. 169, annexed as Ex. 7.

[17] Ex. 3 at ¶¶ 18-19; Ex. 4 at ¶¶ 26, 29; Ex. 5 at ¶¶ 17-21, 158-166.

[18] *Compare* Am. Compl. ¶ 18 *with* Ex. 5 (Thema Compl.) ¶ 369.

[19] *Compare* Thema Compl. ¶ 369 *with* Am. Compl. ¶¶ 22-23, 287, 291 *and* Am. Compl. Counts 5, 14-19 (seeking to recover funds paid to UniCredit and others).

title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce [(mandatory withdrawal)].

28 U.S.C. § 157(d) (emphasis added). In either case, withdrawal authority rests with the District Court. Fed. R. Bankr. P. 5011(a) ("A motion for withdrawal of a case or proceeding shall be heard by a district judge."); *see also* Fed R. Bankr. P. 5011, advisory committee's note ("The withdrawal decision is committed exclusively to the district court.").

Withdrawal is mandatory in this Circuit where, as here, resolution of the matter sought to be withdrawn requires "'significant interpretation'" of non-bankruptcy federal law. *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529(LMM), 2006 WL 337667, at *2 (S.D.N.Y. Feb. 10, 2006) (quoting *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991)), or "'substantial and material consideration of non-Bankruptcy Code federal [law].'" *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.* (In re Enron Corp.), No. 04 Civ. 8177(RCC), 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004) (alteration in original) (quoting *Shugrue v. Air Line Pilots Ass'n Int'l* (In re Ionosphere Clubs, Inc.), 922 F.2d 984, 995 (2d Cir. 1990)). Mandatory withdrawal is compelled whenever there are "complicated issues" that must be addressed by the court to determine the matter sought to be withdrawn; withdrawal does *not* require that there be a conflict between federal law and the Bankruptcy Code or that these issues be of first impression. *Keene Corp. v. Williams Bailey & Wesner, L.L.P.* (In re Keene Corp.), 182 B.R. 379, 382 (S.D.N.Y. 1995). The mandatory withdrawal standard is easily satisfied here.

Although the statute does not define "cause" for permissive withdrawal, the Second Circuit has established a two-pronged test: "A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core," *Orion Pictures Corp. v. Showtime Networks, Inc.* (In re Orion Pictures Corp.), 4 F.3d 1095, 1101 (2d Cir. 1993), although that determination is not itself dispositive. *See* S. *St. Seaport Ltd. P'ship v. Burger Boys,*

*Inc.* (In re Burger Boys, Inc.), 94 F.3d 755, 762 (2d Cir. 1996) (withdrawal appropriate even where issue was "plainly a core bankruptcy matter"). Second, the court must then "weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *In re Orion Pictures Corp.*, *Inc.*, 4 F.3d at 1101. The practicalities of efficiency and uniformity are overriding considerations. *Nw. Airlines Corp. v. City of Los Angeles* (In re Nw. Airlines, Inc. ), 384 B.R. 51, 59 (S.D.N.Y. 2008); *see also Mishkin v. Ageloff*, 220 B.R. 784, 799-801 (S.D.N.Y. 1998).

## ARGUMENT

## I.

## WITHDRAWAL OF THE KOHN ACTION IS MANDATORY BECAUSE ITS RESOLUTION IMPLICATES "SUBSTANTIAL AND MATERIAL" ISSUES OF NON-BANKRUPTCY FEDERAL LAW

Resolution of the Action will unavoidably require substantial and material interpretation of non-bankruptcy federal law, including under SIPA, RICO, and SLUSA. These are questions of non-bankruptcy federal law that should be determined by an Article III Court under the plain terms of 28 U.S.C § 157(d) and the authorities that have interpreted it in this Circuit.

**A. The Trustee's Purported Standing To Bring This Action Raises Possibly Dispositive Issues of Non-Bankruptcy Federal Law**

The Trustee professes to have standing principally under SIPA[20], 15 U.S.C. § 78fff-1 (Am. Compl. ¶ 65), alleging the right to sue third parties not only in the name of BLMIS itself,

---

[20]   SIPA is part of the securities laws and was enacted to protect customers when brokers like BLMIS failed, and to help replenish the SIPC fund which advances to these direct customers up to $500,000 for dissipated securities constituting "customer property." Under SIPA, a "customer" is, in short, someone who has a claim for securities in the hands of the debtor/broker-dealer (called "customer property")—*i.e.*, someone who had a direct account at BLMIS. *See* 15 U.S.C. § 78*lll*(2). SIPA empowers the Trustee to distribute "customer property" of BLMIS to the respective "customers" and to satisfy "customer" net equity claims. *See* 15 U.S.C. § 78fff(a)(1)(B); *see also* 15 U.S.C. § 78*lll*(11) (defining "net equity" as, essentially, the value of the securities in the "customer" account less debts the customer may have had to BLMIS). The legal arrangements under SIPA are based on policies that differ from those in ordinary bankruptcy liquidation proceedings. To analyze SIPA

*(cont'd)*

but also as assignee of claims (*id.* ¶ 67(h)), on behalf of SIPC as subrogee (*id.* ¶ 67(i)) of

thousands of customers of BLMIS, or as "bailee" (*id.* ¶ 67 (g)) of property left by customers in

"bailment" with BLMIS.  Whether any of these theories provides the Trustee with standing is

one of the threshold "60 billion dollar questions" that may determine the viability of the central

claims in the Action.

      1.      **The substantial and material question whether the Trustee has
standing to sue on behalf of BLMIS creditors**

Here, the Trustee has gone much further than a SIPA trustee seeking to claw back

"customer property" (a term defined by SIPA) that may have been transferred out of BLMIS.[21]

Rather, he "seeks to recover the $19.6 billion in [net investor deposits, which he claims is the]

damage[] to the business and property of the BLMIS estate caused by the [purported RICO

enterprise], to be trebled under RICO" and the restitution of unspecified amounts said to have

"unjustly enriched" the defendants at the expense of BLMIS's customers.  (Am. Compl. ¶¶ 8,

573-577.)  Recovery of $19.6 billion alone may provide greater recovery than is allowed the

Trustee pursuant to SIPA, even before tripling that amount under RICO.

The Trustee pleads standing artfully and ambiguously.  For example, he claims "RICO

standing" under SIPA §§ 78eee(b)(2)(A) and (b)(4).  (Am. Compl. ¶ 40.)  But neither of these

subparagraphs arguably addresses the Trustee's power under SIPA; rather, they both may be read

to speak about the jurisdiction of the Bankruptcy Court over the BLMIS estate and the removal

of other liquidation proceedings to that Court.

---

*(cont'd from previous page)*

     requires the "'significant interpretation of federal laws that [C]ongress would have intended to have decided by
     a district judge rather than a bankruptcy judge.'" *Enron Corp. v. J.P. Morgan Sec., Inc.* (In re Enron Corp.), 388
     B.R. 131, 136 (S.D.N.Y. 2008) (alteration in original) (emphasis omitted) (quoting *In re Texaco Inc.*, 84 B.R.
     911, 921 (S.D.N.Y. 1988)).

[21]    The funds or securities in "customer" accounts at BLMIS are not an asset of BLMIS, but at all times belong to
     the customer only.  *See Newbro v. Freed*, 409 F. Supp. 2d 386, 396 (S.D.N.Y. 2006), *aff'd*, No. 06-1722-CV,

*(cont'd)*

Elsewhere, the Trustee claims to be "authorized to bring this action under SIPA §§ 78fff(b) and 78fff-2(c)(3)." (Am. Compl. ¶ 39.) But neither appears to reach the issue of standing to bring the unprecedented RICO claim at the center of the Action. The first simply speaks to the liquidation proceedings of the affected broker-dealer being conducted, to the extent consistent with SIPA, as if chapter 7 of title 11 applied; the latter speaks only to the power of the Trustee to seek recovery of "transfers" out of the BLMIS estate, not to the right to assert stratospheric damage claims under RICO.

Even elsewhere, the Trustee asserts standing to bring "these claims" under SIPA § 78fff-1 (*id.* ¶ 67), a provision which insofar as it addresses the Trustee's powers, expressly limits them to those of a bankruptcy trustee in a liquidation proceeding and thus falls arguably well short of conferring the unprecedented standing the Trustee arrogates to himself here. Still elsewhere, the Trustee alleges that the misconduct charged in the RICO claims has resulted in injury to the "BLMIS estate" for which he presumably may seek redress. (*Id.* ¶¶ 425, 432.) Elsewhere still, he asserts that the $19.6 billion are losses in "*investor* deposits" for which he presumably also may seek redress. (*Id.* ¶ 8 (emphasis added).)

Given the Trustee's diffuse assertions of standing, a court will necessarily have to determine if any of the provisions of SIPA on which the Trustee relies confers standing to press the exorbitant claims asserted in the Action, whether these can survive the general principle that the Trustee may not sue third parties on behalf of the estate's creditors, and indeed whether the Trustee may sue at all as a representative of the BLMIS estate given the central role Madoff played in the misconduct at issue. *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (citing *Caplin v. Marine Midland Grace Trust Co. of N.Y.,* 406 U.S. 416, 428-34

_____
*(cont'd from previous page)*
  2007 WL 642941 (2d Cir. Feb. 27, 2007).

(1972)).[22]  All of these are threshold matters of non-bankruptcy federal law that must be answered to determine if and on what basis the Trustee may assert the ambitious claims he has brought here.

## 2. The substantial and material question whether the Trustee has standing to sue as assignee

The Trustee may likely argue that he is entitled, based on an expansive assignment theory, to pursue against third parties RICO and tort claims far in excess of any customer net equity claims that SIPC may have paid or advanced.  Indeed, the Trustee alludes, without any specificity, to "multiple, express assignments of certain claims of the applicable accountholders." (Am. Compl. ¶ 67(h).)  But to sue for almost $60 billion is beyond the scope of any alleged assignments he may have received in exchange for SIPC payments or advances to customers. *See SIPC v. BDO Seidman LLP*, 49 F. Supp. 2d 644, 654 n.7 (S.D.N.Y. 1999), *aff'd in part, modified in part*, 245 F.3d 174 (2d Cir. 2001); *In re Park S. Sec., LLC*, 326 B.R. 505, 515 (assignment claims allowed against the estate only, not against third parties).[23]

In short, in this context as well, an Article III Court will have to determine under federal non-bankruptcy law if SIPA permits the Trustee to sue third parties (and, even if so, whether for almost $60 billion) on the basis of the assignments by creditors/customers of the type to which the Trustee alludes in his Amended Complaint.  *See BDO Seidman*, 49 F. Supp. 2d at 654 n.7.

---

[22]  Like a bankruptcy trustee under title 11, the Trustee may be barred from suing on behalf of the BLMIS estate itself, 15 U.S.C. § 78fff-1(a), by the *Wagoner* doctrine, named after the cited *Wagoner* case and the *in pari delicto* principles it embodies, because BLMIS was complicit (indeed, principally responsible for) the very harms at issue.  When "a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000).  Whether the Trustee may circumvent *Wagoner* on these facts is itself a question under non-bankruptcy federal law that commands withdrawal of the reference.

[23]  *See also Giddens v. D.H. Blair & Co.* (In re A.R. Baron & Co.), 280 B.R. 794, 805 (Bankr. S.D.N.Y. 2002) (no standing for trustee to assert claims against third parties for unjust enrichment, aiding and abetting breach of fiduciary duties, and conspiracy to price fix); *In re MV Sec., Inc.*, 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985) (SIPA is not a vehicle for the litigation of claims of federal securities fraud).

### 3. The substantial and material question whether the Trustee has standing as subrogee/bailee

The Trustee may well assert standing as subrogee (Am. Compl. ¶67(i)) or as bailee (*id.* ¶67(g)) of customer property, bases for standing that have bedeviled even the Supreme Court[24] and are further cast into doubt by the ambiguous precedential status of the scathingly divided opinion in *Redington v. Touche Ross & Co.,* 592 F.2d 617 (2d. Cir. 1978), *rev'd on other grounds,* 442 U.S. 560 (1979), that sustained a SIPA trustee's standing to sue third parties as a "bailee" of customer property, but was later reversed in other respects by the Supreme Court.

For starters, "subrogation" would typically require a subrogee to have advanced or paid money in order to be subrogated, but only to that extent, to the rights of the payee. SIPA for example, expressly recognizes subrogation "[*t*]*o the extent* moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers." 15 U.S.C. § 78fff-3(a) (emphasis added); *see also Mishkin v. Peat, Marwick, Mitchell & Co.,* 744 F. Supp. 531, 556 (S.D.N.Y. 1990) (under § 78fff-3(a), "[i]n return for advances made to customers," SIPC becomes subrogated to the net equity claims the customer has against the bankrupt broker-dealer, not third parties). Here as well, therefore, an Article III Court will have to resolve the substantial question under SIPA whether subrogation offers the Trustee standing to bring claims in the *billions* against third parties—claims that arguably are beyond the express limitations that SIPA places on standing by subrogation.

Finally, the Trustee may likely assert standing to sue third parties under a "bailee" theory, which proceeds under the fiction that customers (the "bailors") left property with BLMIS as

---

[24] In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), the Supreme Court held that the SIPC did not have standing to sue third parties who through stock manipulation had disabled two broker-dealers for money damages under RICO, despite the SIPC's claim of standing as subrogee to the rights of certain of the failed broker/dealers' customers. In rejecting that claim of standing, Justice Souter, writing for the majority, noted that "SIPC's theory of subrogation is fraught with unanswered questions." *Id.* at 270.

bailee and therefore the Trustee, in place of BLMIS, may sue to recover *that property* if it was improperly dissipated to others. *See Redington*, 592 F.2d at 624-25. Even under *Redington* however, a SIPA trustee may arguably claim against third-parties as bailee only "[t]o the extent that customers have claims that have not been satisfied either by [the debtor] in liquidation or by SIPC." *Redington*, 592 F.2d at 625. UniCredit would argue that this significant limitation to "bailment standing" itself deprives the Trustee of standing to assert the RICO claim at the core of the Action, even if *Redington* remained good law in light of the tensions discussed below.

More generally, even the viability of the "bailment standing" theory under *Redington* may be a hotly debated issue of non-bankruptcy federal law here. *Redington* involved an attempt under Section 17 of the Securities Exchange Act by SIPC and the SIPA trustee to recover from a failed broker's accountants (in the name of the broker's customers) damages allegedly caused by the accountants' failure to discover fraudulent entries in the firm's books. The Supreme Court reversed *Redington*'s principal conclusion that Section 17(a) of the Exchange Act created a private right of action, but did not reach the Circuit Court's subsidiary approval of a SIPA trustee's standing as bailee to assert against third parties the very claims reversed by the Supreme Court, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 567 n.9 (1979)—an issue that was as contentiously debated in the Circuit Court as the private right of action ruling (on which the Supreme Court sided with Judge Mulligan, dissenting in all matters below).[25] The Second Circuit recognized that the Supreme Court's reversal was jurisdictional, *see Redington v. Touche Ross & Co.*, 612 F.2d 68, 70 (2d Cir. 1979), arguably leaving the issue of a SIPA trustee's right

---

[25] Indeed, even the debatable standing accepted in *Redington* extended only to claims against third parties, such as the broker's accountants, who had acted as service providers to the failed broker-dealer itself. Here, the Trustee asserts RICO and common law claims against a much broader and distant universe of service providers (or, as in UniCredit's case, indirect owners of service providers) to entities that invested, often indirectly, with the failed broker-dealer.

to sue third parties as bailee without controlling precedent in this Circuit, despite the original ruling in *Redington*.[26]

Since *Redington*, the notion of a SIPA trustee's standing as bailee has continued to challenge courts in this Circuit. In *Mishkin*, for example, Judge Pollack did not feel himself bound by *Redington* and concluded that neither subrogation nor bailment provided a basis for a SIPA trustee "to bring fraud claims against third parties on behalf of customers." 744 F. Supp. at 558. In *BDO Seidman*, Judge Preska agreed that Judge Pollack's decision in *Mishkin* (and implicitly Judge Mulligan's dissent in *Redington*, on which Judge Pollack relied) was "more faithful to the letter and purpose of" SIPA than *Redington*, but dismissed on other grounds. *See BDO Seidman*, 49 F. Supp. 2d at 653. On appeal, Judge (now Justice) Sotomayor provided no endorsement to *Redington*, and instead observed that "[e]ven if we were justified in revisiting the *Redington* decision . . . we need not do so in this case," as Judge Preska's ruling was affirmed on the alternative grounds. *SIPC v. BDO Seidman, LLP*, 222 F.3d 63, 69 (2d Cir. 2000) (Sotomayor, J.). In short, whether the Trustee may avail himself here of a "bailment" fiction to claim standing in suits against remote third parties, and even if so to what extent, will no doubt be a hotly contested and possibly dispositive issue under non-bankruptcy federal law and, in and of itself, compels the withdrawal of the reference.

\*          \*          \*

In sum, whether the Trustee has power—*i.e.*, standing—to bring the unbounded claims he asserts in the Kohn Action is a question that necessarily involves important, complex, and dispositive issues of non-bankruptcy federal law on which courts have expressed conflicting

---

[26]     On remand, the same Second Circuit panel that originally had ruled 2-1 in favor of SIPC and the SIPA Trustee, unanimously affirmed the dismissal of the complaint, concluding that there existed no basis for federal

*(cont'd)*

views. Indeed, the issue has constitutional dimensions in the federal courts. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992) (standing questions may impact judicial power under Article III of the U.S. Constitution to hear a case or controversy). The plain text of 28 U.S.C. § 157(d) requires that such standing determinations be made by an Article III Court.[27]

## B. The Trustee's RICO Claims Will Require Substantial and Material Interpretation of Non-Bankruptcy Federal Law

The Kohn Action is a breathtaking and unprecedented application of RICO. (Am. Compl. ¶¶ 413-33.) UniCredit would submit that substantial and material interpretation of RICO is required, and that withdrawal of the reference is therefore mandatory. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529(LMM) 2006 WL 337667, at *2-3 (S.D.N.Y. Feb. 10, 2006) (withdrawal of the reference mandatory where RICO claims not necessarily of first impression, but would "require substantial and material consideration and significant interpretation"); *In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 8 n.4 (S.D.N.Y. 2005). UniCredit may bring to the Court's attention, no doubt over the Trustee's contrary views, instances in which withdrawal was ordered in significantly less complex RICO claims than those appearing in the 153-page Amended Complaint and 95-page RICO Case Statement describing an alleged RICO enterprise involving (i) more than 50 named Defendants and 100 "Jane and John Doe" Defendants (Am. Compl. ¶¶ 69-127); (ii) 24 "Non-Defendant Bad Actors" (*id.* ¶¶ 128-52); and (iii) more than 8,000 purported predicate acts (*id.* ¶ 6). *See Cent. Ill. Sav. & Loan Ass'n v. Rittenberg Co.* (In re IQ Telecomms., Inc.), 70 B.R. 742, 745 (N.D. Ill. 1987) (withdrawal

_____

(cont'd from previous page)

    jurisdiction under the Bankruptcy Act or SIPA to entertain the trustee's suit against the accountants. *Redington,* 612 F.2d at 73.

[27]  It is no answer to say that SIPA is a "species" of "bankruptcy law" and therefore the existence of complex or important issues thereunder does not meet the mandatory withdrawal standards of § 157(d). It is not: SIPA is expressly an amendment to the Securities Exchange Act of 1934, not the Bankruptcy Code. *See* 15 U.S.C. §

*(cont'd)*

ordered where RICO count of complaint consisted of 76 pages and alleged that 29 individuals and entities violated RICO by engaging in mail fraud, wire fraud, and 139 specific instances of bankruptcy fraud demonstrated that RICO would be a substantial part of the allegations against the defendants).

Moreover, whether the Trustee satisfied the structural elements of a RICO claim will also be contested at the threshold of, and throughout, the Action. This, alone or in combination with consideration of other non-bankruptcy federal law, such as the effects on the Trustee's RICO claim of the RICO Amendment to the PSLRA and of SLUSA (all discussed below), more than support mandatory withdrawal. *See, e.g.*, *Burger King Corp. v. B-K of Kan., Inc.*, 64 B.R. 728, 731 (D. Kan. 1986) (combination of other federal law with RICO claims mandated withdrawal).

## 1. The Trustee's RICO claims will require substantial and material consideration of whether RICO may be applied extraterritorially

UniCredit contends that the Trustee's RICO claims require significant interpretation of the presumption against extraterritoriality under *Morrison*. Indeed, UniCredit will bring to the Court's attention that the Second Circuit, relying on the Supreme Court's decision in *Morrison*, recently held that RICO has no extraterritorial application in private lawsuits. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, No. 07-4553-cv, 2010 WL 4968691, at *1 (2d Cir. Dec. 8, 2010) (to be published in F.3d) (finding RICO does not apply to actions that "primarily involve[] foreign actors and foreign acts"); *see also Cedeno v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010) (applying same to RICO "claims that are essentially extraterritorial in focus"). The application of these principles to determine if the Action "primarily involves foreign actors

---

78bbb; *see also Redington*, 612 F.2d at 70 (recognizing that SIPA is a part of the federal securities laws and applying principles germane to such laws to interpret the scope of SIPA).

and foreign acts" will no doubt be critical and hotly debated. *See Norex*, 2010 WL 4968691, at *1.

For example, forty-nine of the fifty-seven RICO Defendants—including UniCredit and its affiliates—are foreigners. (*See* Am. Compl. ¶¶ 68-126.) Moreover, the Action focuses on conduct abroad, by actors subject to foreign laws and foreign regulatory constraints. The gist of the Action is that the alleged RICO enterprise was intended to solicit funds from investors in Eastern and Central Europe to "feed" the Madoff Ponzi scheme (s*ee, e.g.*, Am. Compl. ¶¶ 238, 252-54, 277), purportedly through Cayman Islands and Bermuda funds managed by European entities and individuals. (*See, e.g.*, *id.* ¶¶ 260-61, 290-92, 296-300, 321-23, 324-26.) Not surprisingly, virtually all the charged conduct took place abroad. (*See, e.g.*, *id.* ¶¶ 22, 156, 157, 207, 261, 266-267, 309.) Indeed, the Trustee tellingly describes Italy as the "base of operations" of Kohn's "Illegal Scheme." (*See id.* ¶ 156.) By contrast, UniCredit would argue, the Defendants' alleged domestic activities consist of comparatively few meetings and wire transfers. (*See, e.g.*, *id.* ¶¶ 6, 28, 43, 255, 211-218.)

Thus, whether the Kohn Action may be said to involve "primarily . . . foreign actors and foreign acts" or "claims that are essentially extraterritorial in focus" will require substantial and material interpretation of new Second Circuit RICO and Supreme Court jurisprudence. In other words, whether the presumption against extraterritorial application of U.S. laws bars the RICO claims here will be one of the critical issues of federal non-bankruptcy law that a court must address and that may dispose of this $ 60 billion claim entirely. Withdrawal is mandatory for that reason alone.

## 2. The Trustee's RICO claims will require substantial and material consideration whether they are barred by the Private Securities Litigation Reform Act amendment of RICO

In short, the PSLRA's RICO Amendment barred reliance on allegations of "securities fraud" to assert RICO claims. *See* Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified as amendments to 15 U.S.C. §§ 77-78 and 18 U.S.C. § 1964). Thus, the RICO Amendment provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." 18 U.S.C. § 1964(c). UniCredit would argue that the Action effectively, although not expressly, asserts RICO claims based on allegations of securities fraud, and therefore is barred by the RICO Amendment.

To be sure, the Trustee has artfully characterized the predicate acts to include "wire fraud," "mail fraud" or "money laundering." However, UniCredit would bring to the Court's attention that the RICO Amendment precludes RICO actions based on conduct "actionable" as securities fraud, regardless whether a plaintiff explicitly pleads securities fraud, as the Trustee has avoided doing here. *See Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 593 (S.D.N.Y. 2005). UniCredit would further argue that at the crux of the RICO claims is a purported "Illegal Scheme" expressly alleged to have "fed" investor money into the Madoff Ponzi scheme pursuant to supposedly misleading disclosures in the sale of fund investments, and thus involves conduct arguably "actionable" as securities fraud and therefore barred as foundation for a RICO claim, irrespective of the Trustee's careful choice of nomenclature. (*See* Am. Compl. ¶¶ 1, 3, 4, 12-13, 16-18, 20-21, 43, 50, 63 239, 262, 290, 321-32, 324-25, 360-61, 365, 422, 424.)

Courts in this Circuit have expressed differing views on this question. *Compare Cohain v. Klimley*, No. 08 Civ. 5047(PGG), 2010 WL 3701362, at *7-10 (S.D.N.Y. Sept. 20, 2010) (RICO Amendment "bars all RICO claims based on *any conduct* that could be actionable under

the securities laws, including conduct that constitutes aiding and abetting securities fraud"), *and Thomas H. Lee Equity Fund V, L.P., v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 281 (S.D.N.Y. 2009) (Lynch, D.J.), *with OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 368-70 (S.D.N.Y. 2005) (holding RICO claims based on purported aiding and abetting securities violation were not barred by RICO Amendment because they were not actionable by the same plaintiff who brought RICO claim).

UniCredit would also seek to show that Circuit Courts elsewhere have held that RICO claims based on conduct that is "an integral part of" or "sustains" a Ponzi scheme, as the Trustee alleges here, is "actionable" as securities fraud and thus may not support RICO claims, even if the plaintiff elects other legal rubrics to describe the challenged conduct, as the Trustee has carefully done in this case. *See Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) (RICO Amendment bars RICO actions based on conduct that was "an integral part of [a] securities fraud Ponzi scheme"); *Rechberger v. Hurlburt*, No. 07-CV-00061A(F), 2010 U.S. Dist. LEXIS 17815, at *30 (W.D.N.Y. Jan. 12, 2010) (RICO Amendment bars RICO actions based on "conduct that sustains a securities fraud Ponzi scheme"). Again, no doubt the Trustee would argue to the contrary.[28] Accordingly, whether the Trustee alleges conduct "actionable" as securities fraud, and thus unavailable to support a RICO claim, will be a key issue under the securities laws required to be addressed in resolving the Action. Mandatory withdrawal is compelled on that ground alone.

---

[28] Although the Kohn Action as drafted appears to sound in securities fraud, there is understandably no allegation that any of the relevant securities (issued abroad to foreigners only) were sold in the United States to any United States customers. Thus, the sale of such securities in foreign jurisdictions, arguably in compliance with foreign law, further complicates the conflicts of law questions, may cast doubt over the Trustee's allegations that the defendants' conduct is "actionable" under U.S. law, and creates additional issues regarding the extraterritorial application of RICO.

3. **The Trustee's RICO claims will require substantial and material interpretation to determine if they are barred by proximate causation principles**

UniCredit would argue that RICO claims for damages may be pursued only by someone "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Thus, it is said that "a plaintiff must plead . . . 'causation of the injury by the defendant's violation.'" *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003) (citation omitted). UniCredit would thus point out that to satisfy this "causation" requirement, a plaintiff must allege that "the defendant's injurious conduct [was] both the factual and the proximate cause of the injury alleged." *Id.* (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). In other words, did the "alleged violation le[a]d directly to the plaintiff's injuries"? *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). UniCredit, and possibly other Defendants as well, would argue that the Action is a case in which the "link . . . is 'too remote,' 'purely contingent,' or 'indirec[t]', [and thus] is insufficient." *Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983, 989 (2010) (second alteration in original) (citation omitted).

To be sure, the Trustee would point to his recitation of the statutory language that as "a direct and proximate result of the [charged] violations . . . the BLMIS estate has been injured in its business and property." (Am. Compl. ¶¶ 425, 432.) But a formulaic and conclusory recitation is arguably insufficient. And any other basis on which the Trustee relies to charge Defendants with causing harm is simply beyond accepted limits of "proximate" causation, or so UniCredit would argue. That is, the Trustee contends that Defendants "caused" the totality of all the harm suffered here by providing "fresh capital" to BLMIS. (Am. Compl. ¶ 8.) This not only strains logic, but takes no account of the fact that Madoff or BLMIS (which are carefully omitted as participants in the Trustee's alleged illegal enterprise) were the singular wrongdoers in the

Ponzi scheme at issue—as if the now-universal appellation "Madoff Ponzi Scheme" were a misnomer.

In that connection, UniCredit would observe that at least one court has rejected RICO claims against third parties, such as UniCredit, for lack of proximate causation in similar circumstances involving a primary bad actor, such as Madoff or BLMIS. *Lerner*, 318 F.3d at 123; *see also Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-71 (1992) (rejecting SIPC's attempt to assert RICO claim on behalf of customers of a failed broker against those who had allegedly "caused" the failure through stock manipulation because injury was too attenuated as it arose from the firm's "intervening insolvency"). In other words, whether Defendants proximately caused RICO injuries by providing services to those who invested in a Ponzi scheme created and controlled by the genuine miscreant, will require significant interpretation of RICO in the face of the intervening misconduct attributable to Madoff and BLMIS. This alone involves a significant interpretation of RICO supporting mandatory withdrawal.

> **4.     The Trustee's RICO claims will require substantial and material consideration of RICO's basic structural elements**

What constitutes (i) an association-in-fact enterprise, (ii) operation and management of that purported enterprise, and (iii) engaging in specific racketeering acts will be at issue in the Action. The Trustee has asserted that a wide-ranging and disparate group of individuals and corporate entities, arguably lacking any plausible common purpose or symbiotic operations, should be liable under RICO. Whether this may support a viable RICO claim will require significantly more than a routine application of RICO law.

> (a)     Enterprise or Association-in-fact

The Trustee asserts that a broad universe of defendants were members of an "association-in-fact" enterprise he labeled the "Medici Enterprise." (Am. Compl. ¶ 5.) A RICO "enterprise"

is "any individual, partnership, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1961(4), established "for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Thus, "an association-in-fact enterprise must have at least three structural features: [1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009). Each of these features under non-bankruptcy federal law will be the subject of significant legal disagreements before the Action is resolved.

According to the Trustee, the alleged "common purpose" of the purported RICO enterprise was to "exploit [Sonja Kohn's] privileged relationship with Madoff to feed over $9.1 billion of other people's money into his Ponzi scheme," and "to profit from the Ponzi scheme" by obtaining what he characterizes as secret kickbacks from Madoff. (Am. Compl. ¶¶ 1, 3, 5, 9.) Although the Trustee makes much of the supposed purpose animating Sonja Kohn's actions (*see, e.g.*, *id.* ¶¶ 229, 238-39, 244, 267, 279, 283), the only alleged purpose of UniCredit's alleged involvement (as well as the involvement of many other reputable and regulated financial institutions) was a purported desire to generate fees (*see* Am. Compl. ¶¶ 19, 22) that are implausibly miniscule compared to the potential exposure to a supposedly "known" Ponzi scheme, and could more rationally and sensibly be explained as ordinary and regular payment for the provision of financial services to investors. Whether these allegations sufficiently support a "common purpose" necessary to establish an association-in-fact enterprise will require "'significant interpretation, as opposed to simple application,'" of RICO and thus mandates withdrawal of the reference. *See Mishkin,* 220 B.R. at 795 (citation omitted).

Similarly, what constitutes a working "relationship" sufficient to establish an association-in-fact enterprise will be sorely tested here. UniCredit is principally alleged to have indirectly owned entities that pursued investment and business opportunities within the framework of their own legitimate purposes (RICO Case Statement at 91 annexed as Ex. 8) and to have maintained business relationships with a number of defendants (*see, e.g.*, Am. Compl. ¶¶ 252, 339). The Trustee further alleges that several named individual Defendants at various times held positions at several of the different corporate Defendants. (*See, e.g.*, *id.* ¶¶ 280, 344, Ex. A.) Whether these arguably unobjectionable relationships establish an association-in-fact enterprise because the Trustee draws from them nefarious implications will also require "'significant interpretation, as opposed to simple application,'" of RICO and thus also mandates withdrawal of the reference. *Mishkin*, 220 B.R. at 795 (citation omitted).

> (b)  Operation and Management

A plaintiff must plead that a defendant "participate[d]" in the conduct of a RICO enterprise by either (i) taking part in "directing the enterprise's affairs," or (ii) playing a role in its "operation or management." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). UniCredit would call to the Court's attention, however, that "the simple taking of directions and performance of tasks that are 'necessary or helpful to'" a RICO enterprise does not amount to "'directing the enterprise's affairs'" or to playing a role in its "'operation or management.'" *United States v. Viola*, 35 F.3d 37, 40-41 (2d Cir. 1994) (citation omitted). But the Trustee alleges that the purported RICO enterprise was "conceived" by and "largely directed" by Kohn who "masterminded" the "vast illegal scheme to exploit her privileged relationship with Madoff" (Am. Compl. ¶¶ 1, 5) and that UniCredit only assisted by "feeding" funds into BLMIS or supposedly concealing aspects of Kohn's Illegal Scheme (*see, e.g.*, *id.* ¶¶ 338-44). However, allegations that a defendant concealed or had knowledge of fraud in the course of its own business operations,

(which is, at bottom, the central charge made here as to UniCredit and others) are insufficient to meet the RICO "operation or management" test. *See Rosner v. Bank of China*, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007); *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346-47 (S.D.N.Y. 1998); *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A)*, 924 F. Supp. 449, 465-66 (S.D.N.Y. 1996). The Trustee is likely to have different views in that regard.

Thus, whether there are any allegations sufficient to support UniCredit's required participation in the "management" or "operation" of this variegated and longstanding "enterprise"—allegedly with roots back in 1985 (Am. Compl. ¶¶ 162, 416), *decades* before UniCredit is even alleged to have come on the scene (*id*. ¶ 339)—will separately require "significant interpretation, as opposed to simple application," of RICO and thus also mandates withdrawal of the reference.

<div align="center">(c)    <u>Predicate Acts</u></div>

To support his charge of "racketeering activity," 18 U.S.C. § 1961(1), the Trustee asserts that UniCredit and all other Defendants committed acts (i) of mail fraud, bank fraud, and wire fraud in violation of 18 U.S.C. §§ 1341-1343; (ii) of money laundering in violation of 18 U.S.C. §§ 1956 and 1957; and (iii) that allegedly violated the Travel Act. (Am. Compl. ¶ 423.) But "to state a cause of action against any particular defendant, a complaint under [18 U.S.C.] § 1962(c) must charge *each named defendant* with engaging in specific racketeering acts, constituting a pattern within the meaning of the statute, committed *by that defendant* in the course of conducting the affairs of the enterprise." *Zito v. Leasecomm Corp.*, No. 02 Civ.8074(GEL), 2003 WL 22251352, at *10 (S.D.N.Y. Sept. 30, 2003) (emphasis added). Moreover, "'in order to state a civil RICO claim grounded in fraud, [a] plaintiff must meet [the] heightened pleading standard'" of Rule 9(b) of the Federal Rules of Civil Procedure. *MLSMK Invs. Co. v. JP Morgan Chase & Co.*, No. 09 Civ. 4049, 2010 WL 2925403, at *3 (S.D.N.Y. July 15, 2010) (to be

published in F. Supp. 2d) (alterations in original) (citation omitted). Accordingly, "'[i]n addition to alleging the particular details of a fraud, . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" *Id.* (alterations in original) (citing *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004)). UniCredit will argue that the Trustee cannot meet these standards here.

The Trustee, to be sure, asserts that UniCredit's purpose was to earn fees, an otherwise unsurprising corporate ambition. (Am. Compl. ¶¶ 19, 22.) The Trustee also alleges vaguely that in the wake of an unremarkable corporate acquisition, UniCredit undertook "to examine its newly acquired additional [indirect] involvement with BLMIS [through the acquired entity]" and in doing so "identified significant [unspecified] defects in the relationships between and among" certain other Defendants. (*Id.* ¶ 341.) The Trustee alleges that then "UniCredit undertook to further the [purported RICO enterprise] by disguising Primeo Fund's 100% investment in BLMIS" by means of "directing Primeo Fund to close its direct account with BLMIS and invest in BLMIS indirectly through Herald Fund and other Medici Enterprise Feeder Funds." (*Id.* ¶¶ 342-43.) Not much else is provided, beyond the Trustee's tendentious commentary, to describe what UniCredit would say are no more than ordinary corporate transactions or restructurings.

Whether any of these allegations, or all of them collectively, support a charge that UniCredit engaged in the myriad of indictable offenses described in the Action, or even satisfy the heightened pleading requirements of Rule 9(b) requiring *facts* from which to draw a *strong inference* of culpable intent, will require substantial and material interpretation of Rule 9(b) and RICO law.[29]

---

[29] Moreover, whether the Trustee has adequately alleged as to UniCredit the "continuity" necessary to support the required "pattern" of "racketeering activity" may be a hotly debated issue. A "pattern" requires a showing of "continuity plus relationship." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985). In *H.J. Inc. v.*

*(cont'd)*

## C. Determining Whether the Trustee's Common Law Claims Are Barred by SLUSA Will Require Substantial and Material Interpretation of Non-Bankruptcy Federal Law

The Trustee's claims for unjust enrichment, conversion, and money had and received (*see* Am. Compl. ¶¶ 573-84), as well as the Trustee's New York state statutory claims for alleged "fraudulent transfer" (*see* Am. Compl. ¶¶ 536-72), also raise significant issues under non-bankruptcy federal law because they may all be barred under SLUSA. No doubt, the Trustee will argue otherwise.

SLUSA bars (i) claims under "state law," (ii) asserted in a "covered class action," (iii) that allege fraud or omissions in connection with the purchase or sale of "covered securities" or manipulation or deception in connection with such purchases or sales. 15 U.S.C. § 77p(b).[30] There is little doubt that whether each of SLUSA's statutory requirements applies to the Kohn Action is the type of determination under the federal securities laws consigned to an Article III Court under 28 U.S.C. § 157(d).

For starters, as noted above, the Action is based substantially on foreign activities by foreign actors, but does not identify what law applies to its common law claims. (*See* Am. Compl. ¶¶ 573-84.) On the facts here, UniCredit would contend that the governing law is foreign. It is further unclear what foreign law should control and indeed if only one (or more)

---

*Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), the Supreme Court noted that this "continuity" requirement could be "open-ended" or "closed-ended." *Id.* at 241-42. Given the collapse of BLMIS in December of 2008, the "open ended continuity" to provide an influx of "fresh capital" to BLMIS (Am. Compl. ¶¶ 1, 8, 424) is arguably implausible, despite the Trustee's strained attempts to manufacture it (*see* Am. Compl. ¶¶ 385-392). "Close-ended continuity," unlike the open-ended type, requires participation in the "enterprise" for a substantial period of time, which this Circuit has held is unlikely to be shorter than two years, longer than the alleged involvement by UniCredit here. *Spool v. World Child Intn'l. Adoption Agency*, 520 F.3d 178, 184-85 (2d Cir. 2008) (citation omitted); Am. Compl. ¶ 30 & p. 105 (UniCredit's involvement starting in or about 2007).

[30] SLUSA, like SIPA, is part of the federal securities laws and must therefore be interpreted under principles applicable to such (non-bankruptcy) laws. *See Redington*, 612 F.2d at 70. In enacting SLUSA, Congress

foreign legal regimes should apply to test the conduct of different Defendants.[31]  If the governing

law is foreign, then the Court will have to consider whether foreign law claims are "state law"

claims under SLUSA.  This too is a significant question of non-bankruptcy federal law on which

courts have expressed differing views.  *Compare LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 238

(S.D.N.Y. 2007) (Congressional intent should not be evaded by suing under foreign laws; Swiss

law held to trigger SLUSA), *with LaSala v. Bordier et Cie*, 519 F.3d 121, 139 (3d Cir. 2008)

(contra).

      Next, is the Kohn Action a "covered class action" under SLUSA, despite its not being

labeled a class action at all?  SLUSA extends the "covered class action" definition to any action

in which recoveries are sought on behalf of more than 50 persons or where the plaintiff is suing

in a representative capacity.  *See* 15 U.S.C. § 77p(f)(2)(A).  The Trustee asserts explicitly that

BLMIS's *customers* were injured as a result of the conduct challenged under "state law."  (*See*

Am. Compl. ¶¶ 575, 577 (unjust enrichment recoveries are "customer" property to be distributed

to them); ¶ 570 (BLMIS customers have an interest in the recoveries for "conversion"); ¶¶ 583-

84 (recoveries for "money had and received" claims is "customer" property to be distributed to

them)).  These customers number in the *thousands*.  It is thus an important issue under federal

non-bankruptcy law whether the Trustee may evade SLUSA's limitations on these facts and

assert what is effectively a class action arguably grounded in "state law" on behalf of thousands

of customers of BLMIS.  Again, it is likely that the Trustee would contend that his action is not a

_____

*(cont'd from previous page)*

    intended that all actions alleging deception in the purchase or sale of securities meet the procedural safeguards
    of the PSLRA (codified at 15 U.S.C. §§77z-1, 78u-4).

[31]    Even the question of what should be the applicable choice-of-law rule supports removal.  Should federal or
    forum-based conflict of law rules apply?  This appears to turn in this Circuit on whether the action implicates
    "significant federal policy," *Bianco v. Erkins* (In re Gaston & Snow), 243 F.3d 599, 607 (2d Cir. 2001), a
    question that itself raises significant issues of non-bankruptcy federal law here.

"covered class action,"[32] and that UniCredit and other Defendants may take the opposite position. This also is an issue under the federal securities laws that should be answered by the District Court.

Finally, whether the Action implicates "covered securities" under 15 U.S.C. § 77r(b)—*i.e.* the listed stocks and options Madoff falsely professed to buy and sell—is also a question as to which UniCredit and others may well take positions contrary to the Trustee's, and on which courts in the Madoff context have not ruled consistently, even in this District and almost contemporaneously. *Compare Newman v. Family Mgmt. Corp.*, No. 08 Civ. 11215(LBS), 2010 WL 4118083, at *9-10 (S.D.N.Y. Oct. 20, 2010) (to be published in F. Supp. 2d) (Madoff-related claim precluded by SLUSA), *with Anwar v. Fairfield Greenwich Ltd.,* 728 F. Supp. 2d 372, 397-400 (S.D.N.Y. 2010) (contra). This too is a determination that must be remitted to the District Court.

In sum, the resolution of all these matters is plainly a concern of non-bankruptcy federal law: What law governs the "common law" claims that are raised in the Kohn Action? If that law is foreign, are these then "state law" claims under SLUSA? Do these claims involve the purchase and sale of "covered securities"? Is the Kohn Action effectively a "covered class action" triggering SLUSA? All these matters require consideration by an Article III Court and therefore support mandatory withdrawal.

---

[32] If the Trustee were to seek relief under the "entity" exception to the "covered class action" definition, 15 U.S.C. § 78bb(f)(5)(D); *see also RGH Liquidating Trust v. Deloitte & Touche LLP*, 71 A.D.3d 198, 209-15, 891 N.Y.S.2d 324, 333-37 (N.Y. App. Div. 2009), it would still be arguable whether claims he raises possibly on behalf of thousands of "customers" allow that exception to apply here.

## II.
## THE KOHN ACTION SATISFIES THE STANDARDS FOR PERMISSIVE
## WITHDRAWAL OF THE REFERENCE

Permissive withdrawal is equally supported by ample "cause" here. Many of the facts

that underlie the Securities Litigations pending in the District Court also underlie the Trustee's

claims in the Kohn Action. Litigation in separate courts would be inefficient, more costly than

necessary, and increase the risk of inconsistent determinations and duplicative recoveries. Only

the District Court is jurisdictionally able here to bring these proceedings under one judicial

"roof." Withdrawal of the reference can be accomplished without delay and does not implicate

any concerns about forum shopping.

### A.    The Kohn Action Principally Involves Non-Core Claims

The first relevant inquiry in this context, as noted, is whether the claims to be withdrawn

are core or non-core, although that determination is not itself dispositive. *Orion Pictures Corp. v.*

*Showtime Networks, Inc.* (In re Orion Pictures Corp.), 4 F.3d 1095, 1101 (2d Cir. 1993); *In re*

*Burger Boys*, 94 F.3d at 762 (withdrawal appropriate even where issue was "plainly a core

bankruptcy matter").

A "core proceeding is one which 'invokes a substantive right provided by title 11, or [one

which], by its nature, could arise only in the context of a bankruptcy case.'" *Hassett v. BancOhio*

*Nat'l Bank* (In re CIS Corp.), 172 B.R. 748, 755 (S.D.N.Y. 1994) (quoting *Wood v. Wood* (In re

Wood), 825 F.2d 90, 97 (5th Cir. 1987) (first alteration in original)). "By contrast, non-core

proceedings 'involve disputes over rights that . . . have little or no relation to the Bankruptcy

Code, do not arise under the federal bankruptcy law and would exist in the absence of a

bankruptcy case.'" *Complete Mgmt., Inc. v. Arthur Andersen, LLP* (In re Complete Mgmt., Inc.),

No. 02 Civ. 1736, 2002 WL 31163878, at *1 (S.D.N.Y. Sept. 27, 2002) (alteration in original)

(quoting *Wechsler v. Squadron, Ellenoff, Plesent, & Sheinfeld LLP*, 201 B.R. 635, 639 (S.D.N.Y.

1996)); *Gulf States Exploration Co. v. Manville forest Prods. Corp.* (In re Manville Forest Prods. Corp.), 896 F.2d 1384, 1389 (2d Cir. 1990). That recoveries may "benefit [the bankrupt estate] alone is insufficient to ground core jurisdiction." *In re CIS Corp.*, 172 B.R. at 757.

Not surprisingly, the pivotal claims here are the RICO claims, which are plainly "non-core." *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529(LMM) 2006 WL 337667, at *4. That is, RICO claims "'are not unique to a bankruptcy proceeding, . . . do not directly affect a core bankruptcy function, nor are they matters [with] which the bankruptcy court would ordinarily be expected to have greater familiarity or expertise.'" *Id.* (second alteration in original) (quoting *In re Adelphia Commc'ns Corp.*, No. 02 Civ. 8495, 2003 U.S. Dist. LEXIS 9349, at *5-6 (S.D.N.Y. June 4, 2003)).

Similarly, the Trustee's state-law/foreign-law claims—for money had and received, unjust enrichment, and conversion—are all non-core claims. *Appel v. Mainstar Oil Co.* (In re B & L Oil Co.), 46 B.R. 731, 736 (Bankr. D. Colo. 1985) (money had and received); *In re CIS Corp.*, 172 B.R. at 755-57, 761-64 (same); *In re WorldCom, Inc.*, No. 07 Civ. 9590(DC), 2008 WL 2441062, at *4 (S.D.N.Y. June 18, 2008) (same); *In re Worldcom, Inc.*, 2008 WL 2441062 at *4-7 (unjust enrichment; granting motion to withdraw the reference on permissive basis); *In re CIS Corp.*, 172 B.R. at 758 (conversion); *Meadowlands Commc'ns, Inc. v. Banker's Trust Co.*, 79 B.R. 198, 199-200 (D.N.J. 1987) (same); *Reda, Inc. v. Harris Trust & Savings Bank* (In re Reda, Inc.), 60 B.R. 178, 181-83 (Bankr. N.D. Ill. 1986) (same); *Van Dorn Retail Mgmt., Inc. v. Sovran Bank/DC Nat'l, Inc*., No. 90-2974 (JHG), 1991 WL 222061, at *8 n.2 (D.D.C. Oct. 9, 1991) (same).

The non-core nature of the principal claims in the Action heavily favors permissive withdrawal of *all* claims, including any core claims. *See In re Burger Boys,* 94 F.3d at 762; *LTV*

*Steel Co. v. City of Buffalo* (In re Chateaugay Corp.), No. 00 Civ. 9429(SHS), 2002 WL 484950, at *7-8 (S.D.N.Y. Mar. 29, 2002). Indeed, even the presumptively core avoidance claims asserted in the Action incorporate the Trustee's RICO Case Statement. (*See* Am. Compl. (incorporating by reference the Trustee's RICO Case Statement in all claims; Ex. 8 at 41-58). And, in any event, 28 U.S.C. § 157(d) permits removal of both non-core and core claims.

**B.      Efficiency and Uniformity Favors Withdrawal of the Reference**

Because bankruptcy courts are not empowered to issue final orders on the RICO and common law claims brought against UniCredit, and because the District Court will ultimately review both factual findings and legal conclusions respecting claims against UniCredit *de novo*, unnecessary costs can be avoided, and judicial resources conserved, by resolving the claims in a single proceeding in the District Court. *In re Orion Pictures Corp.*, 4 F.3d at 1101.

Overlapping facts in the Action and the Securities Litigations against UniCredit favor withdrawal on the basis of uniformity in judicial administration. *See Pan Am Corp. v. Delta Air Lines, Inc.* (In re Pan Am Corp.), 163 B.R. 41, 42, 44 (S.D.N.Y. 1993) (withdrawing even core bankruptcy claims where two related actions "aris[ing] from the same factual context as the Adversary Proceeding" were pending before the District Court); *see also* Ex. A (describing overlapping allegations). Indeed, courts in this District have often ordered withdrawal on grounds of uniformity in administration where related actions involving similar facts and issues were also being litigated in the District Court. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 337667, at *5; *In re Chateaugay Corp.*, 2002 WL 484950, at *8-9; *In*

*re Complete Mgmt., Inc.*, 2002 WL 31163878, at \*3-4 & n.5; *Mishkin*, 220 B.R. at 800.[33]

Accordingly, withdrawal of the reference is appropriate here to protect against the possibility of inconsistent findings and ruling on similar issues, and to protect the Defendants from possible duplicative recoveries, which by necessity must arise in any additional proceedings, such as the Securities Litigations, against many of the same defendants, where the Action is professed to seek all-encompassing recompense for the harm caused by the Madoff fraud.

## C.    Neither Delay nor Forum Shopping Is Threatened by Withdrawing the Reference

Delay is not an issue.  The operative pleading in the Action was filed in December and UniCredit and the Trustee have stipulated (and the Bankruptcy Court has ordered) that the time to move or answer be extended to June 7, 2011.  (Kohn Action, Dkt. No. 3.)  Likewise, in the related Securities Litigations, the District Court has ordered that motions directed at the pleadings be briefed through October of 2011.  No discovery has occurred in either the Action of the Securities Litigations.

Finally, withdrawal does not implicate any suspect forum-shopping objectives—"finding a jurisdiction with more favorable law, and geographical convenience."  *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 337667, at \*5.  Simply put, the governing law is and will be the law of this Circuit, although UniCredit submits it should be determined and applied here by the District Court.

---

[33]    *Picard v. Cohmad Sec. Corp.*, No. 09 Civ. 7655(US), 2009 WL 4729927 (S.D.N.Y. Dec. 10, 2009), is distinguishable.  There, only four individual defendants were common to both actions, and the district court determined that, given the minimal overlap, withdrawal would neither "substantially diminish the duplication of discovery in the two courts" nor reduce "the theoretical risk of inconsistent results"  *Id.* at \*2.  By contrast, here there is substantial overlap of Defendants and allegations between the cases.  *See* Ex. A (showing overlapping allegations).

## CONCLUSION

For the reasons above, UniCredit respectfully requests that this Court enter an order withdrawing the reference of this case to the Bankruptcy Court.

Dated: New York, New York
February 17, 2011

Respectfully submitted,

OF COUNSEL

Richard L. Brusca
Edward J. Meehan
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7000

 /s/ Marco E. Schnabl
Marco E. Schnabl
   (Marco.Schnabl@Skadden.com
Susan L. Saltzstein
   (Susan.Saltzstein@Skadden.com
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

*Attorneys for Defendant*
*UniCredit S.p.A.*

# EXHIBIT A

**EXHIBIT A:**

**Selected Examples of Overlapping Allegations in the Kohn Action and the Securities Litigations**

| Selected Examples of Overlapping Allegations | | | | |
|---|---|---|---|---|
| **Allegation** | **Kohn Action** | **Primeo Complaint** | **Herald Complaint** | **Thema Complaint** |
| **Bank Austria and/or its parent, UniCredit S.p.A., controlled Bank Medici and its activities.** | "Bank Medici had no banking infrastructure of its own. . . . [I]t was a *de facto* branch of Bank Austria operating under the 'Medici' name. All its accounts and portfolios were held and administered by Bank Austria, and Bank Medici had a revolving door with Bank Austria through which Bank Austria personnel staffed Bank Medici, even when such individuals had no relevant professional experience in Bank Medici's purported 'fund of hedge funds' business." ¶ 23.<br><br>"Bank Austria not only tolerated the activity of its rogue branch, it encouraged, facilitated, and profited from it." Ex. 8 at 25; *see also id.* at 30-31 (describing further similar allegations against UniCredit). | "Bank Austria, which is owned by UniCredit, at all relevant times held the remaining 25% [of Bank Medici]. Medici, at all relevant times, controlled the Primeo Funds, through UniCredit's subsidiary Pioneer, and caused them to become feeder funds for Madoff's Ponzi scheme." ¶ 18. | "UniCredit controlled Medici through Bank Austria, its wholly-owned subsidiary. Through its 25% ownership of Medici, UniCredit had the power to control, and did control, the general business affairs of Medici and the Herald Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of Medici and the Funds which resulted in primary liability. UniCredit knew, or was reckless in not knowing, that the Funds' investments were non-existent, as alleged herein." ¶ 357. | "Defendant UniCredit SpA ('UniCredit'), an international banking organization based in Italy, owned 25% of Medici through its subsidiary, Bank Austria Creditanstalt. Since its acquisition of Bank Austria Creditanstalt in 2006, UniCredit has been a control person of Medici because it had the power to direct or cause the direction of Medici's management and policy." ¶ 27. |

| | Selected Examples of Overlapping Allegations | | | |
|---|---|---|---|---|
| **Allegation** | **Kohn Action** | **Primeo Complaint** | **Herald Complaint** | **Thema Complaint** |
| **Defendants engaged in deceptive and fraudulent acts related to investment activities.** | "Defendants' twenty-year pattern of racketeering activity is comprised of repeated and related predicate acts of: . . . (iii) wire fraud . . . ; (iv) financial institution fraud . . . ; (v) mail fraud . . . ." ¶ 7.<br><br>"UniCredit sought to obfuscate Primeo Fund's investment structure by electing to invest in BLMIS indirectly through [Feeder Funds]. . . . These correspondences furthered the Illegal Scheme by facilitating the conspiracy among [certain Defendants] to disguise UniCredit and Pioneer's . . . investment in BLMIS. These correspondences constitute wire fraud. . . ." Ex. 8 at 64-65; s*ee also id.* at 50-59 (alleging fraud-based predicate acts). | "Defendants subject to this Count recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and the Class. The purpose and effect of said false and misleading statements was, among other things, to induce Plaintiffs and the Class to purchase shares in the Primeo Funds." ¶ 339. | "Each defendant participated in the fraud complained of herein and/or was aware of, or recklessly disregarded numerous red flags showing that their statements concerning the value and/or nature of Lead Plaintiff's and the Class' investment were false or misleading." ¶ 46.<br><br>"All Defendants knew or were reckless for not knowing that their representations about their investment activities were false and misleading, and that their concealment of the true nature and status of the investments would materially mislead putative Class members." ¶ 71. | "Defendants perpetrated their scheme by misrepresenting and omitting material information about, among other things, (i) the true operation and value of Thema and its financial results, business, and prospects; (ii) the fact that Madoff and [BLMIS] were acting as Thema's *de facto* investment manager and sub-custodian; and (iii) the fact that Madoff and [BLMIS] held all Thema's assets. Defendants' fraudulent and reckless misstatements and omission caused Plaintiff and the other members of the Class to invest in Thema." ¶¶ 424-25. |

| Selected Examples of Overlapping Allegations | | | |
|---|---|---|---|
| **Allegation** | **Kohn Action** | **Primeo Complaint** | **Herald Complaint** | **Thema Complaint** |
| **Defendants conspired to conceal the existence and/or scope of Feeder Funds' BLMIS investments.** | "Members of the Medici Enterprise conspired to conceal the fact that each Medici Enterprise Feeder Fund was 100% invested with BLMIS. To bolster this deception, certain of the Medici Enterprise Feeder Funds invested in each other." ¶ 18.<br><br>"Kohn, Bank Austria, Randa, Scheithauer, Zapotocky, Kretschmer, Nograsek, and Kadrnoska conspired to market Primeo Fund as a diversified 'fund of funds' while concealing the fact that Madoff and BLMIS would act as both investment manager and *de facto* custodian. In furtherance of the Illegal Scheme, Bank Austria generated misleading Primeo Marketing materials and distributed them to other members of the Medici Enterprise." ¶ 260. | "Indeed, as of December 31, 2007, 97.5% of the Primeo Select Fund and 54.76% of the Primeo Executive Fund were invested in the Herald USA Funds, another Madoff feeder fund – the name of which, itself, denotes a U.S.-based investment. The remainder of the Primeo Executive Fund was invested in the Alpha Prime Equity Hedge Fund, also a Madoff feeder fund. Thus, the Funds were 100% invested with Madoff in New York, supposedly in U.S. securities." ¶ 150. | "Starting in the mid-1990's and continuing through 2008, Kohn organized and marketed a number of feeder funds, including the Herald Funds. Lead Plaintiff and other members of the Class invested in one of two feeder funds, Herald (USA) and Herald (LUX). Both funds were established by Kohn through Bank Medici to invest with Madoff. Each was nothing more than a pass-through vehicle that gave one-hundred percent of its assets to Madoff. Additionally, the fact that investors' money was being transferred to Madoff was rarely, if ever, disclosed." ¶ 4. | "More fundamentally, Defendants actively concealed their wrongful conduct because they knew but never advised Plaintiff and the Class that Thema was using Madoff/[BLMIS] as the *de facto* investment manager and sub-custodian. Instead, Defendants knowingly misrepresented in prospectuses and annual reports that Medici was the investment manager and that HSBC Trust was the custodian. Thus, as opposed to many investors who invested *directly* with Madoff/[BLMIS], Plaintiff and the Class never knew that Madoff/[BLMIS] was managing their money . . . ." ¶ 438. |

| Selected Examples of Overlapping Allegations | | | | |
|---|---|---|---|---|
| Allegation | Kohn Action | Primeo Complaint | Herald Complaint | Thema Complaint |
| **The fees and other compensation allegedly received by certain Defendants were improper.** | "Kohn, Eurovaleur, Bank Medici and its branches, HAM, and at least thirty other members of the Medici Enterprise Feeder Funds around the world and all took a cut of their fake returns. For over fifteen years, the Medici Enterprise Feeder Funds generated hundreds of millions of dollars in 'retrocession fees,' 'management fees,' 'distribution fees,' and other illicit proceeds of the Illegal Scheme for Kohn, Bank Medici, Bank Austria, BA Worldwide, UniCredit, HAM, and other [Defendants]." ¶ 19.<br><br>"[Defendants] received . . . stolen Customer Property . . . secret corrupt kickbacks from Madoff, unearned fees, compensation, bonuses, and other proceeds of the Illegal Scheme." Ex. 8 at 92. | "[T]he feeder funds were making hundreds of millions of dollars in fees, and . . . those enormous fees served as an incentive for the feeder funds to intentionally ignore the blatant signs of Madoff's wrongdoing . . . ." ¶ 3.<br><br>"Bank Medici ('Medici'), and, specifically, Sonja Kohn ('Kohn'), . . . referred clients to the Funds, and received substantial fees for doing so." ¶ 6. | "Defendants benefited financially . . . . In particular, Defendants received compensation, fees, commissions, kickbacks, and other payments based on (i) the Herald Funds' net asset value; and (ii) Lead Plaintiff's and Class members' subscriptions to the Herald Funds." ¶ 348. | "While failing to perform adequate due diligence or supervision, Defendants pocketed millions of dollars in fees for serving as Thema's directors, auditors, advisors, lawyers, custodians, administrators, and investment managers." ¶ 12.<br><br>"[Defendants] did little if any work to 'earn' their fees, which, for the most part, were calculated as a percentage of Thema's annual NAV. Since Madoff did not charge any advisory fees . . . , Defendants were paid much higher fees by using Madoff as an undisclosed investment advisor and custodian than if they had chosen someone legitimate . . . ." ¶ 272. |

| Selected Examples of Overlapping Allegations | | | | |
|---|---|---|---|---|
| **Allegation** | **Kohn Action** | **Primeo Complaint** | **Herald Complaint** | **Thema Complaint** |
| **Defendants were unjustly enriched and should return the fees they received.** | "All Defendants have been unjustly enriched by their participation in the Illegal Scheme.  They have wrongfully and unconscionably benefited from the receipt of:  (i) stolen Customer Property from BLMIS, for which they did not, in good faith, provide fair value; and (ii) other proceeds of the Illegal Scheme." ¶ 574; *see generally* ¶¶ 573-77 (alleging unjust enrichment). | "As a result of the defendants['] . . . breaches of their fiduciary duties, Plaintiffs and the Class have been forced to pay excessive investment, performance, and management fees in exchange for investment services that were never provided."  ¶ 192.<br><br>"The defendants . . . were enriched at the expense of Plaintiffs and the Class, including by taking Plaintiffs' and the Class' monies in the form of commissions and other fees for their purported management of Plaintiffs' and the Class' investment . . . ."  ¶ 218; *see generally* ¶¶ 214-20, 314-18 (alleging unjust enrichment). | "[The court should] declar[e] that Defendants have been unjustly enriched and impos[e] a constructive trust to recoup Defendants' fees, unjust benefits, and other assets for the benefits of Lead Plaintiff and the Class."  *Ad damnum* (d); *see generally* ¶¶ 238-44, 314-18 (alleging unjust enrichment). | "All Defendants were unjustly enriched at the expense of Plaintiff and the Class . . . by taking Plaintiff's and the Class's monies and earning fees and benefits from such monies . . . ." ¶ 587; *see generally* ¶¶ 585-89 (alleging unjust enrichment). |

| Selected Examples of Overlapping Allegations | | | | |
|---|---|---|---|---|
| **Allegation** | **Kohn Action** | **Primeo Complaint** | **Herald Complaint** | **Thema Complaint** |
| **Sonja Kohn played an instrumental role in causing the Feeder Funds' investments in Madoff and thereby enabling and expanding Madoff's Ponzi scheme.** | "For more than twenty years, Kohn masterminded a vast illegal scheme (the 'Illegal Scheme') to exploit her privileged relationship with Madoff to feed over $9.1 billion of other people's money into his Ponzi scheme." ¶ 1.<br><br>"The Illegal Scheme fed, perpetuated, and profited from the Ponzi scheme and grew alongside it as the Ponzi scheme grew." ¶ 4. | "Sonja Kohn, at all relevant times, owned 75% of Medici. . . . Medici . . . controlled the Primeo Funds, . . . and caused them to become feeder funds for Madoff's Ponzi scheme. . . . Medici's funds have lost approximately $3.5 billion in Madoff's Ponzi scheme." ¶ 18.<br><br>"Kohn was aware, but did not share with Plaintiffs or members of the Class, that defendants were purchasing shares in feeder funds for Madoff's Ponzi scheme. Kohn was a control person of the Primeo Funds." ¶ 19.<br><br>"Kohn controlled the Primeo Funds . . . and caused them to become feeder funds for Madoff's Ponzi scheme." ¶ 442. | "In this instance, Madoff used Sonja Kohn to funnel investors' money from Europe to his headquarters in New York." ¶ 4. | "Kohn caused Thema's assets to be funneled to Madoff and [BLMIS] in New York City. Kohn caused more than $3 billion of Medici Funds' assets to be funneled to Madoff and [BLMIS]." ¶ 69.<br><br>"Accordingly, Kohn actively participated in devising a plan to funnel Thema's assets to Madoff and [BLMIS] in her role as director, chairperson, and 75% owner of Thema's investment manager, Medici." ¶ 164.<br><br>"Kohn was a central figure in causing Thema to invest with Madoff . . . ." ¶ 462. |

| Selected Examples of Overlapping Allegations | | | | |
|---|---|---|---|---|
| **Allegation** | **Kohn Action** | **Primeo Complaint** | **Herald Complaint** | **Thema Complaint** |
| **Sonja Kohn and other Defendants caused losses resulting from the Ponzi scheme.** | "No Ponzi scheme can survive without a constant influx of fresh capital, and the Illegal Scheme provided a flood of cash for Madoff. The total lost in the Ponzi scheme is approximately $19.6 billion in net investor deposits, and without Kohn's Illegal Scheme, the Ponzi scheme could not have continued for as long as it did. The Trustee seeks to recover the $19.6 billion in damages to the business and property of the BLMIS estate caused by the Illegal Scheme, to be trebled under RICO." ¶ 8.<br><br>"The Illegal Scheme facilitated the Ponzi scheme's survival for over twenty years as it simultaneously depleted BLMIS's assets and enriched Kohn and other members of the Medici Enterprise." ¶ 59. | "Defendants' failure to see these red flags ultimately caused Plaintiffs' and Class members' loss." ¶ 11.<br><br>"Accordingly, the Medici Defendants conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff. As set forth in detail herein, the due diligence conducted in New York did not meet the adequate standard of care, and, thus, (i) constituted conduct that was more than merely preparatory to the wrongdoing; and (ii) directly caused Plaintiffs' losses." ¶ 159.<br><br>"The damages suffered by Plaintiffs and the Class were a direct and foreseeable result, proximately caused by the defendants named in this Count's breaches of their fiduciary duties." ¶ 193; *see also* ¶¶ 173-74. | "Accordingly, Defendants conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff. As set forth in detail herein, the due diligence conducted in New York did not meet the adequate standard of care, and, thus, (i) constituted conduct that was more than merely preparatory to the wrongdoing; and (ii) directly caused Lead Plaintiff's losses." ¶ 185. | "Kohn's activities in New York City constituted conduct that was more than merely preparatory to the wrongdoing and directly caused the losses." ¶ 73. |

| Selected Examples of Overlapping Allegations | | | |
|---|---|---|---|
| **Allegation** | **Kohn Action** | **Primeo Complaint** | **Herald Complaint** | **Thema Complaint** |


| Selected Examples of Overlapping Allegations | | | |
|---|---|---|---|
| **Allegation** | **Kohn Action** | **Primeo Complaint** | **Herald Complaint** | **Thema Complaint** |
| **Sonja Kohn received significant fees and other kickbacks for her role in the Ponzi scheme.** | "Madoff's payments to Kohn were not for services rendered. Rather, they were kickbacks for Kohn's solicitation of investors' money to fuel and sustain the Ponzi scheme." ¶ 14.<br><br>"Over the course of the Illegal Scheme, Madoff and Kohn's agreement allowed her to siphon at least $62 million in stolen Customer Property directly from the BLMIS estate. Kohn, her family, and members of the Medici Enterprise owned or controlled by Kohn, received hundreds of millions of dollars in stolen Customer Property and other proceeds of the Illegal Scheme." ¶ 167; *see generally* ¶¶ 165-170 (alleging Madoff paid Kohn for bringing accounts to BLMIS). | "Kohn was paid more than $40 million in kickbacks for funneling $3.5 billion in investments to Madoff from funds she controlled." ¶ 157; *see generally* ¶¶ 155-57 (alleging Madoff paid Kohn for bringing accounts to BLMIS). | "Madoff made tens of millions of dollars in payments to Kohn." ¶ 5.<br><br>"[Kohn] received approximately $40 million dollars in kickbacks from Madoff for steering billions of dollars from investors to his multi-billion dollar fraud." ¶ 29. | "Kohn received secret quarterly payments from Madoff or his affiliates." ¶ 71.<br><br>"[T]hese payments, purportedly to reimburse Kohn for research, amounted to over $32 million over the years." ¶ 72.<br><br>"Kohn . . . received millions of dollars of secret kickbacks for helping steal the Class's money." ¶ 164. |